# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

BACARDI & COMPANY LIMITED; BACARDI USA, INC.,

*Plaintiffs-Appellants*,

v.

UNITED STATES PATENT & TRADEMARK OFFICE; COKE MORGAN STEWART, IN HER OFFICIAL CAPACITY AS THE ACTING DIRECTOR OF THE UNITED STATES PATENT & TRADEMARK OFFICE,

*Defendants-Appellees*,

and

EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS,

*Intervenor/Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Virginia

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
## BACARDI & COMPANY LIMITED AND BACARDI USA, INC.

Michael C. Lynch
Damon W. Suden
Edwin Adlam Herod
KELLEY DRYE & WARREN, LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800

David M. Zionts
Alexander J. Cave
Yevgeniy Pilipovskiy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiffs-Appellants*
*Bacardi & Company Limited and Bacardi USA, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1355__          Caption: __Bacardi & Co. Ltd., et al. v. USPTO, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Bacardi & Company Limited__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       Bacardi Limited is the ultimate parent corporation of Bacardi & Company Limited.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:


5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ David M. Zions                    Date:      4/14/2025

Counsel for: Bacardi & Company Limited

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1355_      Caption: _Bacardi & Co. Ltd., et al. v. USPTO, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Bacardi U.S.A. Inc._
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     Bacardi Limited is the ultimate parent corporation of Bacardi U.S.A. Inc.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?              ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Zionts                        Date:      4/14/2025

Counsel for: Bacardi U.S.A. Inc.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................ viii

INTRODUCTION ....................................................................1

JURISDICTIONAL STATEMENT ...........................................6

STATUTORY AND REGULATORY AUTHORITIES ...........6

STATEMENT OF THE ISSUES..............................................6

STATEMENT OF THE CASE .................................................7

    A.    The Trademark Registration Renewal Process Under
the Lanham Act.........................................................7

    B.    Cubaexport's Unsuccessful Attempt to Renew
Registration of the HAVANA CLUB Mark.............9

    C.    Cubaexport's Petition to the Director ...................14

    D.    The Director Renews Cubaexport's Registration More
than Ten Years After Its Application Was Filed.................15

    E.    The District Court's Rejection of Bacardi's APA
Challenge.................................................................17

SUMMARY OF THE ARGUMENT .......................................19

STANDARD OF REVIEW.....................................................25

ARGUMENT .........................................................................26

I.    The Director Exceeded Her Authority in Renewing
Cubaexport's Registration Because Cubaexport Failed to
Timely Pay the Renewal Fee or Timely Cure the Deficiency........26

A.    The Director Lacked Authority to Retroactively Declare Cubaexport's Unsuccessful and Unlawful Payment Attempt to Be a Timely and Complete Payment...................28

     1.    Cubaexport Did Not Pay and Could Not Have Lawfully Paid the Required Renewal Application Fee Within the Statutorily Prescribed Period............28

     2.    The Director Lacked Authority to Declare Cubaexport's Unsuccessful Payment Attempt Complete and Timely Based on the 2016 Specific License.........................34

B.    Cubaexport Failed to Cure the Payment Deficiency in the Time Prescribed and the Director Lacked Authority to Accept Cubaexport's Cure Attempt Nearly a Decade Late..........................41

     1.    Both PTO Regulations and the July 2006 Office Action Gave Cubaexport Only Until January 2007 to Cure Its Payment Deficiency. .........................41

     2.    The Director Lacked Authority to Accept Cubaexport's Attempt to Cure the Deficiency Nine Years After the Deadline Had Already Passed.........................47

II.    The Director's Decision Was Not Adequately Explained or Justified and thus Arbitrary and Capricious................................55

  A.    The Decision Does Not Adequately Explain Why the 2016 OFAC License Justified Granting the Petition. ..........56

  B.    The Director Did Not Adequately Explain Why Cubaexport Was Entitled to Cure its Deficiency Almost a Decade Late........................61

  C.    The Decision Was Not Based on a "Substantial Compliance" Rationale and May Not Be Upheld on that Basis........................65

CONCLUSION ..................................................................... 66

STATEMENT REGARDING ORAL ARGUMENT ................................ 68

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMIT............................................................................... 69

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Abramski v. United States,*
573 U.S. 169 (2014) ...................................................... 29, 43

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) ........................................ 62

*Bacardi & Co. v. USPTO,*
104 F.4th 527 (4th Cir. 2024) .............................. 5, 9, 10, 17

*Bittner v. United States,*
598 U.S. 85 (2023) .............................................................. 34

*Calcutt v. FDIC,*
598 U.S. 623 (2023) ............................................................ 66

*Checkers Drive-In Rests., Inc. v. Comm'r of Pats. &*
*Trademarks,*
51 F.3d 1078 (D.C. Cir. 1995) ............................................ 7

*In re Cleary Packaging, LLC,*
36 F.4th 509 (4th Cir. 2022) ............................................. 51

*Dean Witter Reynolds, Inc. v. Fernandez,*
741 F.2d 355 (11th Cir. 1984) .......................................... 39

*The Emily*, 22 U.S. (9 Wheat.) 381 (1824) ........................ 30

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ..................................................... 57, 64

*Friends of Buckingham v. State Air Pollution Control Bd.,*
947 F.3d 68 (4th Cir. 2020) ............................................... 58

*Inova Alexandria Hosp. v. Shalala,*
244 F.3d 342 (4th Cir. 2001) ....................................... 56, 66

*Jimenez-Cedillo v. Sessions,*
885 F.3d 292 (4th Cir. 2018) ............................................ 64

*Kisor v. Wilkie*,
588 U.S. 558 (2019) .............................................................. 45

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ...................................................... *passim*

*Lovo v. Miller*,
107 F.4th 199 (4th Cir. 2024) ............................................. 45

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ........................................ 58, 61

*Mestanek v. Jaddou*,
93 F.4th 164 (4th Cir. 2024) .............................................. 26

*Michigan v. EPA*,
576 U.S. 743 (2015) ............................................................ 56

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*,
463 U.S. 29 (1983) ......................................................... *passim*

*Nken v. Holder*,
585 F.3d 818 (4th Cir. 2009) .............................................. 66

*Ohio v. EPA*,
603 U.S. 279 (2024) ................................................ 55, 58, 61

*In re Pennington Seed, Inc.*,
466 F.3d 1053 (Fed. Cir. 2006) ....................... 30, 43, 52, 63

*Pharm. Coal. for Patient Access v. United States*,
126 F.4th 947 (4th Cir. 2025) ............................................ 26

*Salomon-Guillen v. Garland*,
123 F.4th 709 (4th Cir. 2024) ............................................ 44

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................ 58

*Sierra Club v. W. Va. Dep't of Envt'l Prot.*,
64 F.4th 487 (4th Cir. 2023) .............................................. 59

*United States v. Castleman,*
　572 U.S. 157 (2014) ............................................................ 30

*United States v. Nixon,*
　130 F.4th 420 (4th Cir. 2025) ........................................... 41

*USPTO v. Booking.com BV,*
　591 U.S. 549 (2020) ............................................................ 7

*Wyoming Outdoor Council v. U.S. Forest Serv.,*
　165 F.3d 43 (D.C. Cir. 1999) ............................................. 44

**Statutes**

5 U.S.C. § 551 *et seq.* ........................................................... 5

5 U.S.C. § 706 ..................................................... 6, 17, 26, 28, 55

15 U.S.C. § 1058 ................................................................... 8

15 U.S.C. § 1059 ......................................................... *passim*

The Lanham Act, ch. 540, 60 Stat. 427 (1946) ..................... 7

Omnibus Consolidated and Emergency Supplemental
　Appropriations Act, Pub. L. No. 105-277, 112 Stat. 2681
　(1998) ............................................................................... 10

Trademark Law Revision Act, Pub. L. No. 100-667, 102 Stat.
　3935 (1988) ...................................................................... 50

**Regulations**

31 C.F.R. § 501.801 ............................................................. 11

31 C.F.R. § 515.203 ........................................................ 31, 36

31 C.F.R. § 515.501 ............................................................. 11

31 C.F.R. § 515.502 ........................................................ 38, 59

31 C.F.R. § 515.527 (1998) ................................................. 10

37 C.F.R. § 2.6.................................................................28, 40

37 C.F.R. § 2.146..................................9, 16, 23, 51, 60

37 C.F.R. § 2.165......................................................51

37 C.F.R. § 2.166.......................................................8

37 C.F.R. § 2.183..............................................8, 28, 40

37 C.F.R. § 2.184.............................................*passim*

37 C.F.R. § 2.185......................................................44

37 C.F.R. § 2.186................................................9, 51

64 Fed. Reg. 48,900 (Sept. 8, 1999)..................22, 44

**Administrative Decisions**

*In re Carnicon Dev. Co.*,
    34 U.S.P.Q.2d 1541 (Comm'r Pat. & Trademarks 1992) .............53, 65

*In re P.T. Polymindo Permata*,
    109 U.S.P.Q.2d 1256 (Dir. USPTO 2013) ....................................53, 65

*In re Slack*,
    54 U.S.P.Q.2d 1504 (Comm'r Pat. & Trademarks 2000) ..................64

*Soc'y of Tribologists & Lubrication Eng'rs*,
    Serial No. 75/445,159 (Dir. USPTO Feb. 1, 2023) ............................54

**Other Authorities**

H.R. Rep. No. 100-1028 (1988).................................................50

H.R. Rep. No. 105-194 (1997).....................................................42

*Pay*, American Heritage Dictionary of the English Language
    (5th ed. 2022).........................................................................29

*Payment*, Black's Law Dictionary (12th ed. 2024) ...........................29, 32

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 405.01
(2002) ................................................................................ 31

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 405.02(a)
(2002) ................................................................................ 31

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 405.06 ............... 31, 60

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 1606.13(a)
(2002) .................................................................... 22, 44, 63

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 1606.13(a) ........ *passim*

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 1604.19 .................. 40

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
Trademark Manual of Examining Procedure § 1707 .................. 52, 65

# INTRODUCTION

This case concerns a trademark registration that should have been removed from the trademark register long ago—and would have been, but for an unprecedented and unlawful action by the Director of the Patent & Trademark Office ("PTO," "USPTO," or "Office"). Flouting the Lanham Act, its implementing regulations, and longstanding PTO policies, the Director excused a registrant's failure to pay a statutorily required fee by a statutorily required deadline, and granted renewal nearly a decade after that failure. This inexplicable decision was, perhaps unsurprisingly, not explained in any adequate or rational way. The district court's decision upholding this unlawful and arbitrary and capricious agency action should be reversed.

Under the Lanham Act, trademark registrations are not permanent. Instead, to avoid "deadwood" accumulating on the register, Congress has required (among other things) that registrants apply every ten years to renew their registrations. "[P]ayment" of a prescribed fee is a statutory requirement of such an application. 15 U.S.C. § 1059(a). And while Congress recognized that registrants should have a reasonable opportunity to correct problems with their applications, its forbearance

1

was not unlimited: Congress demanded that deficiencies be cured "within the time prescribed after notification of the deficiency." *Id.* The PTO, for its part, has prescribed six months to respond to a deficiency notice. *See* 37 C.F.R. § 2.184(b)(1). And it has long understood that regulation to mean that the response must actually cure the deficiency, or else the registration will expire.

This case is Exhibit A for why these requirements exist. Its origins date back to the Cuban Revolution, when the Castro regime violently stole the Arechabala family's business producing Havana Club rum. In 1976, Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport") capitalized on the theft by registering the mark HAVANA CLUB in the United States. Due to the U.S. trade embargo on Cuba, Cubaexport has never been able to use that mark in U.S. commerce. And in 2006, its registration was set to expire if not timely renewed.

But Cubaexport could not complete the renewal requirements, because U.S. law and policy at the relevant time did not allow the Cuban government to benefit from its expropriation. Among other restrictions, the trade embargo prohibited Cubaexport from paying the statutory fee without a specific license from the U.S. Treasury Department's Office of

Foreign Assets Control ("OFAC"). Recognizing that barrier, Cubaexport told the PTO it had such a license, when in fact it did not. Instead, its *counsel* had a license to *accept* payment for legal services in a *different* proceeding. Initially, the gambit seemed to work: the PTO collected funds from the account Cubaexport had offered. But when PTO discovered the truth—that the proffered license did not authorize the payment—it notified Cubaexport that its application was deficient, the fee had "not been paid," and its unauthorized payment *attempt* would be "refunded."

Consistent with the Act's implementing regulations, the PTO gave Cubaexport six months to file a "complete response," including the fee payment if OFAC authorized it. But OFAC refused to authorize the payment, so the PTO notified Cubaexport that its registration would expire because "the required fee … has not been submitted."

