No. 25-1355

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

BACARDI & COMPANY LIMITED;
BACARDI USA, INC.,

Plaintiffs-Appellants,

v.

COKE MORGAN STEWART, in her official capacity as the
Acting Director of the United States Patent & Trademark Office;
UNITED STATES PATENT & TRADEMARK OFFICE,

Defendants-Appellees,

and

EMPRESA CUBANA EXPORTADORA DE
ALIMENTOS Y PRODUCTOS VARIOS,

Intervenor/Defendant-Appellee.

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————————

## BRIEF FOR DEFENDANTS-APPELLEES

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

PERTINENT STATUTES AND REGULATIONS ................................................. 2

STATEMENT OF THE CASE ................................................................. 2

    A.    Statutory and regulatory background ...................................................2

        1.    Trademark registration and renewal ...........................................2

        2.    The Cuba sanctions regime .......................................................4

    B.    Factual background ...................................................................5

    C.    Administrative proceedings.............................................................6

    D.    District court proceedings ..............................................................9

SUMMARY OF ARGUMENT ............................................................... 11

STANDARD OF REVIEW ................................................................. 13

ARGUMENT ................................................................. 13

I.    The Director Properly Renewed Cubaexport's Registration on the Ground That the Specific License Validated Cubaexport's 2005 Payment ................................................................. 13

    A.    The OFAC license removed the basis for rejecting Cubaexport's payment and refusing its renewal application ..............14

    B.    Bacardi's contrary arguments lack merit .............................................17

    C.    The Director's decision was neither arbitrary nor capricious .............22

II.     The Director Properly Determined That, in the Alternative,
        Cubaexport Corrected Any Fee Deficiency in Its Original Filing ............... 23

        A.      The Director lawfully accepted Cubaexport's correction of any
                fee deficiency ......................................................................24

        B.      Bacardi's contrary arguments misinterpret the Lanham Act and
                USPTO regulations and policy...........................................................26

                1.      USPTO regulations and policy do not establish a
                        mandatory six-month deadline for correcting deficiencies ......26

                2.      The Lanham Act does not prohibit the Director from
                        prescribing a different time limit than the examiner ...............30

        C.      The Director's decision was neither arbitrary nor capricious ............33

CONCLUSION ....................................................................... 35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                        **Page(s)**

*Bacardi & Co. v. USPTO*,
   104 F.4th 527 (4th Cir. 2024) ......................................................... 1, 10

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ...........................................................................23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .........................................................................13

*Department of Com. v. New York*,
   588 U.S. 752 (2019) ....................................................................... 23

*Holly Hill Farm Corp. v. United States*,
   447 F.3d 258 (4th Cir. 2006) ......................................................... 13

*Kellough v. Heckler*,
   785 F.2d 1147 (4th Cir. 1986) ....................................................... 30

*Kennedy v. Braidwood Mgmt., Inc.*,
   145 S. Ct. 2427 (2025) ................................................................... 30

*Lancaster Hosp. Corp. v. Becerra*,
   58 F.4th 124 (4th Cir. 2023) ......................................................... 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................... 33

*Stallard v. USPTO*,
   658 F. Supp. 3d 298 (E.D. Va. 2023), *aff'd*, No. 23-1245, 2023 WL 4742953
   (4th Cir. July 25, 2023) ................................................................. 28

*Starrett v. Special Couns.*,
   792 F.2d 1246 (4th Cir. 1986) ....................................................... 18

*United States v. Arthrex, Inc.*,
   594 U.S. 1 (2021) ........................................................................... 30

*USPTO v. Booking.com B.V.*,
   591 U.S. 549 (2020) ......................................................................... 2

iii

*Vandenbark v. Owens-Illinois Glass Co.*,
   311 U.S. 538 (1941) ................................................................ 16

*Ziffrin, Inc. v. United States*,
   318 U.S. 73 (1943) ................................................................ 16

**Statutes:**

Administrative Procedure Act:
   5 U.S.C. § 557(b) ........................................................... 18, 30
   5 U.S.C. § 701 *et seq.* ......................................................... 1
   5 U.S.C. § 706(2)(A) ......................................................... 13

Lanham Act:
   15 U.S.C. § 1051 *et seq.* ................................................... 1, 2
      15 U.S.C. § 1051(a)(1) ..................................................... 2
      15 U.S.C. § 1052(a)-(e) ..................................................... 2
      15 U.S.C. § 1058 ........................................................... 3
      15 U.S.C. § 1058(c) ..................................................... 3, 24
      15 U.S.C. § 1059 ........................................................ 3, 17
      15 U.S.C. § 1059(a) ..................................................... 3, 24
      15 U.S.C. § 1072 ........................................................... 3
      15 U.S.C. § 1127 ........................................................... 2
      15 U.S.C. § 1115(a) ......................................................... 3

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999,
   Pub. L. No. 105-277, § 211(a)(1), 112 Stat. 2681, 2681-88 (1998) ...................... 5

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. § 1338 ................................................................. 1

28 U.S.C. § 2401 ................................................................. 9

35 U.S.C. § 3 ............................................................... 14, 30

**Regulations:**

31 C.F.R. § 501.801 ............................................................. 4

31 C.F.R. § 515.201 ........................................................... 4

31 C.F.R. § 515.203(c) ................................. 5, 10, 15, 16, 17, 22

31 C.F.R. §§ 515.316-.318 ................................................ 4

31 C.F.R. § 515.527(a)(2) ................................................. 5

37 C.F.R. § 2.146(a) ....................................................... 14

37 C.F.R. § 2.146(a)(2) ..................................................... 9

37 C.F.R. § 2.146(a)(3) ................................................. 9, 32

37 C.F.R. § 2.165(b) .................................................. 9, 14, 32

37 C.F.R. § 2.184(a) ........................................................ 4

37 C.F.R. § 2.184(b)(1) .............................................. 4, 11, 27

37 C.F.R. § 2.185 ......................................................... 27

37 C.F.R. § 2.185(a)(1) ................................................. 3, 24

37 C.F.R. § 2.185(a)(2) .................................................... 29

37 C.F.R. § 2.186 ...................................................... 9, 15

37 C.F.R. § 2.186(a) ...................................................... 28

37 C.F.R. § 2.186(b) ................................................. 4, 14, 32

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................. 1

**Other Authorities:**

*Estate of Glen Campbell*, Ser. No. 87/242,112 (Dir. USPTO June 2, 2025), https://perma.cc/JB3B-CXRP ...........................................25