That could, and should, have ended the matter. And Bacardi—the Arechabala family's successor-in-interest—should have been able to proceed with its own application to register its HAVANA CLUB mark, which remains blocked by Cubaexport's registration. But Cubaexport persisted, petitioning the PTO Director to accept its renewal application

despite its inability to meet the statutory requirements. Remarkably, the Director sat on that petition for almost ten years—nearly the entirety of the term for which Cubaexport had sought to renew its registration—leaving Bacardi's application in limbo all the while. Then, in rapid succession in January 2016, OFAC granted a license, Cubaexport supplemented its petition, and the Director granted the petition and accepted Cubaexport's renewal application. Cubaexport paid the renewal fee almost ten years late, the surcharge owed for late payments, and the fee for its next renewal (which by then had become due)—and thereby retained a registration it did not and legally could not timely renew, for a mark it cannot use.

To put it mildly, this saga does not reflect the scheme Congress designed. Faithful implementation of that scheme should have been straightforward: because Cubaexport did not (and could not, consistent with U.S. foreign policy at the time) timely pay the required renewal application fee, its application was deficient. And because Cubaexport did not (and could not) cure that deficiency within the six-month period prescribed by the PTO, Cubaexport's petition should have been denied,

and its registration should have expired and been removed from the register.

This Court held last year that Bacardi was entitled to challenge the Director's decision under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). *See Bacardi & Co. v. USPTO*, 104 F.4th 527 (4th Cir. 2024). But the district court erred on remand in seeing no problem with the Director's decision on the merits. Contrary to the district court's conclusion, the Director had no authority to declare timely and complete a fee "payment" that did not happen, and legally could not have happened, during the statutorily required period. Nor did the Director have authority to accept Cubaexport's attempt to cure its deficiency nearly nine years after the time for doing so had expired. Her decision to grant Cubaexport's petition was thus unlawful. And beyond that, the decision does not reflect the reasoned decisionmaking the APA demands. It rests on woefully underdeveloped rationales which do not explain why the Director reached her decision. It relies on a factual premise contradicted by evidence the Director did not address. And it departs from established PTO policy without acknowledgment or explanation.

The Director's decision was thus both contrary to law and arbitrary and capricious, and the APA requires that it be set aside. 5 U.S.C. § 706(2)(A), (C). The district court's decision should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Administrative Procedure Act. On March 5, 2025, the district court denied summary judgment to Plaintiffs, granted summary judgment to Defendants and Intervenor-Defendant, and entered final judgment. Plaintiffs timely appealed on April 2, 2025. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY AUTHORITIES

All pertinent statutory and regulatory authorities are reproduced in the Addendum to this brief.

## STATEMENT OF THE ISSUES

1. Whether the PTO Director exceeded her authority by granting Cubaexport's petition for review, accepting its trademark registration renewal application, and renewing its registration, where Cubaexport failed to pay the statutorily required renewal fee within the statutorily

prescribed period, or within the six-month period the PTO prescribed for correction of the deficiency.

2. Whether the Director's decision was arbitrary and capricious because it was inadequately explained and unjustified.

## STATEMENT OF THE CASE

### A. The Trademark Registration Renewal Process Under the Lanham Act

The Lanham Act, ch. 540, 60 Stat. 427 (1946) (codified as amended at 15 U.S.C. § 1051 *et seq.*), "establishes a system of federal trademark registration" that accords "valuable benefits" to registrants. *USPTO v. Booking.com BV*, 591 U.S. 549, 552 (2020). To ensure that these valuable benefits remain available to those seeking to use them, Congress has sought to keep the register free of "marks which are no longer in use," known as "deadwood." *Checkers Drive-In Rests., Inc. v. Comm'r of Pats. & Trademarks*, 51 F.3d 1078, 1085 (D.C. Cir. 1995). Consistent with that aim, the Act requires trademark owners to renew their registrations every ten years by submitting two required filings, and paying required fees, to the PTO.

The renewal process is spelled out in Sections 8 and 9 of the Act. Section 8 requires a registrant to file an affidavit identifying use of the

registered trademark in commerce (or excusable nonuse). 15 U.S.C. § 1058. Section 9 provides that, subject to compliance with Section 8, "each registration may be renewed for periods of 10 years … upon payment of the prescribed fee and the filing of a written application." *Id.* § 1059(a); *see* 37 C.F.R. § 2.183(b) ("A complete renewal application must include … [t]he fee required."). The application and payment must be submitted "within 1 year before the end" of the 10-year registration period, or "within a grace period of 6 months" after that. 15 U.S.C. § 1059(a). The Section 8 affidavit and Section 9 application may be submitted together as a "combined" filing. 37 C.F.R. § 2.166.

If a Section 9 filing is deficient—for example, because the required fee was not paid—"the deficiency may be corrected within the time prescribed after notification of the deficiency, upon payment of a surcharge prescribed therefor." 15 U.S.C. § 1059(a). The Act's implementing regulations fill in the details. They provide that "[i]f the renewal application is not acceptable"—that is, deficient—"the Office will issue a notice," known as an "Office action," "stating the reason(s) for refusal." 37 C.F.R. § 2.184(a). The registrant must "file a response to the refusal of renewal within six months" of the Office action. *Id.*

§ 2.184(b)(1). Citing this regulation, the PTO's Trademark Manual of Examining Procedure underscores that "[a]ny deficiency must be cured within the set period for response to the Office action, i.e., within six months of the issuance date of the action." U.S. Patent & Trademark Office, U.S. Dep't of Commerce, Trademark Manual of Examining Procedure § 1606.13(a) ("TMEP").[1] Following the response, if the PTO "maintains the refusal of the renewal application," the registrant has another six months to file "a petition to the Director to review the refusal." 37 C.F.R. § 2.186(b); *see id.* § 2.146.

## B. Cubaexport's Unsuccessful Attempt to Renew Registration of the HAVANA CLUB Mark

Prior to the Cuban Revolution, the Arechabala family "produced rum that it exported to the United States under the registered trademark HAVANA CLUB." *Bacardi*, 104 F.4th at 529. Castro's government "seized and expropriated Arechabala's assets without compensation" and assigned the HAVANA CLUB business to Cubaexport, "a company owned by the Cuban government." *Id.* After driving the Arechabala family into

---

[1] If the prior 10-year registration period expires *after* the six-month response period, the registrant has until "the expiration date of the registration" to respond. 37 C.F.R. § 2.184(b)(1); *accord* TMEP § 1606.13(a). That scenario is not presented here.

exile, Cubaexport waited for the family's last U.S. trademark registration to lapse in 1973 before it "registered the HAVANA CLUB trademark in the United States for itself" in 1976. *Id.*; *see* JA482-484.

The U.S. trade embargo on Cuba has long prohibited Cubaexport from using that mark in the United States—and, generally, from engaging in transactions in the United States. *See generally* Cuban Assets Control Regulations ("CACR"), 31 C.F.R. Part 515; *id.* § 515.201. But initially, the CACR included a "general license" authorizing transactions to renew trademark registrations, including fee payments. *Id.* § 515.527(a)(1), (b) (1998).

By late 2005, however, when Cubaexport sought to renew its registration before it expired on July 27, 2006, the law had changed. In 1998, Congress precluded reliance on the general license for any "transaction or payment … with respect to a mark … that is the same as or substantially similar to a mark … that was used in connection with a business or assets that were confiscated," absent consent of the owner or its bona fide successor. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 211(a), 112 Stat. 2681, 2681-88 (1998) ("Section 211"). Section 211 thus barred

Cubaexport from paying the fee necessary to renew its registration, unless it could obtain a "specific license" from OFAC authorizing that payment. *See* 31 C.F.R. §§ 501.801(b), 515.501.

Recognizing that obstacle, Cubaexport told the PTO that it had such a license when it submitted its combined Section 8/9 filing in December 2005. JA57. But that was not true. The license in question merely authorized its then-counsel, Ropes & Gray LLP, to "*receive payment for*" legal services in connection with a separate cancellation proceeding then pending in a federal district court. JA199 (emphasis added). Cubaexport nonetheless represented that this license authorized withdrawal of the renewal application fee from Ropes & Gray's PTO deposit account. JA57. And based on that representation, the PTO initially collected funds from that account. JA289.

The following April, though, OFAC notified Cubaexport's counsel and the PTO that the license did *not* authorize payment of the renewal fee. As OFAC explained, the license "cover[ed] only those transactions in connection with the pending District Court litigation," not transactions "external to" that litigation. JA200. Cubaexport applied the next day for a specific license to pay its renewal fee. JA196-198. Recognizing that it

had to file its complete renewal application by July 27, 2006, Cubaexport asked OFAC to issue a specific license "well before" that date. JA198. OFAC did not oblige.

On July 20, 2006, a PTO examiner issued an Office Action refusing Cubaexport's renewal application. JA289-291. Citing OFAC's letter, the examiner explained that the license on which Cubaexport had relied did "not authorize Ropes & Gray LLP to pay the renewal fee." JA289. "Therefore," the examiner concluded, "the required fee for the combined filing ha[d] not been paid," JA289, and would "be refunded since it was not properly authorized," JA291.

Consistent with the Act and its implementing regulations, *see supra* pp. 8-9, the Office Action prescribed a "RESPONSE TIME DEADLINE," directing that "[a] complete response must be received within 6 months from the mailing date of this Office action." JA289. And, noting Cubaexport's outstanding application to OFAC for a specific license, it explained how Cubaexport should respond by the deadline: "by notifying the USPTO whether the specific license application … has been granted or denied." JA289. The Office Action further directed that if the license was granted, "the fee or authorization to charge the fee" must accompany

the response, along with "a $100 deficiency surcharge."  JA289.  And it warned that if the specific license was denied, "the registration will be deemed cancelled/expired."  JA289.

The following week, OFAC, after consulting with various agencies including the Department of State, denied Cubaexport's request for a specific license as "inconsistent with U.S. policy" toward Cuba.  JA301. Cubaexport informed the PTO of the denial, but offered several arguments why, in its view, the PTO should accept the renewal "notwithstanding OFAC's decision not to grant Cubaexport a specific license."  JA293-300.

On August 3, 2006, the PTO examiner issued another Office Action maintaining the refusal.  This Office Action explained that "[b]ecause the specific license is necessary for authorizing payment of the required fee, and that license has been denied, the required fee for filing the Sections 8 & 9 Combined filing has not been submitted," and that "accordingly, the registration will be cancelled/expired."  JA314.  Noting that Cubaexport had offered "arguments in support of renewing the … registration," it advised Cubaexport that it had six months to petition the Director.  JA314.  The same day it issued this Office Action, the PTO

refunded the renewal fee it had previously collected from the Ropes & Gray deposit account. JA452. PTO records reflect the status of the attempted payment in 2005 as "REVERSED." JA452.

## C. Cubaexport's Petition to the Director

Cubaexport filed a petition for review with the Director in October 2006. JA315-316. It argued that the examiner had improperly allowed OFAC to "[d]ictate" the refusal decision and lacked authority to "[c]onstrue [t]he CACR," JA324, JA327, and for that reason erred in finding Cubaexport's application deficient.

The Director suspended action on the petition pending resolution of a lawsuit Cubaexport had filed challenging OFAC's denial of a specific license. JA466. More than five years later, in June 2012, Cubaexport informed the PTO that it had lost that lawsuit. JA491-492. Cubaexport argued, nevertheless, that the PTO could not remove its registration from the register, this time because *the agency* purportedly needed a license from OFAC to do so. JA494. That argument triggered a back-and-forth between OFAC and the PTO. At OFAC's request, the PTO provided a memorandum explaining that "if a §8 affidavit, §9 renewal, or combined §8/9 filing is not accompanied by the prescribed fees, the Director has no

discretion but to issue a refusal stating that the registration will be canceled and/or has expired." JA507. OFAC responded by confirming that the PTO did not need a license to undertake the "ministerial record-keeping function" of updating its records to reflect that Cubaexport's registration had "expired." JA510-511. The PTO took no further action for over three years.

### D. The Director Renews Cubaexport's Registration More than Ten Years After Its Application Was Filed

On January 11, 2016—more than a decade after Cubaexport filed its renewal application—OFAC reversed course and granted Cubaexport a specific license to "engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration ... , including those related to Cubaexport's submission filed with the USPTO on or about December 14, 2005, and the payment referenced therein." JA523. One day later, Cubaexport informed the PTO of this license and authorized the PTO to collect from a new deposit account—not the Ropes & Gray account from which it had attempted to pay years before—the required fees for the 2006 renewal, along with a deficiency surcharge for that renewal, JA519-523, and the fees for the 2016 renewal (which had by then become due), JA514-518.

The next day, the Director granted Cubaexport's nearly decade-old petition. JA524-527.[2] The Director's decision declared that "[t]he facts here support the invocation of supervisory authority to accept" Cubaexport's renewal application, JA526, and briefly stated two alternative rationales. The first, in its entirety, was this:

> Petitioner has provided an OFAC license that specifically authorizes petitioner's December 14, 2005 combined §8/9 filing and fee payment. Thus, the fee payment is effective as of December 14, 2005, and the combined §8/9 filing is considered complete and acceptable as of that date.

JA526.