28 Fed. Reg. 6,974 (July 9, 1963) ....................................... 5

64 Fed. Reg. 48,900 (Sept. 8, 1999) ..................................... 29

*Incendonet, Inc.*, Ser. No. 78/666,290 (USPTO June 14, 2014),
    https://perma.cc/6VGD-PZ79 ...................................................................26

*Incendonet, Inc.*, Ser. No. 78/666,290 (USPTO July 29, 2015),
    https://perma.cc/2RHX-C9U7 .................................................................26

*Incendonet, Inc.*, Ser. No. 78/666,290 (Dir. USPTO Apr. 14, 2016),
    https://perma.cc/RWA8-YLAW ...............................................................26

*North Am. Meat Inst.*, Ser. No. 77/697,432 (Dir. USPTO Aug. 4, 2017),
    https://perma.cc/PB2X-JPZ5 ...................................................................24

*Payment*:
    Black's Law Dictionary (12th ed. 2024) ............................................17
    Oxford English Dictionary (June 2025),
        https://doi.org/10.1093/OED/1184037593 ....................................18

*Society of Tribologists & Lubrication Eng'rs*, Ser. No. 75/445,159 (Dir. USPTO
    Feb. 1, 2023), https://perma.cc/EFQ8-L3L9 .....................................25

*Solix, Inc.*, Ser. No. 85/466,179 (Dir. USPTO Sept. 27, 2023),
    https://perma.cc/7HHK-CG9J ................................................................26

*Taylor Commercial Foodservice Inc.*, Ser. No. 75/691,878
    (Dir. USPTO Jan. 10, 2025), https://perma.cc/8SCR-82K8 ........................ 25-26

USPTO, *Trademark Manual of Examining Procedure
    (TMEP)* (May 2025) ................................................................ 27, 29, 32, 33, 34

vi

## STATEMENT OF JURISDICTION

Plaintiffs Bacardi & Company Limited and Bacardi USA, Inc. (collectively, Bacardi) seek review of agency action by the United States Patent and Trademark Office (USPTO) under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* Bacardi invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1338. JA11. This Court held in *Bacardi & Co. v. USPTO*, 104 F.4th 527, 535-36 (4th Cir. 2024), that the Lanham Act, 15 U.S.C. § 1051 *et seq.*, did not preclude judicial review in this case. On March 5, 2025, the district court granted summary judgment for the government and intervenor-defendant Empresa Cubana Exportadora de Alimentos y Productos Varios (Cubaexport). JA571. Bacardi timely filed a notice of appeal on April 2, 2025. JA573; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

After Cubaexport timely submitted fees required to renew its trademark registration, the USPTO accepted the fees and marked them as received. Several months later, a trademark examiner refunded the fees as unauthorized under the Cuba sanctions regime and refused Cubaexport's renewal application. While that decision was pending review by the USPTO Director, the Treasury Department's Office of Foreign Assets Control (OFAC) issued a license retroactively authorizing the initial payment, and Cubaexport returned the fee to the USPTO. The Director

concluded that the fee was paid and renewed the registration.  The issues presented are:

1.    Whether the district court properly upheld the Director's renewal of the registration on the ground that the OFAC license retroactively authorized the original fee payment.

2.    Whether the district court properly upheld the Director's alternative rationale that Cubaexport properly corrected any fee deficiency in its original renewal application.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to Bacardi's brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

### 1.    Trademark registration and renewal

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, "provides federal statutory protection for trademarks" in addition to that provided by state law.  *USPTO v. Booking.com B.V.*, 591 U.S. 549, 552 (2020).  The Act authorizes federal registration of trademarks if certain requirements are met.  *See* 15 U.S.C. §§ 1051(a)(1), 1052(a)-(e), 1127.  Federal registration provides various benefits

including "prima facie evidence" of a mark's validity, *id.* § 1115(a), and "constructive notice of the registrant's claim of ownership," *id.* § 1072.

Once obtained, a trademark registration may be renewed for additional 10-year terms if a registrant meets the Lanham Act's requirements. *See* 15 U.S.C. §§ 1058, 1059. Section 8 of the Act requires an affidavit showing continued use of the trademark in commerce or excusable non-use and payment of a fee. *See id.* § 1058. Section 9 requires a renewal application and payment of a fee within the year before the registration expires or during a grace period of six months after expiration. *See id.* § 1059.

The Lanham Act and USPTO regulations both address the correction of deficiencies in such filings. For Section 8 filings, "the deficiency may be corrected after the statutory time period, within the time prescribed after notification of the deficiency," upon payment of a surcharge. 15 U.S.C. § 1058(c). Likewise, for Section 9 filings, "the deficiency may be corrected within the time prescribed after notification of the deficiency, upon payment of a surcharge prescribed therefor." *Id.* § 1059(a). USPTO regulations accordingly provide that "deficiencies may be corrected before the expiration date of the registration without paying a deficiency surcharge," and "[d]eficiencies may be corrected after the expiration date of the registration with payment of the deficiency surcharge." 37 C.F.R. § 2.185(a)(1). None of these provisions specifies a time limit for such a correction.

3

USPTO regulations further set out procedures under which the Director may review—and reverse—an examiner's refusal of a renewal application.  If an examiner determines that a "renewal application is not acceptable," the USPTO will "issue a notice stating the reason(s) for refusal," known as an "Office action." 37 C.F.R. § 2.184(a), (b)(1).  The applicant must "file a response to the refusal of renewal within six months of the date of issuance of the Office action."  *Id.* § 2.184(b)(1).  If the examiner maintains the refusal, the applicant may then submit "a petition to the Director to review the refusal."  *Id.* § 2.186(b).  "The petition must be filed within six months of the date of issuance of the Office action maintaining the refusal . . . ."  *Id.*  The statute and regulations do not set a time limit for the Director's decision.

## 2.  The Cuba sanctions regime

The Cuban Assets Control Regulations (CACR) administered by OFAC prohibit, among other things, transactions by "any person subject to the jurisdiction of the United States" involving property in which Cuba or any Cuban national has "any interest of any nature."  31 C.F.R. § 515.201.  Exceptions may be "specifically authorized by the Secretary of the Treasury."  *Id.*  Such exceptions may take two forms:  a "general license" that authorizes a class of transactions for all who meet its criteria or a "specific license" that authorizes transactions for particular applicants.  *Id.* §§ 501.801, 515.316-.318.  When issued for a past

4

transaction, a license retroactively validates the transaction even if the transaction was prohibited when made: "an appropriate license . . . issued by . . . the Secretary of the Treasury before, during or *after* a transfer shall validate such transfer or render it enforceable to the same extent as it would be valid or enforceable but for" the CACR.  *Id.* § 515.203(c) (emphasis added).