The second was similarly skeletal. It asserted that "[n]on-payment or insufficient payment of the fee for a combined §8/9 filing is a deficiency that can be corrected, even after the statutory time period, as long as the correction occurs within the time prescribed after notification of the deficiency," and that Cubaexport had made such a correction by "fil[ing] a timely petition," "obtaining an OFAC license," "providing the license to the USPTO as a timely supplement to its petition," and "authorizing the

---

[2] The Commissioner for Trademarks issued the decision under a delegation of authority. 37 C.F.R. § 2.146(h). For simplicity, Bacardi refers to it as the Director's decision.

USPTO to charge any uncollected fees to its counsel's USPTO deposit account."  JA526.

On these grounds, the Director accepted payment of the renewal fee and declared that "[t]he petition is granted," "[t]he combined §8/9 filing is accepted," "[t]he registration is renewed," and "the USPTO's records will be updated accordingly."  JA527.  PTO records show that Cubaexport paid the fee for the 2006 renewal, as well the deficiency surcharge for its late payment, on January 12, 2016.  JA539, JA542.

### E.    The District Court's Rejection of Bacardi's APA Challenge

Bacardi filed this APA case seeking to set aside the Director's decision as unlawful and arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).  JA25.  The district court initially dismissed on the basis that the Lanham Act precluded APA review, but this Court reversed and remanded for consideration of the merits.  *See Bacardi*, 104 F.4th at 535-36.

On remand, Cubaexport intervened, JA3 (ECF No. 39), and the parties filed cross-motions for summary judgment.  The district court granted Defendants' and Cubaexport's motions and denied Bacardi's, upholding the Director's decision on two alternative grounds.  JA571.

17

The first rested on 31 C.F.R. § 515.203(c), which the Director's decision had not mentioned. Citing that regulation, the district court observed that OFAC may retroactively validate transfers and render them enforceable to the same extent they would have been but for the CACR. JA567. The court then asserted, without further explanation, that the license OFAC issued in 2016 had such retroactive effect, and "effectively validated the payment [of the renewal fees] as having been made as of December 14, 2005." JA567. The court thus concluded that "the Director's finding that payment of the fee was timely and the decision to accept Cubaexport's 2006 renewal application" was neither unlawful nor arbitrary and capricious. JA567.

As for the second rationale, the district court concluded that "any payment deficiency was cured." JA567. In the court's judgment, Cubaexport was not required to cure the deficiency identified in the July 2006 Office Action within six months. JA568. Instead, the court concluded, once Cubaexport "respond[ed] to the refusal" by "inform[ing] the USPTO" of OFAC's decision and filed a petition for review of the examiner's decision maintaining the refusal, "there was no prescribed

time period for curing the deficiency," and "Cubaexport was entitled to cure the deficiency while its petition was pending." JA568.

In reaching that conclusion, the district court relied principally on the "supervisory authority" the Director may exercise in adjudicating petitions. JA568 (citing 37 C.F.R. § 2.146(a)(3)). The court explained that the Director may exercise such authority when (among other circumstances) "a petitioner can show that it has substantially complied with the requirements of the statute or rules." JA568. Although the Director's decision had not mentioned substantial compliance, the district court—relying on a single decision of the Director issued in another matter years after deciding Cuabexport's petition—concluded that "Cubaexport had substantially complied with the renewal application requirements." JA568-569. It thus held that "the Director's alternative reason for accepting Cubaexport's 2006 renewal application" was neither unlawful nor arbitrary and capricious. JA570.

## SUMMARY OF THE ARGUMENT

**I.** The Director exceeded her authority in granting Cubaexport's petition and accepting its renewal application.

**A.** Cubaexport failed to make timely "payment" of the required renewal application fee within six months following expiration of its prior registration, as required by the Lanham Act. 15 U.S.C. § 1059(a). A "payment" is the performance of an obligation by the delivery of money accepted in discharge of the obligation. An unsuccessful payment *attempt* is therefore not a "payment." To read the Act otherwise would render the statutory fee payment obligation meaningless. And the PTO's longstanding practice respecting unsuccessful payment attempts confirms this interpretation.

Cubaexport's unsuccessful attempt to pay the required fee in December 2005 was therefore not a "payment" under the Act. Indeed, it was unlawful for Cubaexport to make the payment without a specific license from OFAC, and upon learning that Cubaexport had not obtained such a license, the PTO deemed the fee not paid and effectuated a refund. Moreover, when Cubaexport *did* eventually pay the fee in 2016, the PTO collected not just the fee, but also a deficiency surcharge, which would not have been necessary (or authorized) if Cubaexport had timely paid the fee in December 2005. It makes no difference that the PTO initially collected the fee (based on Cubaexport's false representation that it had

a license); the payment requirement demands that, come the *end* of the statutory period, funds have permanently changed hands. Here, they did not do so until years after the statutory period ended.

The Director lacked authority to decree that Cubaexport's unsuccessful December 2005 payment attempt was a complete payment effective as of that date. Nothing in the Lanham Act or its implementing regulations confers that power. Nor did the specific license OFAC issued in 2016. That license could not have retroactively validated a Cubaexport payment made within the statutory period, because no such payment occurred. OFAC's authority to issue retroactive licenses is irrelevant: it enables OFAC to alter the legal consequences of a transaction that occurred, not to create legal consequences from one that did not. And in fact, the license only authorized Cubaexport to make a *new* payment; it did not provide for retroactive effect.

Because Cubaexport failed to pay the required renewal fee within the statutorily prescribed timeframe, and the Director lacked power to change that fact, Cubaexport's renewal application was deficient.

**B.** Cubaexport failed to cure its payment deficiency "within the time prescribed after notification of the deficiency." *Id.* The Act requires

the PTO to prescribe a single, finite period—"*the* time prescribed"—within which a registrant may cure renewal application deficiencies, indicating that registrants may *not* do so after that period.

Here, the PTO prescribed in two different but complementary ways the time for Cubaexport to cure its payment deficiency: six months. First, a PTO regulation requires renewal applicants to "file a response" to the refusal of an application within six months of being notified that the application is "not acceptable." 37 C.F.R. § 2.184(a), (b)(1). Context confirms that this response period is "the time prescribed" for curing deficiencies. Indeed, that has been the PTO's own longstanding and consistent interpretation. *See* TMEP § 1606.13(a) (current and 2002 versions); 64 Fed. Reg. 48,900, 48,915 (Sept. 8, 1999) (referring to "a six-month deficiency period"). Second, the PTO prescribed the same six-month period in its July 2006 Office Action refusing Cubaexport's application. That Office Action gave Cubaexport six months to submit a "complete response" explaining whether it had been granted an OFAC license and, if so, providing the renewal fee.

Cubaexport failed to cure its payment deficiency within the six-month period that the PTO prescribed, which ended on January 20, 2007.

Indeed, it did not pay the renewal fee (and accompanying deficiency surcharge) for nearly nine years more.

The district court nonetheless concluded that Cubaexport was entitled to cure the deficiency while its petition was pending—that is, that a registrant may help itself to an indefinite extension of time to cure deficiencies just by filing a petition, and that the Director has limitless power to accept deficiency cures even well after the deadline prescribed for submitting them has passed. But the Act and its implementing regulations confer no such power. Indeed, that power would all but nullify the Act's requirement that deficiencies be cured within "the time prescribed" for doing so, 15 U.S.C. § 1059(a), and the regulation prescribing that time, 37 C.F.R. § 2.184(b)(1). It would also defeat the purpose of requiring registrants to timely renew their registrations.

To the extent the Director identified a putative source for this supposed power, it pointed almost exclusively to the Director's "supervisory authority." *Id.* § 2.146(a)(3). But that authority cannot override the Act or the specific regulation carrying out the Act's mandate to prescribe a period for curing deficiencies. Nor does the PTO's own

established policy recognize that the Director may use her "supervisory authority" in this way.

Because Cubaexport did not timely cure its payment deficiency and the Director lacked the authority to accept Cubaexport's attempt to do so well after its time had expired, the Director acted unlawfully in granting Cubaexport's petition and accepting its renewal application. The APA therefore requires that her decision be set aside.

**II.** Even assuming that the Director had authority to grant Cubaexport's petition, neither rationale she articulated adequately explained or justified her decision to do so, which was arbitrary and capricious and should be set aside.

**A.** The Director's first rationale merely stated a putative fact (that the 2016 license authorized Cubaexport's December 2005 "fee payment") and concluded that this "payment" was therefore effective as of December 2005. That is hardly an explanation at all, let alone one rationally connecting the facts found and the choice made. The district court took the Director's rationale to be that OFAC's license retroactively authorized the "payment," but the Director herself did not say as much. And regardless, the Director's cursory explanation failed to grapple with

the overwhelming evidence that there was no December 2005 "fee payment," and left numerous other important matters unaddressed.

**B.** The Director's alternative rationale, that Cubaexport cured any deficiency in January 2016, fares no better. Again, it omitted critical elements: an explanation of *why* it was appropriate to afford Cubaexport nearly nine years to cure the deficiency, or even identification of the relevant "time prescribed" for curing it. Moreover, it departed from established, longstanding PTO policy limiting the period in which a deficiency may be cured to the six months following notification of that deficiency. When an agency does that, it must display awareness of the change and explain it. The Director did neither.

**C.** The Director's decision cannot be upheld on the district court's "substantial compliance" rationale. That rationale is absent from the Director's decision, and courts and counsel are powerless to supply rationales for agency action that the agency failed to articulate when acting.

## STANDARD OF REVIEW

The Administrative Procedure Act requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). "This court reviews a grant of summary judgment on an APA claim de novo," *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025), "independently assess[ing] whether, based on the administrative record, the agency action was unlawful" or arbitrary and capricious, *Mestanek v. Jaddou*, 93 F.4th 164, 170 (4th Cir. 2024) (cleaned up). In doing so, courts must "decide legal questions" "by applying their own judgment" and "set aside any [agency] action inconsistent with the law as they interpret it," without deference to the agency's legal interpretations. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024).

## ARGUMENT

### I. The Director Exceeded Her Authority in Renewing Cubaexport's Registration Because Cubaexport Failed to Timely Pay the Renewal Fee or Timely Cure the Deficiency.

Cubaexport did not file a complete application to renew its registration of the HAVANA CLUB mark within the period prescribed by Section 9 of the Lanham Act. It *attempted* to pay the required renewal fee, claiming it possessed an OFAC license authorizing the payment— even though the license to which it pointed plainly did no such thing. But

26

the PTO ultimately *refused* the attempted payment, deemed the fee not paid, and refunded the money.  Cubaexport's renewal application was thus deficient—it did not comply with the statutory requirements.

Nor did Cubaexport timely cure that deficiency.  Section 9 allows for such cures only "within the time prescribed after notification of the deficiency." 15 U.S.C. § 1059(a).  And here, PTO regulations and the July 2006 Office Action refusing Cubaexport's application each prescribed the same cure period: six months, ending on January 20, 2007.  Cubaexport did not secure a license authorizing it to make the payment by then, and so did not make that payment until January 2016 when it finally obtained such a license.  That was nearly nine years too late.

The Director nonetheless granted Cubaexport's petition and accepted its renewal application.  That decision was unlawful.  The Director had no authority to retroactively declare Cubaexport's unsuccessful—and unlawful—*attempt* to timely pay its renewal application fee to be a timely, complete payment.  Nor did she have authority to allow Cubaexport to cure the deficiency almost a decade after the time prescribed for doing so had expired.  The Director was thus legally obliged to deny Cubaexport's petition.  Because she did not do so,

her action was "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## A. The Director Lacked Authority to Retroactively Declare Cubaexport's Unsuccessful and Unlawful Payment Attempt to Be a Timely and Complete Payment.

### 1. *Cubaexport Did Not Pay and Could Not Have Lawfully Paid the Required Renewal Application Fee Within the Statutorily Prescribed Period.*

Section 9 of the Lanham Act provides that registration of a mark "may be renewed for periods of 10 years at the end of each successive 10-year period following the date of registration upon *payment* of the prescribed fee and the filing of a written application." 15 U.S.C. § 1059(a) (emphasis added). That application must be made "within 1 year before the end of each successive 10-year period for which the registration was issued or renewed, or it may be made within a grace period of 6 months after the end of each successive 10-year period." *Id.* As PTO regulations recognize, "[a] complete application must include" the required fee. 37 C.F.R. §§ 2.6(a)(5)-(6), 2.183(b)-(c).

Cubaexport failed to comply with these requirements because it failed to successfully make "payment" of the required renewal application fees within six months of the end of its 10-year registration period (i.e.,

by July 27, 2006). JA314. A "payment" is the "[p]erformance of an obligation by the delivery of money … *accepted* in partial or full discharge of the obligation." *Payment*, Black's Law Dictionary (12th ed. 2024) (emphasis added); *see also Pay*, American Heritage Dictionary of the English Language (5th ed. 2022) (defining "pay" as "[t]o give money in return for goods or services rendered" and "[t]o discharge or settle (a debt or obligation)"), https://ahdictionary.com/word/search.html?q=pay. *Unsuccessful* payment *attempts* are therefore not "payment[s]" within the ordinary meaning of that term: such attempts are not "accepted," and do not "discharge" any "obligation," in part or in full.