The CACR originally included a general license allowing Cuban-affiliated entities to register and renew U.S. trademarks.  *See* 28 Fed. Reg. 6,974, 6,982 (July 9, 1963).  In 1998, however, Congress precluded the general license from applying to any trademark "that was used in connection with a business or assets that were confiscated" by the Cuban government.  *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 211(a)(1), 112 Stat. 2681, 2681-88 (1998); *see also* 31 C.F.R. § 515.527(a)(2) (implementing regulation).  A specific license is therefore required to pay registration or renewal fees for any such mark.

## B.    Factual background

According to Bacardi's complaint, the HAVANA CLUB trademark was originally owned by Jose Arechabala S.A. (JASA), which owned a rum business in Cuba.  JA9.  JASA registered the HAVANA CLUB mark in 1935.  JA18.

Bacardi alleges that, in 1960, the Cuban government expropriated JASA's assets, JA18, and later transferred JASA's trade names and registered trademarks

5

to Cubaexport, JA19.  After JASA's HAVANA CLUB registration expired,

Cubaexport applied to register the mark, and the USPTO issued the registration in

1976.  JA19.

In 1997, JASA transferred any remaining interest in the HAVANA CLUB

mark to Bacardi.  JA19.  Bacardi applied to register the mark, but the USPTO

issued an Office action refusing the application because of Cubaexport's existing

registration.  JA19.  That application is currently suspended pending separate

litigation in which Bacardi seeks to cancel Cubaexport's registration under the

Lanham Act.  *See* JA20; Complaint, *Bacardi & Co. v. Empresa Cubana

Exportadora de Alimentos y Productos Varios* (*Bacardi I*), No. 1:04-cv-519

(D.D.C. Mar. 29, 2004), Dkt. No. 1.

## C.   **Administrative proceedings**

1.   The agency proceedings in this case commenced when Cubaexport

sought to renew its HAVANA CLUB registration, which was due to expire on July

27, 2006.  JA20.  On December 14, 2005, Cubaexport filed a combined Section 8

affidavit and Section 9 renewal application.  JA57, JA65.  The application

authorized the USPTO to charge the applicable fees to its counsel Ropes & Gray's

deposit account.  JA57.  The application cited a specific license pertaining to the

*Bacardi I* litigation and explained why, in Cubaexport's view, the specific license

6

authorized the payment.  JA57-60.  The USPTO charged the fees to Ropes &
Gray's account and marked them posted as of December 21, 2005.  JA540, JA542.

Several months later, on April 6, 2006, OFAC sent a letter to Ropes & Gray,
copying the USPTO, stating that the specific license did not authorize payment of
the fees.  JA199-200.  The letter explained that Ropes & Gray could apply for
another specific license for the fees, JA199-200, and the firm so applied the next
day, JA301.

A USPTO trademark examiner issued an Office action on July 20, 2006,
stating that Cubaexport's Section 8/9 filing could not be accepted because the fee
payment was not authorized by an OFAC license.  JA289.  The Office action stated
that "[t]he fee charged on December 21, 2005, for the combined filing will be
refunded since it was not properly authorized."  JA291 n.1.  Cubaexport timely
responded on August 1, 2006.  JA293.  Cubaexport informed the USPTO that
OFAC had denied a specific license on July 28, 2006, but argued that the
registration should nonetheless be renewed.  JA293.

On August 3, 2006, the examiner issued an Office action maintaining the
original refusal, explaining that because the payment was unauthorized, the fee was
unpaid and "the registration will be cancelled/expired."  JA314.  The USPTO
refunded the Section 8/9 fees on the same day.  JA540, JA542.

Cubaexport timely sought review by submitting a petition to the Director on October 4, 2006. JA316. The USPTO suspended the petition on December 6, 2006, because Cubaexport was seeking judicial review of OFAC's denial of a specific license. JA466.

That litigation extended for several years and was not ultimately resolved until 2012. JA492. Cubaexport, OFAC, and the USPTO subsequently engaged in correspondence regarding whether a specific license was required to declare the HAVANA CLUB registration cancelled or expired. JA491-494, JA502-511.

2.     On January 11, 2016, after a new request from Cubaexport, OFAC granted Cubaexport a specific license to "engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration . . . , including those related to Cubaexport's submission filed with the USPTO on or about December 14, 2005, and the payment referenced therein." JA522-523. A day later, Cubaexport informed the USPTO and requested that the Director grant Cubaexport's still-pending petition, citing OFAC's authority to retroactively authorize transactions. JA519-523. Cubaexport also authorized the USPTO to withdraw the fees again, JA519, and submitted a new renewal application for the 2016-2026 renewal period, JA514-516.

On January 13, 2016, the USPTO Director (acting through the Commissioner of Trademarks), granted Cubaexport's petition, accepted the 2005

8

Section 8/9 filing, and renewed the registration.  JA524, JA526-527 (citing

authority 37 C.F.R. §§ 2.146(a)(2), 2.146(a)(3), 2.165(b), 2.186).  The Director

provided two alternative grounds.

First, "Petitioner has provided an OFAC license that specifically authorizes

petitioner's December 14, 2005 combined §8/9 filing and fee payment.  Thus, the

fee payment is effective as of December 14, 2005, and the combined §8/9 filing is

considered complete and acceptable as of that date."  JA526.

Second, even if the OFAC license had not retroactively validated the

December 14, 2005, payment, "[n]on-payment or insufficient payment of the fee

for a combined §8/9 filing is a deficiency that can be corrected, even after the

statutory time period, as long as the correction occurs within the time prescribed

after notification of the deficiency."  JA526.  "Petitioner has satisfied the fee

requirement by obtaining an OFAC license that authorizes petitioner's payment of

the fee for the combined §8/9 filing, providing the license to the USPTO as a

timely supplement to its petition, and authorizing the USPTO to charge any

uncollected fees to its counsel's USPTO deposit account."  JA526.