To read the Act otherwise would render the statutory obligation to make a timely payment virtually meaningless. To satisfy it, a registrant would not actually have to effect any permanent transfer of money to the PTO. Indeed, a registrant could satisfy the requirement by purporting to *try* to make a payment it *knew* would not succeed—e.g., by offering a maxed-out credit card or overdrawn checking account.

But courts do not normally read laws to "address[] not the substance of a transaction, but only empty formalities." *Abramski v. United States*, 573 U.S. 169, 180 (2014). They instead follow a

"presumption against ineffectiveness," A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012)—that is, they presume that Congress "does not enact useless laws," *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in judgment). That presumption generally demands the rejection of interpretations that would "rende[r] the law in a great measure nugatory," so that it may be "elude[d] … in the most easy manner." *The Emily*, 22 U.S. (9 Wheat.) 381, 389 (1824). An interpretation under which an unsuccessful payment attempt satisfies a statutory payment requirement does just that.

As it happens, the PTO has long recognized that an unsuccessful payment attempt is not a "payment." The subject is addressed in its Trademark Manual of Examining Procedure, which "represent[s] the PTO's established policy" and so deserves judicial "respect." *In re Pennington Seed, Inc.*, 466 F.3d 1053, 1059 (Fed. Cir. 2006); *cf. Loper Bright*, 603 U.S. at 403 ("Congress expects courts to … interpret[] statutes[] with due respect for the views of the Executive Branch."). Per the Manual, when "a check is returned unpaid, or an EFT or credit card is refused or charged back by a financial institution," the PTO processes

filings "as though the fee had been omitted" entirely. TMEP § 405.06; *see also id.* §§ 405.01(a), 405.02(a) (2002) (similar). The PTO, in other words, does not (or did not, before this case) consider a "payment" made unless funds were deposited, received, accepted, and ultimately *kept* in discharge of the obligation to pay the fee—an unsuccessful attempt does not suffice. Consistent with the ordinary meaning of "payment," the PTO "will not approve a pending application … until all outstanding fees, including the processing fee, have been *paid*" in this sense. TMEP § 405.06 (emphasis added).

As a matter of both ordinary meaning and longstanding administrative interpretation, then, Cubaexport's *attempt* to pay the required fee when it submitted its renewal application in December 2005 was not a "payment" fulfilling the statutory requirement, because that attempt was ultimately unsuccessful. In fact, it was *unlawful* at the time for Cubaexport to make the required payment. Under the CACR and Section 211, Cubaexport could not lawfully make the payment without a specific license from OFAC authorizing it—and any purported payment without a license would have been legally "null and void." 31 C.F.R. § 515.203(a); *see supra* pp. 10-11. That is presumably why, in 2005,

Cubaexport represented that it *did* have a specific license to make the payment, JA57, even though it did not—only Ropes & Gray had a license to "*receive* payment for" legal services in a different proceeding, JA343 (emphasis added). And it is why, once OFAC alerted the PTO to this fact, the PTO determined that "the required fee for filing the Sections 8 & 9 Combined filing ha[d] not been submitted," JA314, and refunded the funds it had initially withdrawn. JA542.

In short, during the statutory renewal period, the PTO refused to "accept[]" Cubaexport's attempted "delivery of money" in "partial or full discharge of the obligation," *Payment*, Black's Law Dictionary, *supra*, because that attempt was unlawful. So—under the ordinary meaning of the statutory term—there was no "payment" within the statutorily prescribed period. *See* 15 U.S.C. § 1059(a). For that reason, when OFAC *did* issue a specific license in 2016 authorizing payment of the renewal fee, JA522-523, Cubaexport had to issue a *new* authorization for withdrawal of funds from a *different* account, JA519, and had to pay not just the renewal fee but a deficiency surcharge for paying late, JA539, JA542; *see* 15 U.S.C. § 1059(a). Neither would have been necessary if Cubaexport's December 2005 *attempt* at payment had resulted in an

actual "payment"—that is, a completed transfer of funds, accepted in discharge of Cubaexport's fee obligation.

It makes no difference that the PTO initially withdrew funds from the Ropes & Gray deposit account—in reliance on Cubaexport's representation that it had a specific license—before returning them. Cubaexport induced the PTO to make that withdrawal with its inappropriate reliance on the Ropes & Gray license. After learning that the payment attempt was "not properly authorized," JA291, and that OFAC had declined to grant a specific license that *did* authorize Cubaexport to pay the fee, JA289, the PTO immediately executed a refund, leaving the parties just as they would have been had Cubaexport never tried to pay, JA539, JA542. If that sequence of events—a fleeting funds transfer, improperly initiated and then reversed—sufficed to effectuate a "payment," the "payment" requirement would be meaningless, and the PTO's longstanding practice of treating transfers charged back as if no payment had been attempted would itself be contrary to law. *See supra* pp. 30-31.

What matters instead is that come the *end* of the statutory period for filing a complete renewal application (including "payment" of the fee),

*see* 15 U.S.C. § 1059(a), the funds needed to satisfy the renewal fee obligation had not changed hands—and would not for almost a decade longer, JA539, JA542.  Ordinary meaning and the PTO's own practice, "not to mention a dose of common sense," *Bittner v. United States*, 598 U.S. 85, 103 (2023), confirm that interpretation.  Cubaexport thus failed to make timely "payment" of the required renewal fee, and its application was deficient.

### 2. *The Director Lacked Authority to Declare Cubaexport's Unsuccessful Payment Attempt Complete and Timely Based on the 2016 Specific License.*

Because Cubaexport's December 2005 attempted payment of the renewal fee was unsuccessful (and unlawful), the Director lacked authority to determine, more than a decade later, that Cubaexport's "December 14, 2005, combined §8/9 filing *and fee payment* … is effective as of December 14, 2005."  JA526 (emphasis added).  There *was* no "December 14, 2005 … fee payment"—only an unlawful payment *attempt*, which was ultimately refused and refunded.  And the Lanham Act and its implementing regulations do not authorize the Director to treat an unsuccessful payment attempt as an actual payment effective at the time

of the attempt. Neither the PTO nor Cubaexport has contended otherwise, and the district court did not conclude otherwise.

The district court nonetheless upheld the Director's decision to declare the failed December 2005 fee payment attempt a complete and timely payment. JA567. In doing so, the district court relied exclusively on the specific license that OFAC issued in 2016. The CACR, the district court observed, allows OFAC to "issue a license authorizing a transfer of funds previously made in violation of the embargo," and provides that "such license 'shall validate such transfer or render it enforceable to the same extent as it would be valid and enforceable but for the [CACR].'" JA567 (quoting 31 C.F.R. § 515.203(c)). The court asserted that the 2016 license was such a "retroactive" license, and that it "effectively validated the payment as having been made as of December 14, 2005, which was within the statutory renewal period." JA567.

But the 2016 specific license could not have retroactively validated a payment made within the statutory renewal period, because as just explained, there was no payment made during that period. To the contrary, the only payment Cubaexport successfully made occurred in 2016. Look no further than the PTO's own transaction records: the

attempted renewal payment from 2005 is marked "REVERSED," whereas the *accepted* renewal payment is recorded as having been made effective on January 12, 2016. JA542. And that payment, of course, came well past the statutorily prescribed period, which ended on July 27, 2006. *See* 15 U.S.C. § 1059(a).

Given that inescapable reality, the CACR regulation on which the district court relied is irrelevant. On its face, it authorizes OFAC only to retroactively "validate" and "render … enforceable" a "transfer" "to the same extent as it would be valid or enforceable but for" the CACR. 31 C.F.R. § 515.203(c). In other words, when OFAC exercises this authority, a transfer that *in fact happened*, but which violated the CACR and so would otherwise be "null and void," *id.* § 515.203(a), can become legally effective as if the CACR had not made it illegal in the first place. But a transfer that has not happened has no legal effect whether the CACR prohibits it or not; there is nothing to retroactively validate or enforce either way. To "validate" and "render … enforceable" a nonexistent "transfer" "to the same extent as it would be valid or enforceable but for" the CACR, in other words, is just to replace nothing with nothing.

Put simply, OFAC's authority under Section 515.203(c) is to *alter* the legal consequences of a transfer that *happened*—not to *create* legal consequences from a transfer that did *not* happen. A hypothetical illustrates the point. Suppose that when submitting its renewal application in December 2005, Cubaexport had not claimed that a license authorizing Ropes & Gray to "receive" payment for legal services somehow authorized paying the renewal fee, JA343; instead admitted that it lacked an OFAC license authorizing payment; and timely sought a specific license from OFAC rather than attempt to pay the fee unlawfully. Suppose further that everything afterwards happened just as it did in fact: that OFAC denied Cubaexport's license application; that the PTO then refused Cubaexport's renewal application; that in 2016 OFAC issued a license; and that Cubaexport then paid the renewal fee. In that scenario, even if the 2016 license explicitly stated that it had retroactive effect, the payment would unquestionably be effective only in 2016—there would be no 2005 transfer to retroactively validate.

The only difference between that hypothetical and what actually happened is that Cubaexport *did* try to make the payment based on the Ropes & Gray license, and the PTO, relying on Cubaexport's

representation, briefly withdrew funds—only to reverse the withdrawal after OFAC set the record straight. But plainly Cubaexport's attempt to make an unlawful payment should not put it in a *better* position than if it had not tried to act unlawfully at the outset. That conduct notwithstanding, Cubaexport did not successfully make a payment in December 2005. And OFAC's authority to issue retroactive licenses is not a time machine. So even if OFAC had purported to retroactively license a prior payment, the legal consequences of the December 2005 *non*-payment would have remained unchanged—that is, remained nonexistent. Because no completed payment took place before the statutory period expired, all that an OFAC license could accomplish was to authorize Cubaexport *prospectively* to pay renewal application fees.

And in actuality, that is just what the 2016 license did: it authorized Cubaexport to "*engage*"—present tense—"in all transactions necessary to renew and maintain" its registration, "including those *related to*" its December 2005 submission and "the payment referenced therein." JA523 (emphases added). That is a prospective license, not a retroactive one. A CACR license does not "authorize or validate any transaction effected" in the past unless it "*specifically* so provides." 31 C.F.R. § 515.502(a)

(emphasis added); *see, e.g.*, *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 359 (11th Cir. 1984) ("The license further provided that the authorization extends 'retroactive[ly] to the date of the filing of the *Reynolds* action [*i.e.,* January 10, 1979]'" (alteration in original)). The 2016 license does not cite Section 515.203(c), and does not specifically say it extends retroactively. It does not say, for instance, "this license is retroactive to December 14, 2005," or "this license authorizes and validates any payment made on December 14, 2005."

The 2016 license thus removed the CACR—though not the Lanham Act or its implementing regulations, neither of which OFAC may displace—as an obstacle to Cubaexport making a *new* payment "related to" its 2005 renewal application. But it did not transform Cubaexport's unsuccessful and unlawful 2005 payment attempt into a successful and lawful payment *timely completed in 2005*, within the statutorily prescribed period. *See* 15 U.S.C. § 1059(a). OFAC could not have done that, the license it issued in 2016 did not purport to do that, and that license did not somehow empower the Director to do the same. And neither the district court nor the Director has identified any other source of such an alchemical power to create something from nothing. The

Director accordingly lacked authority to treat as timely a payment made and accepted in August 2016, on the *ipse dixit* that the payment was "effective as of" December 2005.

Rather, because Cubaexport failed to pay the required renewal application fee within the statutorily prescribed timeframe, it did not timely file a "[a] complete application" under Section 9.  37 C.F.R. §§ 2.6(a)(5)-(6), 2.183(b)-(c).  Indeed, at least before this litigation, the PTO apparently agreed: upon the Director's decision to grant Cubaexport's petition in 2016, the PTO collected Cubaexport's (new) payment of the renewal application fee, and the deficiency surcharge reserved for late payments of that fee.  JA539, JA542; *see* TMEP § 1604.19.  In short, Cubaexport made the payment only in 2016, which was not "within 1 year before the end of [the prior] 10-year period for which the registration was issued or renewed" or "within … 6 months" thereafter.  15 U.S.C. § 1059(a).

**B. Cubaexport Failed to Cure the Payment Deficiency in the Time Prescribed and the Director Lacked Authority to Accept Cubaexport's Cure Attempt Nearly a Decade Late.**

*1. Both PTO Regulations and the July 2006 Office Action Gave Cubaexport Only Until January 2007 to Cure Its Payment Deficiency.*

Section 9 provides that if a renewal application "is deficient, the deficiency may be corrected *within the time prescribed after notification of the deficiency*, upon payment of a surcharge prescribed therefor." *Id.* (emphasis added). Cubaexport did not cure its payment deficiency within "the time prescribed" by the PTO. In fact, it blew its deadline by nearly nine years.