## D.    District court proceedings

Bacardi filed an APA suit challenging the Director's decision in December

2021, shortly before the six-year statute of limitations was to expire.  JA8, JA11;

28 U.S.C. § 2401.  Bacardi asked the district court to "(i) set aside the decision of

the Director . . . ; (ii) declare that Cubaexport's HAVANA CLUB trademark registration . . . expired as of the end of its term in 2006; and (iii) order the [US]PTO to remove Cubaexport's expired HAVANA CLUB trademark registration from the registry." JA29.

The district court initially dismissed the suit on the ground that the Lanham Act precludes a third party from obtaining APA review of the Director's renewal decision. *See Bacardi & Co. v. USPTO*, 104 F.4th 527, 531 (4th Cir. 2024). This Court reversed and remanded, holding that the Lanham Act does not preclude such review. *See id.* at 535-36. Cubaexport subsequently intervened as a defendant. JA3.

The district court entered summary judgment for defendants. JA559-560. The court held that OFAC's specific license "effectively validated the payment as having been made as of December 14, 2005, which was within the statutory renewal period." JA567. The court explained that the specific license validated the 2005 payment and made it enforceable "to the same extent" it would be without the CACR. JA567 (quoting 31 C.F.R. § 515.203(c)). "Accordingly, the Director's finding that payment of the fee was timely and the decision to accept Cubaexport's 2006 renewal application was neither arbitrary nor capricious and was in accordance with the Lanham Act and its regulations." JA567.

10

Alternatively, the district court held that Cubaexport had corrected any fee deficiency by making payment while its petition to the Director was still pending. JA567.  The court rejected Bacardi's claim that "Cubaexport was required to cure the deficiency and pay the fee within six months from the date of the July 2006 Office Action."  JA568.  The court explained that the six-month deadline in 37 C.F.R. § 2.184(b)(1) was for filing a response, not for correcting a deficiency. JA568 n.7.  The court further explained that, where a petitioner "has substantially complied with the requirements of the statute or rules," agency precedent provided that the Director "may exercise supervisory authority" to grant a petition and accept a late payment.  JA568-569.  Because the "deficiency was cured when the renewal and deficiency surcharge were paid," "the Director's alternative reason for accepting Cubaexport's 2006 renewal application was also neither arbitrary nor capricious and was in accordance with the Lanham Act and its regulations." JA570.

## SUMMARY OF ARGUMENT

1.    As the district court recognized, the Director properly accepted Cubaexport's renewal application and renewed its registration on the ground that the specific license retroactively validated Cubaexport's 2005 fee payment. Although an examiner had determined that the payment was not authorized by OFAC and had to be refunded, that decision was not final.  Cubaexport properly

11

petitioned the Director for review and, while that petition was pending, OFAC issued a specific license requiring the Director to treat the December 2005 payment as authorized. The Director therefore correctly reversed the decision to reject the payment and refuse the renewal application.

Bacardi principally argues that no payment was made because the examiner returned Cubaexport's payment as unauthorized several months after the USPTO initially accepted it. But the Director had the ultimate authority to determine whether to accept the payment and the application, so the Director's determination on review overruled the examiner's. Bacardi has no basis for binding the agency to the examiner's actions at an intermediate step in the administrative process.

2.     The district court also correctly accepted the Director's alternative rationale for renewal, that Cubaexport properly corrected any fee deficiency. The Lanham Act and the USPTO's regulations set no time limit for correcting deficiencies, instead leaving such limits to the agency's discretion. Here, the Director properly exercised that discretion to extend the deficiency-correction deadline to permit Cubaexport's payment.

Bacardi wrongly contends that the Director was bound by the earlier six-month deadline specified by the examiner. The Director has the ultimate authority to exercise the agency's discretion to set a time limit for correcting deficiencies. Bacardi points to nothing in the Lanham Act, implementing regulations, or policy

12

that prohibits the Director's action here.  To the contrary, the decision is consistent

with the Director's longstanding practice of allowing, when appropriate, the

correction of deficiencies after six months.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo.

*See Lancaster Hosp. Corp. v. Becerra*, 58 F.4th 124, 127 (4th Cir. 2023).  Under

the APA, a court assesses whether final agency action is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  That review entails assessing "'"whether the agency conformed with

controlling statutes," and whether the agency has committed "a clear error of

judgment."'"  *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (4th Cir.

2006).  "[T]he ultimate standard of review is a narrow one.  The court is not

empowered to substitute its judgment for that of the agency."  *Id.* (alteration in

original) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

416 (1971)).

## ARGUMENT

I.  **The Director Properly Renewed Cubaexport's Registration on the Ground That the Specific License Validated Cubaexport's 2005 Payment**

As the district court properly recognized, the USPTO permissibly renewed

Cubaexport's trademark registration on the ground that OFAC issued a license

13

retroactively authorizing Cubaexport's fee payment nothwithstanding the Cuba
sanctions in the CACR.  JA567.

### A.    The OFAC license removed the basis for rejecting Cubaexport's payment and refusing its renewal application

The specific license that OFAC issued in 2016 resolved an issue that
remained open during the pendency of Cubaexport's petition to the Director:
whether the examiner erred in refusing Cubaexport's application on the ground that
Cubaexport's 2005 fee payment was not authorized by OFAC and had to be
refunded.  In reviewing the examiner's decision, the Director correctly concluded
that OFAC's specific license retroactively authorized the payment and thus
removed the sole basis for the examiner's decision to reject the payment and refuse
the application.  The Director therefore properly reversed and concluded that
Cubaexport's application was timely and complete.

1.    The USPTO Director holds the power to make final decisions for the
USPTO.  *See* 35 U.S.C. § 3 (vesting "powers and duties of the" USPTO in the
Director).  That power includes the authority to review and reverse or revise
trademark examiners' decisions regarding renewal.  37 C.F.R. §§ 2.146(a),
2.165(b), 2.186(b).

The question before the Director was whether the examiner erred in refusing
Cubaexport's application on the ground that Cubaexport's payment was not
authorized by OFAC and had to be rejected.  Although the USPTO initially

withdrew the funds and posted the payment, JA540, JA542, the examiner

concluded several months later based on an OFAC determination that the payment

was unauthorized, JA289.  The examiner therefore determined that the fee had to

be refunded and deemed unsubmitted, JA291 n.1, JA314, and refused the renewal

application on that basis, JA314.

However, the examiner's determination was not the agency's final decision.