Since a set of 1998 amendments, Section 9 has contemplated that the PTO, upon notifying a registrant of a deficiency in its renewal application, will prescribe a single, finite period of time—"*the* time prescribed," *id.* (emphasis added)—within which the registrant may cure any deficiencies. The plain implication is that the registrant may *not* cure deficiencies after that "time prescribed" has expired. *See United States v. Nixon*, 130 F.4th 420, 431 (4th Cir. 2025) ("it is well-established under the *expressio unius* canon of statutory interpretation that where a law expressly describes a particular situation to which it shall apply,

what was omitted or excluded was intended to be omitted or excluded" (cleaned up)).[3]

Here, the PTO prescribed in two different but complementary ways the time for Cubaexport to cure its payment deficiency. The first was by regulation. The second was through the July 2006 Office Action. Both required Cubaexport to cure its deficiency within six months.

The pertinent regulation requires a registrant whose Section 9 renewal application is refused to "file a response to the [Office's] refusal of renewal within six months of the date of issuance of the Office action, or before the expiration date of the registration, whichever is later." 37 C.F.R. § 2.184(b)(1). In this context, the opportunity to "file a response" *is* the opportunity to cure any deficiencies, or otherwise to explain why the PTO was wrong to refuse the renewal application to begin with.

That interpretation is clear from reading the text in context. Subsection (a) provides that "[i]f the renewal application is not

_____

[3] "[A] look at" the Act's "history if anything only underscores that plain meaning." *Loper Bright*, 603 U.S. at 393; *see* H.R. Rep. No. 105-194, at 17 (1997) (revision to Section 8—paralleling revision to Section 9—requires "the correction of a deficiency" to "be filed *no later than* the end of a prescribed period after notification of the deficiency" (emphasis added)).

acceptable"—that is, deficient—"the Office will issue a notice stating the reason(s) for refusal." *Id.* § 2.184(a). Subsection (b) then gives the registrant six months from that notice (i.e., "the Office action" referred to in Section 2.184(b)(1)) to "file a response," or otherwise see its registration expire.

Reading the two subsections together—and in light of the Act's requirement that the PTO prescribe *some* time period for curing deficiencies, 15 U.S.C. § 1059(a)—it is difficult to see what role the required "response" could have in this scheme if it were *not* the vehicle for curing whatever deficiencies made the renewal application "not acceptable" or explaining why the PTO erred in finding deficiencies to begin with. Certainly the response contemplated is not just some *pro forma* acknowledgment of the PTO's refusal; that would be an "empty formalit[y]." *Abramski*, 573 U.S. at 180.

Sure enough, outside of this litigation, the PTO has long understood Section 2.184(b)(1) to prescribe a six-month period for curing deficiencies. The Trademark Manual—which, as noted, "represent[s] the [Office's] established policy" and warrants judicial "respect," *In re Pennington Seed*, 466 F.3d at 1059—is unequivocal: "Any deficiency [in a renewal

application] *must* be cured within the set period for response to the Office action, i.e., within six months of the issuance date of the action, or before the expiration date of the registration, whichever is later." TMEP § 1606.13(a) (emphasis added). The Manual cites only one regulatory provision as the source of that requirement: "37 C.F.R. § 2.184(b)." *Id.* That agency interpretation of its regulation is nothing new. The Manual has reflected it since at least 2002. *See* TMEP § 1606.13(a) (2002).

Going back even further, to the 1999 preamble to the rule that promulgated Section 2.184(b)(1), the PTO referred to "a six-month deficiency period" while explaining the interplay between Sections 2.184 and 2.185. 64 Fed. Reg. at 48,915. Section 2.185 does not itself provide for such a period.[4] So the only "six-month deficiency period" the PTO could have been referring to is the one created by the six-month response deadline in Section 2.184(b)(1). This preamble language confirms the "long-held understanding of the agency." *Salomon-Guillen v. Garland*, 123 F.4th 709, 718 (4th Cir. 2024); *see also Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) (preamble provides

---

[4] Section 2.185 sets out the circumstances, inapplicable here, under which a deficiency may be cured *without* paying a deficiency surcharge. *See* 37 C.F.R. § 2.185(a).

"evidence of [the] agency's contemporaneous understanding of its proposed rules").

The PTO's "early, longstanding, and consistent interpretation" of Section 2.184(b)(1) "count[s] as powerful evidence of its original public meaning." *Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring) (emphasis omitted). As the Supreme Court recently explained, legal "interpretations issued contemporaneously" with enactment, "and which have remained consistent over time, may be especially useful in determining the … meaning" of a provision. *Loper Bright*, 603 U.S. at 394.

The district court brushed aside Section 2.184(b) in a footnote, deeming it irrelevant because it does not *expressly* refer to "a deadline by which a deficiency must be cured." JA568. But interpreting a regulation is not a magic words test. Rather, "context is vital": courts "read [a] regulation's words—just like a statute's—in their context and with a view to their place in the overall regulatory scheme." *Lovo v. Miller*, 107 F.4th 199, 213, 216 (4th Cir. 2024). And they do so cognizant of the fact that "[t]he agency that 'wrote the regulation' will often have direct insight into what the rule was intended to mean." *Kisor*, 588 U.S. at 570 (plurality

opinion) (cleaned up); *see also Loper Bright*, 603 U.S. at 386. But the district court never explained what it could mean, in context, to "respond" to an Office Action if not to cure the deficiency (or convince the examiner why there is none). Nor did it grapple with the PTO's longstanding, consistent interpretation of Section 2.184(b) to prescribe a six-month deadline for curing deficiencies.

Section 2.184(b), of its own force, thus prescribed a six-month period from the July 2006 Office Action for Cubaexport to cure the payment deficiency. But even if the regulation itself had not done so, that Office Action independently (but consistently with the regulations and longstanding agency policy) did the same. Under the heading "RESPONSE TIME DEADLINE," it provided that "[a] complete response must be received within 6 months from the mailing date of this Office action." JA289. More, it instructed Cubaexport *how* to respond: "by notifying the [Office] whether the specific license application filed on April 7, 2006 has been granted or denied" and, if granted, providing "the fee or authorization to charge the fee." JA289. In other words, the Office Action gave Cubaexport six months to *cure the deficiency*. And it spelled

out the consequences if Cubaexport could not do so: "the registration will be deemed cancelled/expired." JA289.

So whether under Section 2.184(b), the July 2006 Office Action, or both, "the time prescribed" for Cubaexport to cure its payment deficiency was the six-month period running from the July 2006 Office Action until January 20, 2007. Cubaexport failed to cure within that time prescribed, because it did not pay the required renewal application fee and deficiency surcharge until January 12, 2016—nearly nine years too late. JA289, JA291, JA539, JA542.

2. *The Director Lacked Authority to Accept Cubaexport's Attempt to Cure the Deficiency Nine Years After the Deadline Had Already Passed.*

The district court nonetheless held that once Cubaexport filed its petition, "there was no prescribed time period for curing the deficiency," and that "Cubaexport was entitled to cure the deficiency while its petition was pending." JA568. As a result, the district court held that the Director did not act unlawfully in deciding that Cubaexport had cured its deficiency in 2016. JA568-70. Put differently, the district court concluded that merely by filing a petition, registrants may help themselves to an indefinite extension of time to cure deficiencies and that

the Director acts lawfully by accepting such cures even when they take place nearly a decade late. But the district court did not identify the source of that expansive power, and none exists. Such a power, in fact, would upend the renewal application scheme set out in the Lanham Act and its implementing regulations.

The district court's conclusion, once again, all but nullifies a Lanham Act requirement: the command that deficiencies in Section 9 filings be cured "within the time prescribed after notification of the deficiency." 15 U.S.C. § 1059(a). On the district court's understanding, provided a registrant makes some empty, perfunctory "response" acknowledging the refusal of its application, the registrant can give itself an *additional* period—of indefinite length—to cure deficiencies in that application just by filing a petition seeking "review of the examiner's refusal" by the Director. JA568. And the Director may allow this unlimited opportunity to cure, by the simple expedient of not acting on the petition. None of this is what the Act says. It says only that "the deficiency may be corrected within the time prescribed after notification of the deficiency"—period. 15 U.S.C. § 1059(a).

The district court's assertion that once Cubaexport petitioned the Director "there was no prescribed time period for curing the deficiency," JA568, should thus raise alarm bells. Of course there was a prescribed time period for curing the deficiency—there had to be. Otherwise, the statutory requirement to correct deficiencies "within the time prescribed after notification of the deficiency," 15 U.S.C. § 1059(a), which requires the PTO to prescribe a single, finite period for curing deficiencies, would be meaningless—and especially so if deficiencies could be cured nearly a decade after the fact. As explained, the period prescribed was the six-month period ending on January 20, 2007. *See supra* pp. 42-47. That Cubaexport's petition remained pending (long) after that date did not mean there was no longer any "time prescribed" for curing the deficiency. It meant that "the time prescribed" for doing so had expired.

Nor do the Lanham Act's implementing regulations purport to grant the Director the power to authorize belated deficiency corrections. Instead, as Bacardi has explained, *see supra* pp. 41-42, the regulations prescribe a single, finite time period for curing Section 9 filing deficiencies: the six-month period for responding to an Office Action refusing a renewal application. *See* 37 C.F.R. § 2.184(b)(1); TMEP

§ 1606.13(a).  This regulation, too, would be pointless if deficiencies could instead be cured at *any* time before the Director acts on a registrant's petition (perhaps years or decades later).

Such a power would also defeat much of the purpose of requiring registrants to periodically renew registration of their marks.  Congress amended Sections 8 and 9 in 1988 to reduce the registration period from 20 years to 10.  *See* Trademark Law Revision Act, Pub. L. No. 100-667, §§ 110, 111, 102 Stat. 3935, 3939 (1988).  In doing so, it sought to address the "serious" problem of "deadwood," that is, "[u]nused marks on the trademark register."  H.R. Rep. No. 100-1028, at 11 (1988).  Such "deadwood," the House Judiciary Committee explained, "prevent[s] others wishing to use those marks from doing so."  *Id.*  But a putative power of the Director to accept a registrant's attempt to cure deficiencies after the time prescribed has expired would frustrate those congressional aims.  As this case illustrates, such a power would allow the Director to *indefinitely* prevent potential registrants (like Bacardi here) from reaping the benefits of registering for themselves an unused mark.  Congress did not grant a power so plainly at odds with its broader statutory design.

To the extent the district court identified a source for the Director's putative authority to grant registrants indefinite time to cure deficiencies after the time for doing so has expired, it pointed almost exclusively to the Director's "supervisory authority to consider the sufficiency of [the] renewal application." JA568.[5] It is true that PTO regulations allow registrants to petition the Director "[t]o invoke the supervisory authority of the Director in appropriate circumstances." 37 C.F.R. § 2.146(a)(3). But that general "supervisory authority" does not and cannot mean anything goes. It cannot override the express statutory requirement that deficiencies be cured within a finite "time prescribed" after notification of the deficiency, 15 U.S.C. § 1059(a), nor the specific regulatory provision carrying out that mandate by prescribing a six-month period for curing deficiencies, 37 C.F.R. § 2.184(b)(1); *see In re Cleary Packaging, LLC*, 36 F.4th 509, 515 (4th Cir. 2022) ("the more specific provision should govern over the more general").

---

[5] To the extent the district court also relied on 37 C.F.R. § 2.165, *see* JA567, that was misplaced. That provision (which concerns Section 8), and the parallel provision concerning Section 9, 37 C.F.R. § 2.186(b), merely stay the *results* of cancellation and expiration, respectively, pending the Director's resolution of a petition. *See id.* §§ 2.165(b), 2.186(b). They do not authorize the Director to effectively extend a registrant's time to cure deficiencies after that time has expired.

Once again, moreover, the PTO's own "established policy," *In re Pennington Seed, Inc.*, 466 F.3d at 1059, does not recognize such a power. The Trademark Manual notes that the Director generally exercises "supervisory authority" only to correct a "*clear error* or an *abuse of discretion*"—that is, to correct an examiner decision that was erroneous based on the information the examiner had at the time. TMEP § 1707 (emphasis added). But the Director has never disputed that the examiner correctly handled Cubaexport's renewal application given that, at the time, no OFAC license authorized Cubaexport to pay the renewal application fees. To be sure, the Manual also indicates that "in some cases," the Director may exercise supervisory authority "even where there has been no clear error or abuse of discretion, if a petitioner can show that it *has substantially complied* with the requirements of the statute or rules." *Id.* (emphasis added). But that exception is limited: it prevents minor technicalities from barring successful processing of a filing otherwise valid *at the time it was filed*.

The two examples the Manual provides make that clear. In one, the Director concluded that a petitioner had substantially complied where it had submitted, during the six-month "response" period for

curing deficiencies, "unverified but otherwise acceptable specimens that would have obviated the specimen refusals." *See In re P.T. Polymindo Permata*, 109 U.S.P.Q.2d 1256 (Dir. USPTO 2013). And in the other, the Commissioner for Patents concluded that the combination of a petitioner's unverified and verified statements in its Section 8 filing substantially complied with the Section 8 requirement demanding a verified statement that the "mark is in use in commerce." *In re Carnicon Dev. Co.*, 34 U.S.P.Q.2d 1541 (Comm'r Pat. & Trademarks 1992).