Cubaexport timely sought review by filing a petition to the Director.  JA316; *see

also* 37 C.F.R. § 2.186 (providing that examiner's decision is not final agency

action subject to judicial review).  Among other arguments, Cubaexport contended

that the USPTO "erred" in "refus[ing] to accept the fee" and that the law did not

"permit[] the [USPTO] to refuse payment of the prescribed renewal fee."  JA323-

324 (emphasis omitted).

2.      When the Director considered the petition on the merits, OFAC had

issued a specific license authorizing the payment the examiner concluded was not

authorized by OFAC.  That specific license had retroactive effect by operation of

the sanctions regulations in the CACR.  Specifically, a license "issued by . . . the

Secretary of the Treasury . . . *after* a transfer shall validate such transfer or render it

enforceable to the same extent as it would be valid or enforceable but for" the

CACR.  31 C.F.R. § 515.203(c) (emphasis added).  Here, although the specific

license was issued after the December 2005 payment, it authorized Cubaexport "to

engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark . . . , including those related to Cubaexport's submission filed with the USPTO on or about December 14, 2005, and *the payment referenced therein*." JA523 (emphasis added).

The Director therefore correctly determined that the December 2005 payment was "validate[d]" or "enforceable to the same extent as it would be . . . but for" the Cuba sanctions. 31 C.F.R. § 515.203(c). The Director accordingly reversed the examiner's prior conclusion that the renewal filing "could not be accepted because the required fee was not authorized to be paid and thus was deemed not to have been paid." JA525.

Of course, the examiner could not have known with any certainty that OFAC would later retroactively authorize the payment. In this respect, the examiner's situation is akin to that of a district court that relies on law that later changes while a case is pending appeal. "A change in the law between a [trial court judgment] and an appellate decision requires the appellate court to apply the changed law." *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78 (1943). "Intervening and conflicting decisions will thus cause the reversal of judgments which were correct when entered." *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 543 (1941). Here, the specific license changed the applicable legal principles by requiring the Director to retroactively treat the December 2005 payment as authorized. So

16

treated, the examiner's earlier decisions were no longer correct, and the Director properly reversed them.

## B.  Bacardi's contrary arguments lack merit

1.     Bacardi's arguments regarding the Lanham Act's requirements misread the statute, fail to appreciate the Director's authority to make final decisions for the agency, and misunderstand the Cuba sanctions regulations.

As discussed above, the specific license had full effect despite being issued "after" the transaction, 31 C.F.R. § 515.203(c), and the Director thus properly concluded that the original payment was valid and effective.  Bacardi misses the point when it urges that the funds Cubaexport transferred did not constitute "payment" because the examiner determined at an intermediate stage that the agency should return the funds.  *See* 15 U.S.C. § 1059 (authorizing renewal "upon payment of the prescribed fee").[1]  Tendering funds that the agency ultimately decides it must accept constitutes "payment" by any definition of the term, which in any event can refer to tendering funds without regard to acceptance.  *Compare Payment*, Black's Law Dictionary (12th ed. 2024) ("1.  Performance of an obligation by the delivery of money or some other valuable thing accepted in

---

[1] As noted, the USPTO initially withdrew the fee and posted the payment to Cubaexport's account.  Thus, even on Bacardi's theory, Cubaexport's payment was complete at that time.  If the examiner could reverse the agency's initial acceptance of the payment, the Director could likewise reverse the examiner's rejection, thereby restoring the payment to its initial status.

partial or full discharge of the obligation."), *with id.* ("3.  A disbursement of money."); *Payment*, Oxford English Dictionary (June 2025), https://doi.org/10.1093/OED/1184037593 ("The action or an act of paying money owed; the remuneration of a person with money or its equivalent, in discharge of a debt or in exchange for goods, services, etc.").

Bacardi fails to appreciate that whether the USPTO should accept the payment was precisely one of the issues before the Director in reviewing the examiner's refusal of Cubaexport's application.  The Director retained the ultimate authority to accept or reject the payment and determined that it had to be accepted because of the specific license.  *Cf.* 5 U.S.C. § 557(b) ("On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision . . . .").  That decision is the only one with legal effect and the only one subject to review before this Court.  *See Starrett v. Special Couns.*, 792 F.2d 1246, 1252 (4th Cir. 1986) ("[W]e review the decision of the [agency], not that of the [Administrative Law Judge].").

Bacardi similarly misses the point in contending that "[w]hat matters . . . is that come the end of the statutory period for filing," "the funds needed to satisfy the renewal fee obligation had not changed hands."  Appellants' Br. 33-34 (emphasis omitted).  The relevant point is that Cubaexport timely submitted the funds, and the Director ultimately determined that the payment was valid and

18

should be accepted.  If a registrant timely submits a fee but the USPTO does not finally decide to accept it until after the filing deadline, the registrant has still complied with the statute, regardless of whether an examiner disagreed at an intermediate stage and incorrectly returned the fee.  The statute sets a deadline for the registrant to tender payment, not for the USPTO to accept it.

Bacardi's contrary interpretation would create bizarre results and eviscerate the Director's review authority.  Suppose a registrant authorizes a withdrawal from its account, but a backlog causes the USPTO to fail to withdraw the funds or accept them until after the filing deadline.  Or suppose the examiner rejected a payment on an obviously mistaken ground—for example, by misreading OFAC correspondence to prohibit a transaction that was actually authorized—and the Director does not complete review by the filing deadline.  On Bacardi's view, the Director could not renew either meritorious registration, at least without the registrant going through the deficiency process and paying deficiency fees.  Nothing in the statute suggests that Congress intended these results or, more generally, that a mistake or delay on the examiner's part would invalidate what would otherwise be a complete renewal application.

Bacardi's analogy (at 29, 30-31) to the USPTO's treatment of bounced checks and credit card chargebacks is inapposite.  In such cases, the payor has never actually tendered payment because, due to third-party action, there are no

19

funds for the agency to accept or reject; the Director cannot review a bank's

decision not to deliver funds to the USPTO due to insufficient funds. Here, in

contrast, the agency's own examiner reversed the agency's initial acceptance of the

transferred funds; the Director properly reviewed and reversed that decision in

turn.

2.      Bacardi's arguments regarding the CACR and the specific license are

likewise unavailing. Bacardi does not advance its argument by contending (at 31-

32) that the December 2005 payment was unlawful when it was made; as noted, a

specific license can change a payment's lawfulness after the fact. *See supra*

pp. 15-16.