Here, by contrast, Cubaexport did not and *could not* "substantially comply" with the fee payment requirement within the statutory time period for making that payment, or within the regulatory time period (prescribed pursuant to the Act's mandate) for curing deficiencies. The CACR, after all, made it unlawful for Cubaexport to do so without a specific license from OFAC. And OFAC, well aware of the consequences, refused to authorize Cubaexport to pay the fee during the required time period, concluding that doing so would have been "inconsistent with U.S. policy" toward Cuba. *See supra* p. 13. In other words, Cubaexport failed to comply with a statutory requirement because the Executive Branch

made a foreign policy decision that prevented it from doing so. That is hardly a mere technical error.

For similar reasons, also misplaced was the district court's reliance on the Director's decision (issued seven years after granting Cubaexport's petition) to grant a petition in *Society of Tribologists & Lubrication Engineers*, Serial No. 75/445,159 (Dir. USPTO Feb. 1, 2023). *See* JA568-569. There, the Director decided that a Section 7 request for amendment or correction of a registration certificate qualified as a combined Section 8/9 filing because it evinced "a clear intent to file a declaration of use and renewal application" and contained most of the relevant information. *Soc'y of Tribologists*, Serial No. 75/445,159. On those "unique facts," the Director "agree[d] to exercise supervisory authority," because it was "reasonable to assume that petitioner believed" its Section 7 request sufficed and made a mere technical mistake. *Id.*

Inability to meet a statutory requirement as a direct consequence of a U.S. foreign policy decision, though, is no technicality. Nor did the Director in *Society of Tribologists* decide, or have occasion to decide, that it is somehow possible for a registrant to substantially comply with the Act and its implementing regulations when legally prohibited from doing

so, as Cubaexport was.  And regardless, neither *Society of Tribologists* nor any other administrative action is the arbiter of whether the agency action before this Court was lawful.  "Courts must exercise their independent judgment" in answering that question.  *Loper Bright*, 603 U.S. at 412.

In short, the Director's decision exercised a power that the Lanham Act does not confer—the power to allow a deficiency in a renewal application to be cured years after "the time prescribed after notification of the deficiency" has expired.  15 U.S.C. § 1059(a).  The decision was therefore unlawful, and this Court should set it aside.  5 U.S.C. § 706(2)(A), (C).

## II.    The Director's Decision Was Not Adequately Explained or Justified and thus Arbitrary and Capricious.

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up).  That is the case, for instance, if the agency did not articulate "a satisfactory explanation for its action including a rational connection between the facts found and the choice made," "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence," *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Whether these requirements have been satisfied must be determined on the grounds "articulated by the agency itself" in the decision under review. *Id.* at 50 (cleaned up); *see also Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) ("[N]either we nor the agency may supply the explanation on appeal.").

Even assuming that the Director had authority to grant Cubaexport's petition, her decision to do so falls short on each of these fronts, and so does not reflect the "reasoned decisionmaking" the APA demands. *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up). Neither of the two rationales the Director articulated—nor the "substantial compliance" rationale supplied by the district court— adequately explained or justified her decision.

## A. The Decision Does Not Adequately Explain Why the 2016 OFAC License Justified Granting the Petition.

The Director's first rationale for granting Cubaexport's petition consisted of two sentences. The first asserted a putative fact—that Cubaexport in 2016 procured a license "that specifically authorizes petitioner's December 14, 2005 combined §8/9 filing and fee payment." JA526. The second jumped to the conclusion that "[t]hus, the fee

56

payment is effective as of December 14, 2005, and the combined §8/9 filing is considered complete and acceptable as of that date." JA526.

That is not a "satisfactory explanation"—and certainly not one articulating a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up). It is hardly an explanation at all. The district court took the Director's rationale to be that "OFAC's ... retroactive authorization in January 2016 effectively validated the payment as having been made as of December 14, 2005, which was within the statutory renewal period." JA567. But it is far from clear that the Director actually relied on that rationale in reaching her decision. The decision did not mention OFAC's power to retroactively validate or render enforceable past transactions, nor cite the source of that power (31 C.F.R. § 515.203(c)). And it did not explain why the Director believed (assuming she did) that the license retroactively authorized a supposed December 2005 payment when, on its face, it did not. *See supra* pp. 38-39.

Even the most basic contours of the retroactive authorization rationale thus cannot "reasonably be discerned" from the decision itself, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (cleaned

up).  That alone is fatal, for "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947); *accord Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 83-84 (4th Cir. 2020).

In any event, the agency's rationale must be not just discernible but "*reasonably* explained."  *Ohio*, 603 U.S. at 292 (cleaned up, emphasis added).  The Director's two sentences do not come close to meeting the requirements of reasoned decisionmaking.

To start, the Director "offered an explanation for [her] decision that runs counter to the evidence."  *State Farm*, 463 U.S. at 43.  "An agency … cannot simply state it believes something to be true—against the weight of all the evidence before it—without further support."  *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (cleaned up).  Yet the Director's decision did even less than that.  It merely *assumed* that there was a "December 14, 2005 … fee payment," JA526, without addressing the evidence that there was not.

The decision did not engage with the examiner's well-founded conclusion that the renewal application fee had *not* been paid. JA289, JA314, JA470. It did not address the evidence in the administrative record that the attempted December 2005 payment was "REVERSED." JA542. And it did not explain why, if the renewal fee payment was effective as of December 2005, the agency collected the same renewal fee in 2016 from a different account, alongside a surcharge that the PTO only levies for late payments. JA289, JA539, JA542. The Director had to at least "grapple[] with" this evidence running counter to the basic factual premise undergirding her rationale. *Sierra Club v. W. Va. Dep't of Envt'l Prot.*, 64 F.4th 487, 502 (4th Cir. 2023) (cleaned up). Instead the Director failed to mention any of it.

The Director also left several other "important aspect[s] of the problem" unaddressed. *State Farm*, 463 U.S. at 43. Consider all the questions the decision did not answer. It did not explain how the 2016 license could retroactively validate and render enforceable Cubaexport's payment *attempt*, given that the attempt was not successful—nor how the license can be read to have retroactive effect despite not "specifically" providing for it. *See* 31 C.F.R. § 515.502(a); *supra* pp. 38-39. It was silent

on how any decision *by OFAC* to issue a retroactive license (even assuming that is what OFAC did) gives *the Director* the authority to deem an unsuccessful payment attempt to be a complete payment, effective as of the date the attempt was made. It did not explain why the Director declined to apply the agency's most analogous policy for reversed payments, which it does not treat as effective payments. *See* TMEP § 405.06. It did not wrestle with whether Cubaexport should have been rewarded for representing that the Ropes & Gray license authorized the fee payment, rather than admitting that it lacked a license to make the payment. *See supra* pp. 37-38. It did not mention the PTO's pre-litigation position *in this very case* that if a renewal fee is not paid, "the Director *has no discretion*" to grant a petition seeking review of an examiner's refusal, and must instead "issue a refusal stating that the registration will be canceled and/or has expired." JA507 (emphasis added). And it contained not a whisper about why it is an "appropriate" use of the Director's supervisory authority, 37 C.F.R. § 2.146(a)(3), to declare an unsuccessful payment attempt to be timely and complete more than ten years—a full registration period—after the fact, or how doing so

possibly effectuates the congressional policy favoring prompt removal of "deadwood" from the trademark register.  *See supra* pp. 7, 50.[6]

Such a threadbare rationale is not the reasoned explanation the APA requires of agencies.  "[B]ecause we said so" is not enough.  *Mayor of Baltimore*, 973 F.3d at 276 (cleaned up).

## B. The Director Did Not Adequately Explain Why Cubaexport Was Entitled to Cure its Deficiency Almost a Decade Late.

The Director's alternative rationale—that Cubaexport cured any deficiency in January 2016—fares no better.

Its first failure is that once again, the Director listed a premise and a conclusion, but failed to articulate a "rational connection" between the two.  *State Farm*, 463 U.S. at 43 (cleaned up).  The decision noted that "[n]on-payment or insufficient payment of the fee for a combined §8/9 filing is a deficiency that can be corrected, even after the statutory time period, as long as the correction occurs within the time prescribed after notification of the deficiency," and that Cubaexport had "filed a timely petition" upon being notified of its right to do so.  JA526.  Then it jumped

---

[6] The lack of any answer on these points indicates that the decision was not only not "reasonably explained," but also not "reasonable."  *Ohio*, 603 U.S. at 292 (cleaned up).

to the conclusion that Cubaexport had "satisfied the fee requirement by obtaining an OFAC license that authorizes [its] payment of the fee for the combined §8/9 filing, providing the license to the USPTO as a timely supplement to its petition, and authorizing the USPTO to charge any uncollected fees to its counsel's USPTO deposit account." JA526.[7] But the Director never connected the dots with an explanation of *why* those actions sufficed to "satisf[y] the fee requirement"—that is, cure the deficiency within the time prescribed.

In particular, the decision failed to say that the Director was retroactively extending Cubaexport's long-since expired time to cure the deficiency (and explain the reason for that extension and the source of power to do so), to explain why "the time prescribed after notification of the deficiency" had not expired well before January 2016, or even to identify what the Director thought the "time prescribed" *was*. At the very least there were strong reasons to think that the "time prescribed" had ended nine years earlier, *see supra* pp. 42-47—making it incumbent on

_____

[7] This rationale thus took as a premise that Cubaexport's December 2005 payment had *not* been completed—the opposite premise of the Director's first rationale. *Cf. ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (agency "reasoning cannot be internally inconsistent").

the Director to explain why she disagreed and what time was actually prescribed. Yet the Director grappled with none of those considerations—not the statutory requirement that there be a single, finite "time prescribed" for curing deficiencies, 15 U.S.C. § 1059(a), not the July 2006 Office Action unambiguously prescribing that time (six months), and, perhaps most notably, not the regulation that the PTO itself has long interpreted to prescribe a six-month period for curing deficiencies, 37 C.F.R. § 2.184(b)(1).

The Director's failure on that last point is especially striking. Once more, "the TMEP … represent[s] the PTO's established policy," *In re Pennington Seed*, 466 F.3d at 1059, and it has long unambiguously interpreted Section 2.184(b)(1) to limit the period in which a deficiency may be cured (absent circumstances inapplicable here) to six months following notification. *See* TMEP § 1606.13(a) (current and 2002 versions); *supra* pp. 43-44. In concluding that Cubaexport had timely cured its payment deficiency in January 2016—some nine years after the Section 2.184(b)(1) period had lapsed—the Director departed from that established agency policy.

When an agency does that, it must "ordinarily … display awareness that it *is* changing position." *Fox Television Stations*, 556 U.S. at 515. The Director has followed that rule in the past. *See, e.g.*, *In re Slack*, 54 U.S.P.Q.2d 1504 (Comm'r Pat. & Trademarks 2000) (relying on supervisory authority to change PTO policy, explaining reasons for doing so, and directing that "[t]o the extent this new policy is inconsistent with the current standards set forth in the" Manual, it "will be amended to incorporate the … new policy"). But the decision here did not. Incredibly, the Director *cited the Trademark Manual* as support for allowing a deficiency to be cured after nine years, *see* JA526 (citing, *inter alia*, TMEP § 1606.13), without displaying awareness that the Manual says the opposite: that "[a]ny deficiency must be cured … within six months of the issuance date of the [Office] action," TMEP § 1606.13(a). This "'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

**C.    The Decision Was Not Based on a "Substantial Compliance" Rationale and May Not Be Upheld on that Basis.**

Finally, although the district court upheld the Director's decision in part because "Cubaexport had substantially complied with the renewal application requirements," JA569, the decision itself did not assert as much.    As noted, the Director occasionally exercises supervisory authority "even where there has been no clear error or abuse of discretion, if a petitioner can show that it has substantially complied with the requirements of the statute or rules"—that is, that but for some technicality, the filing would have been valid when made.    TMEP § 1707; *see supra* pp. 52-53.    When the Director exercises that authority, she says so explicitly.    *See, e.g.*, *In Re P.T. Polymindo Permata*, 109 U.S.P.Q.2d 1256 (petitioner's submission "demonstrated substantial compliance"); *In re Carnicon Dev. Co.*, 34 U.S.P.Q.2d 1541 (petitioner's statements could "be interpreted as substantially in compliance").

But any reference to substantial compliance is absent from the Director's decision here.    That is hardly surprising; a "substantial compliance" rationale would have added still more factual inconsistency to the Director's grab-bag of rationales—one premised on Cubaexport

having made a *complete* payment (not merely a substantially compliant one) effective as of December 2005, and the other premised on Cubaexport curing a full-fledged *deficiency* by paying the required fee only in 2016. And the omission is fatal to reliance on such a rationale now. "[A] court … must … restrict itself to what the agency actually did say," *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009), and courts and counsel alike are powerless to supply rationales for agency action that the agency never articulated when acting, *see, e.g.*, *Inova Alexandria Hosp.*, 244 F.3d at 350; *Calcutt v. FDIC*, 598 U.S. 623, 628-29 (2023) (per curiam). So even if Cubaexport *had* substantially complied with the application requirements—and it did not and could not, *see supra* pp. 53-55—the Director's decision cannot be upheld on that basis.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court.