Bacardi also errs in contending (at 34-38) that the specific license could not

validate the December 2005 payment because there was no transfer to validate. As

a factual matter, the transfer occurred when the USPTO received and posted

Cubaexport's payment. Only after several months did an examiner determine that

the USPTO could not accept the fee and had to refund it—that is, that the USPTO

should not recognize the effectiveness of the transfer. In reversing that decision,

the Director restored the effectiveness of the initial transfer, as required by the

specific license. This Court therefore need not decide how the CACR and the

Lanham Act would apply if Cubaexport tendered payment but the USPTO did not

withdraw the funds, or if Cubaexport did not tender payment at all.  *See*
Appellants' Br. 37-38.

Once again, Bacardi erroneously focuses on the practical consequences of
the examiner's decision rather than the Director's ultimate decision for the agency,
which is actually before the Court.  Those consequences—the agency's refund of
the fee; Cubaexport's subsequent return of the fee from a different account after
the Director reversed; and the way these transfers were recorded in the USPTO's
ledger—have nothing to do with whether the examiner was incorrect to reject the
payment in the first place.  The propriety of that decision was before the Director,
whose decision is now before this Court.  And once the decision to reject the
payment was reversed, Cubaexport was entitled to restore the funds from any
account:  reversing the refusal to accept the funds meant accepting payment, not
that the agency must turn back the clock and recreate the precise circumstances of
the original payment.

The fact that Cubaexport paid a deficiency surcharge also does not change
the analysis.  The Director's alternative rationale—that Cubaexport cured any
deficiency after the deadline for initial submission—required such a fee, *see infra*
pp. 24-26, and Cubaexport's application cannot be denied on the ground that
Cubaexport paid too much.

Finally, Bacardi errs in claiming (at 38-39) that the specific license did not retroactively authorize the December 2005 payment. As noted, the regulations specify that a license issued after a transfer renders the transfer valid after the fact. *See* 31 C.F.R. § 515.203(c). That is so regardless of the verb tense used in the license, particularly where, as here, the license refers to a specific payment that was made in the past. By authorizing "the payment referenced" in "Cubaexport's submission filed with the USPTO on or about December 14, 2005," the license plainly intended to validate the payment made on that date.[2]

### C.   The Director's decision was neither arbitrary nor capricious

Bacardi's arbitrary-and-capricious arguments add little to its contrary-to-law arguments and merit little discussion. Bacardi wrongly faults (at 57) the Director for failing to use the word "retroactivity" or cite the relevant CACR regulation, 31 C.F.R. § 515.203(c). But the Director stated that the "OFAC license . . . specifically authorizes petitioner's December 14, 2005 combined §8/9 filing and fee payment" and therefore that "the fee payment is effective as of December 14, 2005, and the combined §8/9 filing is considered complete and acceptable as of that date." JA526. In concluding that the OFAC license made the payment

---

[2] Bacardi's different interpretation of the license (at 38) as authorizing transactions "related to" the December 2005 application and to the accompanying payment, JA523, does not change the analysis because the December 2005 payment is related to both the submission and to itself.

effective as of a past date, the Director plainly found the license to have retroactive effect even if the Director did not use the word "retroactive."

Bacardi also faults the Director (at 59-61) for not addressing the various arguments it has come up with in the course of this litigation. But none of those arguments were presented to the Director, and none are so significant that not addressing them *sua sponte* is outside the "the bounds of reasoned decisionmaking." *Department of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

Ultimately, the Director's decision was a straightforward application of the governing legal principles. Cubaexport tendered a payment, which was subsequently validated by an OFAC license, and the Director therefore reversed the examiner's decision to refuse the application and reject the payment as unauthorized by OFAC. The Director explained as much, and nothing more was required.

## II. The Director Properly Determined That, in the Alternative, Cubaexport Corrected Any Fee Deficiency in Its Original Filing

Even if the specific license did not retroactively validate Cubaexport's December 2005 payment, the Director properly concluded in the alternative that Cubaexport corrected any resulting deficiency. Bacardi disputes not the sufficiency of Cubaexport's correction but only its timeliness, arguing that the

Director could not extend the deficiency-correction deadline to permit Cubaexport's payment. The district court correctly rejected Bacardi's arguments.

### A. The Director lawfully accepted Cubaexport's correction of any fee deficiency

1. The Lanham Act and USPTO regulations specifically provide that registrants may cure deficiencies in timely-submitted Section 8 and Section 9 filings. However, neither sets a uniform deadline for doing so. Instead, both give the agency discretion to set time limits. The Lanham Act provides that, "[i]f any application filed under [Section 9] is deficient, the deficiency may be corrected within the time prescribed after notification of the deficiency, upon payment of a surcharge prescribed therefor." 15 U.S.C. § 1059(a); *see also id.* § 1058(c). The regulations likewise provide only that "[d]eficiencies may be corrected after the expiration date of the registration with payment of the deficiency surcharge." 37 C.F.R. § 2.185(a)(1).

Examiners will normally specify a six-month period for correcting deficiencies in the first instance, *see infra* pp. 27-29, but the Director has the ultimate authority to exercise discretion on behalf of the agency. *See, e.g.*, *North Am. Meat Inst.*, Ser. No. 77/697,432 (Dir. USPTO Aug. 4, 2017), https://perma.cc/PB2X-JPZ5 ("In some cases, the Director will exercise supervisory authority under Rule 2.146(a)(3), if a petitioner can show that he or she has substantially complied with the requirements of the statute or rules or that

24

some other facts warrant the exercise of that authority."); *Society of Tribologists &*
*Lubrication Eng'rs*, Ser. No. 75/445,159 (Dir. USPTO Feb. 1, 2023),
https://perma.cc/EFQ8-L3L9.  In this case, the examiner's July 2006 Office action
informed Cubaexport that it had six months to correct the deficiency.  JA289.
However, that deadline was not the USPTO's final decision.  Cubaexport filed a
timely petition to the Director, who had the ultimate authority to affirm or alter the
deficiency-correction deadline, although the Director did not exercise that
authority while the petition was suspended.  JA466.

That suspension ended after OFAC issued a specific license and Cubaexport
submitted payment of the fee and a deficiency surcharge.  JA525, JA539, JA542.
The Director accepted the fee, JA526, effectively extending the deficiency-
correction deadline to allow the payment.  The Director could have prescribed a
further period for correction, but doing so was unnecessary because Cubaexport
had already paid.  Cubaexport therefore corrected any deficiency within the time
prescribed by the Director.