Date: May 23, 2025

/s/ David M. Zionts

Michael C. Lynch
Damon W. Suden
Edwin Adlam Herod
KELLEY DRYE & WARREN, LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800

David M. Zionts
Alexander J. Cave
Yevgeniy Pilipovskiy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Plaintiffs-Appellants Bacardi & Company Limited and
Bacardi USA, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument in this Administrative Procedure Act case, which presents important issues concerning the interpretation of provisions of the Lanham Act and its implementing regulations, as well as the application of the APA's arbitrary and capricious standard, in the context of a complex and long-running dispute regarding an attempt to renew a trademark registration. Plaintiffs-Appellants respectfully submit that oral argument would assist the Court in resolving these important issues.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 25-1355     Caption: Bacardi & Co. Ltd., et al. v. USPTO, et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____12,976_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word version 2408 [*identify word processing program*] in
Century Schoolbook, size 14 [*identify font, size, and type style*];

**or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) David M. Zionts_____

Party Name Bacardi & Co. Ltd. and Bacardi USA, Inc.     Date: 5/23/2025_____

# Addendum of Relevant Statutory Provisions and Regulatory Materials

## Table of Contents

**Page**

**Statutes**

Lanham Act (codified as 15 U.S.C. § 1051 *et seq.*)

15 U.S.C. § 1058.................................................................A-1

15 U.S.C. § 1059.................................................................A-4

**Regulations**

Cuban Assets Control Regulations, 31 C.F.R. Part 515

31 C.F.R. § 515.203...........................................................A-5

31 C.F.R. § 515.502...........................................................A-8

Rules of Practice in Trademark Cases, 37 C.F.R. Part 2

37 C.F.R. § 2.146...............................................................A-9

37 C.F.R. § 2.165.............................................................A-13

37 C.F.R. § 2.183.............................................................A-14

37 C.F.R. § 2.184.............................................................A-15

37 C.F.R. § 2.185.............................................................A-17

37 C.F.R. § 2.186.............................................................A-18

**Trademark Manual of Examining Procedure ("TMEP")**

TMEP § 405.06.................................................................A-19

TMEP § 1606.13(a) ..........................................................A-20

TMEP § 1707....................................................................A-21

# 15 U.S.C. § 1058 - Duration, affidavits and fees

## (a) Time periods for required affidavits

Each registration shall remain in force for 10 years, except that the registration of any mark shall be canceled by the Director unless the owner of the registration files in the United States Patent and Trademark Office affidavits that meet the requirements of subsection (b), within the following time periods:

**(1)** Within the 1-year period immediately preceding the expiration of 6 years following the date of registration under this chapter or the date of the publication under section 1062(c) of this title.

**(2)** Within the 1-year period immediately preceding the expiration of 10 years following the date of registration, and each successive 10-year period following the date of registration.

**(3)** The owner may file the affidavit required under this section within the 6-month grace period immediately following the expiration of the periods established in paragraphs (1) and (2), together with the fee described in subsection (b) and the additional grace period surcharge prescribed by the Director.

## (b) Requirements for affidavit

The affidavit referred to in subsection (a) shall--

**(1)** **(A)** state that the mark is in use in commerce;

**(B)** set forth the goods and services recited in the registration on or in connection with which the mark is in use in commerce;

**(C)** be accompanied by such number of specimens or facsimiles showing current use of the mark in commerce as may be required by the Director; and

**(D)** be accompanied by the fee prescribed by the Director; or

**(2)** **(A)** set forth the goods and services recited in the registration on or in connection with which the mark is not in use in commerce;

**(B)** include a showing that any nonuse is due to special circumstances which excuse such nonuse and is not due to any intention to abandon the mark; and

**(C)** be accompanied by the fee prescribed by the Director.

## (c)  Deficient affidavit

If any submission filed within the period set forth in subsection (a) is deficient, including that the affidavit was not filed in the name of the owner of the registration, the deficiency may be corrected after the statutory time period, within the time prescribed after notification of the deficiency. Such submission shall be accompanied by the additional deficiency surcharge prescribed by the Director.

## (d)  Notice of requirement

Special notice of the requirement for such affidavit shall be attached to each certificate of registration and notice of publication under section 1062(c) of this title.

## (e)  Notification of acceptance or refusal

The Director shall notify any owner who files any affidavit required by this section of the Director's acceptance or refusal thereof and, in the case of a refusal, the reasons therefor.

## (f)  Designation of resident for service of process and notices

If the owner is not domiciled in the United States, the owner may designate, by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the last designated

address, or if the owner does not designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served on the Director.

# 15 U.S.C. § 1059 – Renewal of registration

## (a)    Period of renewal; time for renewal

Subject to the provisions of section 1058 of this title, each registration may be renewed for periods of 10 years at the end of each successive 10-year period following the date of registration upon payment of the prescribed fee and the filing of a written application, in such form as may be prescribed by the Director. Such application may be made at any time within 1 year before the end of each successive 10-year period for which the registration was issued or renewed, or it may be made within a grace period of 6 months after the end of each successive 10-year period, upon payment of a fee and surcharge prescribed therefor. If any application filed under this section is deficient, the deficiency may be corrected within the time prescribed after notification of the deficiency, upon payment of a surcharge prescribed therefor.

## (b)    Notification of refusal of renewal

If the Director refuses to renew the registration, the Director shall notify the registrant of the Commissioner's refusal and the reasons therefor.

## (c)    Designation of resident for service of process and notice

If the registrant is not domiciled in the United States the registrant may designate, by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, or if the registrant does not designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served on the Director.

# 31 C.F.R. § 515.203 - Effect of transfers violating the provisions of this part

**(a)**   Any transfer after the "effective date" which is in violation of any provision of this part or of any regulation, ruling, instruction, license, or other direction or authorization thereunder and involves any property in which a designated national has or has had an interest since such "effective date" is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property.

**(b)**   No transfer before the "effective date" shall be the basis for the assertion or recognition of any right, remedy, power, or privilege with respect to, or interest in, any property in which a designated national has or has had an interest since the "effective date" unless the person with whom such property is held or maintained had written notice of the transfer or by any written evidence had recognized such transfer prior to such "effective date."

**(c)**   Unless otherwise provided, an appropriate license or other authorization issued by or pursuant to the direction or authorization of the Secretary of the Treasury before, during or after a transfer shall validate such transfer or render it enforceable to the same extent as it would be valid or enforceable but for the provisions of section 5(b) of the Trading With the Enemy Act, as amended, and this part and any ruling, order, regulation, direction or instruction issued hereunder.

**(d)**   Transfers of property which otherwise would be null and void, or unenforceable by virtue of the provisions of this section shall not be deemed to be null and void, or unenforceable pursuant to such provisions, as to any person with whom such property was held or maintained (and as to such person only) in cases in which such person is able to establish each of the following:

    **(1)**   Such transfer did not represent a willful violation of the provisions of this part by the person with whom such property was held or maintained;

    **(2)**    The person with whom such property was held or maintained did not have reasonable cause to know or suspect, in view of

all the facts and circumstances known or available to such person, that such transfer required a license or authorization by or pursuant to the provisions of this part and was not so licensed or authorized or if a license or authorization did purport to cover the transfer, that such license or authorization had been obtained by misrepresentation or the withholding of material facts or was otherwise fraudulently obtained; and

**(3)** Promptly upon discovery that:

**(i)** Such transfer was in violation of the provisions of this part or any regulation, ruling, instruction, license or other direction or authorization thereunder, or

**(ii)** Such transfer was not licensed or authorized by the Secretary of the Treasury, or

**(iii)** If a license did purport to cover the transfer, such license had been obtained by misrepresentation or the withholding of material facts or was otherwise fraudulently obtained;

the person with whom such property was held or maintained filed with the Treasury Department, Washington, D.C., a report in triplicate setting forth in full the circumstances relating to such transfer. The filing of a report in accordance with the provisions of this paragraph shall not be deemed to be compliance or evidence of compliance with paragraphs (d)(1) and (2) of this section.

**(e)** Unless licensed or authorized by § 515.504 or otherwise licensed or authorized pursuant to this chapter any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the "effective date" there existed the interest of a designated foreign country or national thereof.

**(f)** For the purpose of this section the term property includes gold, silver, bullion, currency, coin, credit, securities (as that term is defined in section 2(1) of the Securities Act of 1933, as amended), bills of exchange, notes, drafts, acceptances, checks, letters of credit, book credits, debts, claims, contracts, negotiable documents of title,

mortgages, liens, annuities, insurance policies, options and futures in commodities, and evidences of any of the foregoing. The term property shall not, except to the extent indicated, be deemed to include chattels or real property.

## 31 C.F.R. § 515.502 - Effect of subsequent license or authorization

**(a)** No license or other authorization contained in this part or otherwise issued by or under the direction of the Secretary of the Treasury pursuant to section 3(a) or 5(b) of the Trading With the Enemy Act, as amended, or section 620(a), Pub.L. 87–195, or Proclamation 3447, shall be deemed to authorize or validate any transaction effected prior to the issuance thereof, unless such license or other authorization specifically so provides.

**(b)** No regulation, ruling, instruction, or license authorizes a transaction prohibited under this part unless the regulation, ruling, instruction, or license is issued by the Treasury Department and specifically refers to this part.

# 37 C.F.R. § 2.146 - Petitions to the Director

**(a)**   Petition may be taken to the Director in a trademark case:

**(1)**   From any repeated or final formal requirement of the examiner in the ex parte prosecution of an application if permitted by § 2.63(a) and (b);

**(2)**   In any case for which the Act of 1946, Title 35 of the United States Code, or parts 2, 3, 6, and 7 of Title 37 of the Code of Federal Regulations specifies that the matter is to be determined directly or reviewed by the Director;

**(3)**   To invoke the supervisory authority of the Director in appropriate circumstances;

**(4)**   In any case not specifically defined and provided for by parts 2, 3, 6, and 7 of Title 37 of the Code of Federal Regulations; or

**(5)**   In an extraordinary situation, when justice requires and no other party is injured thereby, to request a suspension or waiver of any requirement of the rules not being a requirement of the Act of 1946.

**(b)**   Questions of substance arising during the ex parte prosecution of applications, or expungement or reexamination of registrations, including, but not limited to, questions arising under sections 2, 3, 4, 5, 6, 16A, 16B, and 23 of the Act of 1946, are not appropriate subject matter for petitions to the Director.

**(c)**   **(1)**   Every petition to the Director shall include a statement of the facts relevant to the petition, the points to be reviewed, the action or relief requested, and the fee required by § 2.6. Any brief in support of the petition shall be embodied in or accompany the petition. The petition must be signed by the petitioner, someone with legal authority to bind the petitioner (*e.g.*, a corporate officer or general partner of a partnership), or a practitioner qualified to practice under § 11.14 of this chapter, in accordance with the requirements of § 2.193(e)(5). When facts are to be proved on petition, the petitioner must

submit proof in the form of verified statements signed by someone with firsthand knowledge of the facts to be proved, and any exhibits.

**(2)** A petition requesting reinstatement of a registration cancelled in whole or in part for failure to timely respond to an Office action issued in an expungement and/or reexamination proceeding must include a response to the Office action, signed in accordance with § 2.193, or an appeal

**(d)** Unless a different deadline is specified elsewhere in this chapter, a petition under this section must be filed by not later than:

**(1)** Two months after the issue date of the action, or date of receipt of the filing, from which relief is requested; or

**(2)** Where the applicant or registrant declares under § 2.20 or 28 U.S.C. 1746 that it did not receive the action, or where no action was issued, the petition must be filed by not later than:

**(i)** Two months of actual knowledge of the abandonment of an application and not later than six months after the date the trademark electronic records system indicates that the application is abandoned in full or in part;

**(ii)** Where the registrant has timely filed an affidavit of use or excusable non-use under Section 8 or 71 of the Act, or a renewal application under Section 9 of the Act, two months after the date of actual knowledge of the cancellation/expiration of a registration and not later than six months after the date the trademark electronic records system indicates that the registration is cancelled/expired;

**(iii)** Two months after the date of actual knowledge of the denial of certification of an international application under § 7.13 of this chapter and not later than six months after the trademark electronic records system indicates that certification is denied; or

**(iv)** Where an expungement or reexamination proceeding has been instituted under § 2.92, two months after the

date of actual knowledge of the cancellation of goods and/or services in a registration and not later than six months after the date the trademark electronic record system indicates that the goods and/or services are cancelled.