The Director's decision is consistent with longstanding practice.  In
appropriate cases on petition to the Director, the Director routinely allows
correction of deficiencies after expiration of the initial six-month deadline set in an
Office action.  *See, e.g.*, *Estate of Glen Campbell*, Ser. No. 87/242,112 (Dir.
USPTO June 2, 2025), https://perma.cc/JB3B-CXRP; *Taylor Commercial*

25

*Foodservice Inc.*, Ser. No. 75/691,878 (Dir. USPTO Jan. 10, 2025),

https://perma.cc/8SCR-82K8; *Solix, Inc.*, Ser. No. 85/466,179 (Dir. USPTO Sept.

27, 2023), https://perma.cc/7HHK-CG9J.  For example, in *Incendonet, Inc.*, Ser.

No. 78/666,290 (USPTO June 14, 2014), https://perma.cc/6VGD-PZ79, the

examiner issued an Office action finding a Section 8 filing deficient and required

both a response and correction of the deficiency within six months.  The registrant

attempted correction by submitting new specimens, but the specimens were

inadequate.  *See Incendonet, Inc.*, Ser. No. 78/666,290 (USPTO July 29, 2015),

https://perma.cc/2RHX-C9U7.  The examiner maintained the refusal and provided

no further opportunity to correct the deficiency.  *See id.*  Over a year after the

initial six-month deficiency-correction deadline expired, the registrant submitted

another specimen in a petition to the Director, who granted review and accepted

the correction of the deficiency.  *See Incendonet, Inc.*, Ser. No. 78/666,290 (Dir.

USPTO Apr. 14, 2016), https://perma.cc/RWA8-YLAW.

## B. Bacardi's contrary arguments misinterpret the Lanham Act and USPTO regulations and policy

### 1. USPTO regulations and policy do not establish a mandatory six-month deadline for correcting deficiencies

a.    Bacardi's contrary arguments rest on misreadings of USPTO

regulations and policy.  Bacardi incorrectly relies (at 42) on the regulation

governing responses to Office actions, which provides that "[t]he registrant must

26

file a response to the refusal of renewal within six months of the date of issuance

of the Office action."  37 C.F.R. § 2.184(b)(1).  But as the district court correctly

explained, "Bacardi misreads this regulation, which specifies the time in which to

file a response."  JA568 n.7.  "There is no reference in § 2.184(b)(1) to a deadline

by which a deficiency must be cured."  JA568 n.7.  Bacardi's atextual argument (at

42-43) that this regulation could have no purpose other than prescribing a time for

correcting deficiencies ignores that a registrant may submit many types of

responses that do not include a correction—for example, an argument that the

application was not actually deficient.  That the USPTO did not intend "fil[ing] a

response," 37 C.F.R. § 2.184(b)(1), as synonymous with "[c]orrecting

deficiencies" is evident from the fact that the USPTO expressly addresses the latter

as a separate topic in the very next section, *id.* § 2.185.

        b.      Bacardi likewise errs (at 43-44) in relying on a provision of the

Trademark Manual of Examining Procedure that states that "[a]ny deficiency must

be cured within the set period for response to the Office action, i.e., within six

months of the issuance date of the action," and cites § 2.184(b)(1) for that deadline.

USPTO, *Trademark Manual of Examining Procedure (TMEP)* § 1606.13(a) (May

2025) (TMEP).  That TMEP provision directs examiners to use the six-month

deadline for responding to an Office action as the deadline for correcting a

deficiency, as the examiner did in this case.  *See* JA289 (specifying that "the fee or

authorization to charge the fee must accompany the response"). It does not

constrain the Director in determining the period for cure when reviewing an

examiner's decision; nor does it have the force of law or bind the Director at all.

"As explained in its Introduction, the TMEP 'sets forth the guidelines and

procedures followed *by the examining attorneys* at the USPTO'; however, the

TMEP also clarifies that the guidelines 'do not have the force and effect of law'

but 'have been developed as a matter of internal office management[.]'" *Stallard

v. USPTO*, 658 F. Supp. 3d 298, 302 (E.D. Va. 2023) (alteration in original)

(emphasis added) (quoting TMEP, Introduction (July 2022); TMEP, Foreword

(July 2022)), *aff'd*, No. 23-1245, 2023 WL 4742953 (4th Cir. July 25, 2023).

Thus, although the TMEP directs examiners to use a six-month deadline, the

TMEP does not require the Director to do so.

That result makes sense in context. In most cases, registrants cannot even

file a petition to the Director until they have submitted a response, 37 C.F.R.

§ 2.186(a), so by the time the Director considers the matter, the six-month deadline

will usually have passed. For the Director to exercise effective review authority,

the Director must be able to permit the correction of deficiencies after the six-

month deadline for filing a response. Suppose, for example, that the Director

agreed with the examiner that the application was deficient but disagreed as to

what was required to correct the deficiency. On Bacardi's reading, the Director's

28

decision would be meaningless because the registrant could not even provide the correction required by the Director, having already passed the six-month mark.

Nor does the TMEP support Bacardi's interpretation (at 44) of § 2.184(b)(1) as addressing the time to correct deficiencies. The TMEP, in providing that "[a]ny deficiency must be cured within the set period for response to the Office action," actually recognizes that the § 2.184(b)(1) time period is for "response to the Office action" and merely directs examiners to use the same time limit for correction of a deficiency. TMEP § 1606.13(a).

      c.    Bacardi also errs in relying (at 44) on vague language in the preamble to the rule that promulgated the current § 2.184. The preamble states that § 2.185(b) "specifically addresses whether the failure to file a renewal application in the proper time period will be considered a deficiency that can be cured during a six-month deficiency period." 64 Fed. Reg. 48,900, 48,915 (Sept. 8, 1999). It is unclear what "six-month deficiency period" the preamble refers to, but the only six-month period mentioned in § 2.185 is the six-month statutory grace period. *See* 37 C.F.R. § 2.185(a)(2). That phrase does not establish that the agency interpreted a different provision, § 2.184(b)(1), as prescribing a uniform six-month period for correcting deficiencies.