**(e)** **(1)** A petition from the grant or denial of a request for an extension of time to file a notice of opposition must be filed by not later than fifteen days after the issue date of the grant or denial of the request. A petition from the grant of a request must be served on the attorney or other authorized representative of the potential opposer, if any, or on the potential opposer. A petition from the denial of a request must be served on the attorney or other authorized representative of the applicant, if any, or on the applicant. Proof of service of the petition must be made as provided by § 2.119. The potential opposer or the applicant, as the case may be, may file a response by not later than fifteen days after the date of service of the petition and must serve a copy of the response on the petitioner, with proof of service as provided by § 2.119. No further document relating to the petition may be filed.

**(2)** A petition from an interlocutory order of the Trademark Trial and Appeal Board must be filed by not later than thirty days after the issue date of the order from which relief is requested. Any brief in response to the petition must be filed, with any supporting exhibits, by not later than fifteen days after the date of service of the petition. Petitions and responses to petitions, and any documents accompanying a petition or response under this subsection, must be served on every adverse party pursuant to § 2.119.

**(f)** An oral hearing will not be held on a petition except when considered necessary by the Director.

**(g)** The mere filing of a petition to the Director will not act as a stay in any appeal or inter partes proceeding that is pending before the Trademark Trial and Appeal Board, nor stay the period for replying to an Office action in an application, except when a stay is specifically

requested and is granted or when §§ 2.63(a) and (b) and 2.65(a) are applicable to an ex parte application.

**(h)** Authority to act on petitions, or on any petition, may be delegated by the Director.

**(i)** If the Director denies a petition, the petitioner may request reconsideration, if:

    **(1)** The petitioner files the request by not later than:

        **(i)** Two months after the issue date of the decision denying the petition; or

        **(ii)** Two months after the date of actual knowledge of the decision denying the petition and not later than six months after the issue date of the decision where the petitioner declares under § 2.20 or 28 U.S.C. 1746 that it did not receive the decision; and

    **(2)** The petitioner pays a second petition fee under § 2.6.

# 37 C.F.R. § 2.165 - Petition to Director to review refusal

**(a)**     A response to the examiner's initial refusal to accept an affidavit or declaration is required before filing a petition to the Director, unless the examiner directs otherwise. *See* § 2.163(b) and (c) for the deadline for responding to an examiner's Office action.

**(b)**     If the examiner maintains the refusal to accept the affidavit or declaration, the owner may file a petition to the Director to review the action within the time periods specified in § 2.163(b) and (c).

**(c)**     If no petition is filed within the time periods set forth in paragraphs (a) and (b) of this section, the registration will be cancelled and a notice of cancellation will issue.

**(d)**     A decision by the Director is necessary before filing an appeal or commencing a civil action in any court.

# 37 C.F.R. § 2.183 - Requirements for a complete renewal application

A complete renewal application must include:

**(a)** A request for renewal of the registration, signed by the registrant or the registrant's representative;

**(b)** The fee required by § 2.6 for each class;

**(c)** The additional fee required by § 2.6 for each class if the renewal application is filed during the six-month grace period set forth in section 9(a) of the Act;

**(d)** If the renewal application covers less than all the goods, services, or classes in the registration, then a list specifying the particular goods, services, or classes to be renewed.

**(e)** If at least one fee is submitted for a multiple-class registration, but the fee is insufficient to cover all the classes and the class(es) to which the fee(s) should be applied are not specified, the Office will issue a notice requiring either the submission of additional fee(s) or an indication of the class(es) to which the original fee(s) should be applied. Additional fee(s) may be submitted if the requirements of § 2.185 are met. If the required fee(s) are not submitted and the class(es) to which the original fee(s) should be applied are not specified, the Office will presume that the fee(s) cover the classes in ascending order, beginning with the lowest numbered class.

**(f)** Renewals of registrations issued under a prior classification system will be processed on the basis of that system, unless the registration has been amended to adopt international classification pursuant to § 2.85(e)(3).

# 37 C.F.R. § 2.184 - Refusal of renewal

**(a)**   If the renewal application is not acceptable, the Office will issue a notice stating the reason(s) for refusal.

<Text of subsection (b) effective until (date pending).>

**(b)**   **(1)**   The registrant must file a response to the refusal of renewal within six months of the date of issuance of the Office action, or before the expiration date of the registration, whichever is later. If no response is filed within this time period, the registration will expire, unless time remains in the grace period under section 9(a) of the Act. If time remains in the grace period, the registrant may file a complete new renewal application.

   **(2)**   The response must be signed by the registrant, someone with legal authority to bind the registrant (e.g., a corporate officer or general partner of a partnership), or a practitioner who meets the requirements of § 11.14 of this chapter, in accordance with the requirements of § 2.193(e)(2).

<Text of subsection (b) delayed until announcement of effective date in the Federal Register. *See* 88 FR 62463.>

**(b)**   **(1)**   The registrant must file a response to the refusal of renewal within three months of the date of issuance of the Office action or before the expiration date of the registration, whichever is later.

   **(2)**   Unless notified otherwise in the Office action, the three-month response period designated in paragraph (b)(1) of this section may be extended by three months up to a maximum of six months from the Office action issue date, upon timely request and payment of the fee set forth in § 2.6(a)(28). To be considered timely, a request for extension of time must be received by the Office on or before the deadline for response set forth in the Office action.

**(3)** When a timely response is a bona fide attempt to advance the examination of the renewal application and is a substantially complete response to the outstanding Office action, but consideration of some matter or compliance with a requirement has been omitted, the owner may be granted 30 days, or to the end of the time period for response to the action to which the substantially complete response was submitted, whichever is longer, to explain and supply the omission before the expiration is considered.

**(4)** If no response is filed within the time periods set forth in paragraphs (b)(1) through (3) of this section, the registration will expire, unless time remains in the grace period under section 9(a) of the Act. If time remains in the grace period, the registrant may file a complete, new renewal application.

**(5)** The response must be signed by the registrant, someone with legal authority to bind the registrant (*e.g.*, a corporate officer or general partner of a partnership), or a practitioner who meets the requirements of § 11.14 of this chapter, in accordance with the requirements of § 2.193(e)(2).

**(c)** If the renewal application is not filed within the time periods set forth in section 9(a) of the Act, the registration will expire.

# 37 C.F.R. § 2.185 - Correcting deficiencies in renewal application

**(a)**   If the renewal application is filed within the time periods set forth in section 9(a) of the Act, deficiencies may be corrected after notification from the Office, as follows:

**(1)**   Correcting deficiencies in renewal applications filed within one year before the expiration date of the registration. If the renewal application is filed within one year before the expiration date of the registration, deficiencies may be corrected before the expiration date of the registration without paying a deficiency surcharge. Deficiencies may be corrected after the expiration date of the registration with payment of the deficiency surcharge required by section 9(a) of the Act and § 2.6.

**(2)**   Correcting deficiencies in renewal applications filed during the grace period. If the renewal application is filed during the six-month grace period, deficiencies may be corrected before the expiration of the grace period without paying a deficiency surcharge. Deficiencies may be corrected after the expiration of the grace period with payment of the deficiency surcharge required by section 9(a) of the Act and § 2.6.

**(b)**   If the renewal application is not filed within the time periods set forth in section 9(a) of the Act, the registration will expire. This deficiency cannot be cured.

# 37 C.F.R. § 2.186 - Petition to Director to review refusal of renewal

**(a)** A response to the examiner's initial refusal of the renewal application is required before filing a petition to the Director, unless the examiner directs otherwise. *See* § 2.184(b) for the deadline for responding to an examiner's Office action.

<Text of subsection (b) effective until (date pending).>

**(b)** If the examiner maintains the refusal of the renewal application, a petition to the Director to review the refusal may be filed. The petition must be filed within six months of the date of issuance of the Office action maintaining the refusal, or the renewal application will be abandoned and the registration will expire.

<Text of subsection (b) delayed until announcement of effective date in the Federal Register. *See* 88 FR 62463.>

**(b)** If the examiner maintains the refusal of the renewal application, a petition to the Director to review the refusal may be filed. The petition must be filed within the time periods specified in § 2.184(b).

<Text of subsection (c) effective until (date pending).>

**(c)** A decision by the Director is necessary before filing an appeal or commencing a civil action in any court.

<Text of subsection (c) delayed until announcement of effective date in the Federal Register. *See* 88 FR 62463.>

**(c)** If no petition is filed within the time periods set forth in paragraphs (a) and (b) of this section, the renewal application will be abandoned and the registration will expire.

<Text of subsection (d) added by 86 FR 64333, delayed until announcement of effective date in the Federal Register. *See* 88 FR 62463.>

**(d)** A decision by the Director is necessary before filing an appeal or commencing a civil action in any court.

# TMEP § 405.06 - Payments Refused or Charged Back by Financial Institutions

If a check is returned unpaid (for permitted paper filings (*see* TMEP §301.01)), or an EFT or credit card is refused or charged back by a financial institution, the document that accompanied the payment is processed as though the fee had been omitted. *See In re Paulsen*, 35 USPQ2d 1638, 1639 (Comm'r Pats. 1995). If the document included an authorization to charge deficient fees to a deposit account (*see* 37 C.F.R §2.208 ) that has sufficient funds to cover the fee, the USPTO charges the fee in question, together with a fee for processing the payment that was refused, to the deposit account.

If the document was not accompanied by an authorization to charge fees to a deposit account, the USPTO notifies the party who filed the document of the fee deficiency in a written action. If the deadline for filing the fee is not set by statute, the fee may be resubmitted within the period set for response to the Office action. If the fee in question is statutory (*e.g.*, a filing fee for an appeal, statement of use, or request for extension of time to file a statement of use), the fee must be resubmitted before the expiration of the statutory filing period.

Under 37 C.F.R. §2.6(b)(10), there is a fee for processing any payment that is refused or charged back by a financial institution. This fee covers the work done by USPTO personnel in processing the payment that is refused or charged back. The requirement for submission of the processing fee is strictly enforced. The USPTO will not approve a pending application for publication or registration, or take any other requested action in an application or registration, until all outstanding fees, including the processing fee, have been paid. Any request for waiver of this processing fee should be referred to the Office of the Deputy Commissioner for Trademark Examination Policy.

*See* TMEP §202.03(a) and §202.03(a)(i) regarding the processing of an application in which the application filing fee payment is refused or charged back by a financial institution, §1104.10(b)(vii) regarding fee deficiencies in amendments to allege use, §1108.02(c) regarding fee deficiencies in requests for extensions of time to file a statement of use, §1109.15(a) regarding fee deficiencies in statements of use, §1604.06(c) regarding fee deficiencies in affidavits under §8 of the Act, and §1606.05(c) regarding fee deficiencies in renewal applications.

# TMEP § 1606.13(a) - Correcting Deficiencies in §9 Renewal Applications Filed Within the Year Before the Expiration Date of the Registration

If the renewal application is filed within one year before the expiration date of the registration, deficiencies may be corrected, after notification from the Office, before the expiration date without paying a deficiency surcharge, or after the expiration date with payment of the deficiency surcharge required by §9(a) of the Act. 37 C.F.R. §2.185(a)(1).

Any deficiency must be cured within the set period for response to the Office action, *i.e.*, within six months of the issuance date of the action, or before the expiration date of the registration, whichever is later. If no response is filed within this time period, the registration will expire, unless time remains in the grace period. If time remains in the grace period, the registrant may file a complete new renewal application, with a new fee. 37 C.F.R. §2.184(b); *see* TMEP §1606.12.

## TMEP § 1707 - Director's Supervisory Authority Under 37 C.F.R. §2.146(a)(3)

Under 35 U.S.C. §2 and 37 C.F.R. §2.146(a)(3), the Director may exercise supervisory authority on petition in appropriate circumstances. As noted in TMEP §1706, the Director may review the actions of an examiner or paralegal under 37 C.F.R. §2.146(a)(3) to determine whether there has been clear error or an abuse of discretion.

In some cases, the Director will exercise supervisory authority under 37 C.F.R. §2.146(a)(3) even where there has been no clear error or abuse of discretion, if a petitioner can show that it has substantially complied with the requirements of the statute or rules. *See In re P.T. Polymindo Permata*, 109 USPQ2d 1256, 1257 (Dir USPTO 2013); *In re Carnicon Dev. Co.*, 34 USPQ2d 1541, 1543 (Comm'r Pats. 1992) (holding that an assertion of verified date of first use, coupled with statement of current method of use, interpreted as substantially in compliance with the minimum filing requirement for a statement of use for a verified statement that the "mark is in use in commerce."); TMEP §1713.01.

The Director may also exercise supervisory authority under 37 C.F.R. §2.146(a)(3) to make changes to USPTO practice. *See, e.g., In re L.G. Lavorazioni Grafite S.r.l.*, 61 USPQ2d 1063, 1064 (Dir USPTO 2001); *In re Slack*, 54 USPQ2d 1504, 1506 (Comm'r Pats. 2000); *In re Moisture Jamzz, Inc.*, 47 USPQ2d 1762, 1763–1764 (Comm'r Pats. 1997); *In re El Taurino Rest., Inc.*, 41 USPQ2d 1220, 1222 (Comm'r Pats. 1996); *In re Monte Dei Maschi Di Siena*, 34 USPQ2d 1415, 1416 (Comm'r Pats. 1995).