29

### 2.    The Lanham Act does not prohibit the Director from prescribing a different time limit than the examiner

Bacardi errs in arguing (at 46-50) that, because the July 2006 Office action initially specified a six-month deficiency-correction deadline, the Lanham Act prohibited the Director from prescribing a longer time limit.  Congress vested the powers of the USPTO in the Director, 35 U.S.C. § 3, and nothing in the Lanham Act removes this discretionary power from that grant.  Nor does any provision of the Lanham Act bar the agency from extending the prescribed time.

Bacardi's argument contravenes bedrock administrative law principles. "[T]he 'almost-universal model of adjudication in the Executive Branch'" is "'for principal officers to have the capacity to review decisions made by inferior adjudicative officers.'"  *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2450 (2025); *see United States v. Arthrex, Inc.*, 594 U.S. 1, 25 (2021) (holding that statute "cannot constitutionally be enforced to the extent that its requirements prevent the Director from reviewing final decisions rendered by" Administrative Patent Judges).  Moreover, "[t]he agency has all the powers [on review of an initial decision] which it would have in making the initial decision."  *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986) (second alteration in original) (quoting 5 U.S.C. § 557(b)).  Thus, if the examiner could prescribe a deficiency-correction deadline, the Director had the same power on review and could affirm or alter that deadline.

30

That power does not mean, as Bacardi suggests (at 47-48, 50), that petitioners can give themselves "an indefinite extension of time to cure deficiencies" or that "deficiencies c[an] . . . be cured at *any* time before the Director acts on a registrant's petition."  On timely petition, the Director can either deny the petition, adhere to the original deadline, or set a new deadline.  In the first two scenarios, the registrant gains no new opportunity to correct the deficiency.  The third is merely an exercise of the power Congress gave to the Director, as the ultimate agency decisionmaker, to prescribe a time limit for correcting deficiencies.

Bacardi mistakenly presumes that the Director will always exercise discretion in the registrant's favor when it speculates (at 48) that the Director will give out "unlimited opportunit[ies] to cure, by the simple expedient of not acting on" petitions.  The Director acts in the interest of the USPTO, and not the registrant, and has no incentive to provide unlimited opportunities to cure.  Stripped of the presumption of impropriety, Bacardi's argument amounts to a contention that stays of proceedings are improper because they may result in indefinite extensions.  But stays are routine in both judicial and agency proceedings.  A stay of appellate proceedings may result in an indefinite extension of a party's obligation to make some payment, for example, but it would violate the presumption of regularity to assume such stays will be granted for improper

31

purposes.  Bacardi's argument (at 50) that the Director will allow unused

trademark registrations to accumulate by not acting on petitions is even more

farfetched and inconsistent with the presumption of regularity.

Bacardi faults (at 49) the district court's reasoning that, once Cubaexport

filed its petition, "there was no prescribed time period for curing the deficiency,"

JA568, but that argument is unavailing.  Perhaps the better interpretation is that the

original deadline applied until the Director altered it, but the distinction makes no

difference because the Director's decision is determinative.  Moreover, this Court

reviews the Director's decision, not the examiner's.  *See supra* p. 18.  Thus, the

metaphysical status of the original deadline pending Director review is irrelevant.

Finally, Bacardi errs (at 52-54) in suggesting that the Director lacked

authority to review the examiner's decision.  Bacardi cites a TMEP provision that

identifies situations in which the Director "may" exercise review and states that

"[i]n some cases, the Director will exercise supervisory authority under 37 C.F.R.

§[ ]2.146(a)(3) . . . if a petitioner can show that it has substantially complied with

the requirements of the statute or rules."  TMEP § 1707.  Those permissive

statements do not and cannot limit the Director's authority to review examiners'

decisions.  *See supra* p. 30; 37 C.F.R. § 2.146(a)(3) (permitting petitions to

"invoke the supervisory authority of the Director in appropriate circumstances");

*id.* §§ 2.165(b), 2.186(b).  In any event, Cubaexport did substantially comply with

the requirement by transferring funds that the USPTO received and marked as posted. *See* TMEP § 1606.05(c) ("If the deposit account authorization was included with the renewal application as filed, and the deposit account had sufficient funds to cover the fee(s) in question, there is no fee deficiency and no deficiency surcharge is required.").

### C. The Director's decision was neither arbitrary nor capricious

Bacardi's argument that the Director's alternative rationale was arbitrary and capricious likewise fails. Bacardi principally contends (at 62-63) that the Director should have expressly extended the deficiency-correction deadline. But the Director stated that a deficiency "can be corrected . . . within the time prescribed after notification of the deficiency" and then determined that Cubaexport had done so. JA526. A court "will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" and here it "'may reasonably be discerned'" that the Director extended the time limit to permit Cubaexport to correct the deficiency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Expressly specifying a new deadline would have been an academic exercise because Cubaexport had already paid.

Contrary to Bacardi's argument (at 63-64), the Director's decision was not an unacknowledged change in policy. As explained above, the Director has routinely exercised supervisory authority to allow the correction of deficiencies

after the time limit specified in an examiner's initial Office action.  *See supra* pp. 25-26.  Bacardi contends (at 63-64) that the TMEP uses the six-month period for responding to an Office action as the time limit for correcting deficiencies, TMEP § 1606.13(a).  However, as explained, the TMEP addresses examiners and not the Director, and applying that provision to the Director would effectively eliminate the Director's review power.  *See supra* pp. 27-29.  Nor did the Director cite § 1606.13(a) as authority for the decision; in the TMEP's numbering scheme, § 1606.13 is a different section than § 1606.13(a).

Bacardi's argument (at 65-66) that the Director did not discuss "substantial compliance" is irrelevant.  The TMEP explains that the Director will sometimes exercise supervisory authority based on substantial compliance.  *See* TMEP § 1707.  The Director has also permitted otherwise late submissions on the basis of substantial compliance.  But substantial compliance is not a requirement to exercise the Director's review authority or the Director's discretion to prescribe a deadline for correcting deficiencies.  The Director therefore had no need to invoke substantial compliance.

Finally, Bacardi's invocation of foreign policy (at 53-54) actually supports the Director.  At the time the Director considered Cubaexport's petition, the foreign policy of the United States, as reflected in the specific license, was that Cubaexport should be "authorized to engage in all transactions necessary to renew

34

and maintain the HAVANA CLUB trademark." JA523. The Director's actions were therefore consistent with American foreign policy.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
DANIEL TENNY

 *s/ Weili J. Shaw*
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

AUGUST 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,540 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

s/ Weili J. Shaw
WEILI J. SHAW