**No. 25-1355**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

BACARDI & COMPANY LIMITED; BACARDI USA, INC.,

*Plaintiffs-Appellants,*

v.

COKE MORGAN STEWART, in her official capacity as the
Acting Director of the United States Patent & Trademark Office;
UNITED STATES PATENT AND TRADEMARK OFFICE,

*Defendants-Appellees,*

and

EMPRESA CUBANA EXPORTADORA DE
ALIMENTOS Y PRODUCTOS VARIOS,

*Intervenor/Defendant-Appellee.*

————————————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————————————————————————————

**BRIEF FOR INTERVENOR/DEFENDANT-APPELLEE**

———————————————————————————————

David H. Bernstein
Carl Micarelli
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Intervenor/Defendant-Appellee
Empresa Cubana Exportadora de Alimentos y
Productos Varios*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1355__     Caption: __Bacardi & Company Ltd., et al. v. Coke Morgan Stewart, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Empresa Cubana Exportadora de Alimentos y Productos Varios__
(name of party/amicus)

_____

 who is __intervenor/defendant-appellee__ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
    If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☑YES ☐NO
        If yes, identify entity and nature of interest:

        Pernod Ricard S.A., a publicly held company (Euronext Paris: RI), is the distributor of Havana Club rum from Cuba.


5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ David H. Bernstein          Date:    4/11/2025

Counsel for: Intervenor/Defendant - Appellee

ii

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS ........................................................ iii

TABLE OF AUTHORITIES...................................................... v

INTRODUCTION ............................................................... 1

JURISDICTIONAL STATEMENT .............................................. 2

STATEMENT OF THE ISSUES ................................................ 2

PERTINENT STATUTES AND REGULATIONS................................ 2

STATEMENT OF THE CASE.................................................... 3

    A.  Cubaexport's 1976 Havana Club Trademark Registration ...................... 3

    B.  Bacardi's Prior Efforts to Challenge Cubaexport's Registration.............. 3

    C.  Cubaexport's 2005 Renewal Application ................................. 5

    D.  Proceedings Before the USPTO Post-Registration Examiner ................. 7

    E.  Proceedings Before the USPTO Director ................................ 8

    F.  Proceedings in the District Court............................................ 9

SUMMARY OF THE ARGUMENT ........................................... 9

STANDARD OF REVIEW ..................................................... 11

ARGUMENT ................................................................... 12

    I.    Cubaexport Submitted Timely Payment as Prescribed by Law. ................ 12

    II.   Even If There Had Been a Payment Deficiency, Cubaexport Had the Right to Correct the Deficiency Once It Received an OFAC License. ........................................................... 16

A.   The Right to Correct Deficiencies Is Guaranteed by Statute, and Cubaexport Complied with All Relevant Deadlines..............................16

B.   The USPTO's Acceptance of Cubaexport's Renewal Application Was Neither Arbitrary Nor Capricious. ...................................19

CONCLUSION .........................................................................................24

STATEMENT CONCERNING ORAL ARGUMENT ...........................................25

CERTIFICATE OF COMPLIANCE .......................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bacardi & Co. v. USPTO*,
    104 F.4th 527 (4th Cir. 2024) ...............................................................4

*Bacardi & Co. v. USPTO*,
    No. 1:21-CV-1441, 2022 WL 2184940 (E.D. Va. Apr. 6, 2022),
    *rev'd and remanded*, 104 F.4th 527 (4th Cir. 2024) ............................2

*Blaustein & Reich, Inc. v. Buckles*,
    365 F.3d 281 (4th Cir. 2004) ...............................................................23

*Empresa Cubana Exportadora de Alimentos y Productos Varios v.*
    *U.S. Dep't of Treasury*,
    638 F.3d 794 (D.C. Cir. 2011) ...............................................................5

*Galleon S.A. v. Havana Club Holding, S.A.*,
    No. 92024108, 2004 WL 199225 (T.T.A.B. Jan. 29, 2004)..................5

*PEI Licensing LLC v. Havana Club Holding S.A.*,
    No. 92065427, 2020 WL 3551682 (T.T.A.B. June 30, 2020)...............6

*Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*,
    98 F.4th 483 (4th Cir. 2024) ...............................................................20

**Statutes**

28 U.S.C. § 1291 ..................................................................................................2

Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88 (1998) .........................4, 5, 6

Pub. L. No. 118-137, 138 Stat. 1649 (2024)...............................................................5

Trademark Act of 1946 (Lanham Act), 15 U.S.C. § 1051 *et seq.* ...1, 2, 5, 10, 22, 23
    Section 8, 15 U.S.C. § 1058...................................... 6, 12, 13, 16-19, 21
    Section 9, 15 U.S.C. § 1059......................................6, 12, 16, 17, 21, 22

**Regulations**

31 C.F.R. § 501.801 ....................................................................................23

Cuban Assets Control Regulations, 31 C.F.R. § 515.101 *et seq.* .. 3, 4, 10, 14-16, 22
    31 C.F.R. § 515.201 ...........................................................................14
    31 C.F.R. § 515.203 ......................................................1, 14, 15, 21
    31 C.F.R. § 515.205 ...........................................................................14
    31 C.F.R. § 515.319 ...........................................................................14
    31 C.F.R. § 515.527 ...................................................................3, 4, 6

Rules of Practice in Trademark Cases, 37 C.F.R. § 2.2 *et seq.*:
    37 C.F.R. § 2.146 ...............................................................................19
    37 C.F.R. § 2.165 .......................................................................18, 19
    37 C.F.R. § 2.186 .......................................................................18, 19
    37 C.F.R. § 2.208 ...............................................................12, 13, 14

**Other Authorities**

144 Cong. Rec. S6578-79, 1998 WL 319872 (June 15, 1998) .........................16, 17

Obama White House, *Charting a New Course on Cuba*,
    https://obamawhitehouse.archives.gov/issues/foreign-policy/cuba
    [https://perma.cc/2E7N-8F8Z] (2016)...............................................................8

OFAC, FAQ No. 9,
    https://ofac.treasury.gov/faqs/9 (updated Aug. 21, 2024) .................................14

USPTO, *Trademark Manual of Examining Procedure* (TMEP):
    § 405.03.............................................................................................14
    § 1606.05...............................................................................12, 13, 14
    § 1604.06...................................................................................13, 14
    § 1606.14.............................................................................................19

## INTRODUCTION

Cubaexport's HAVANA CLUB trademark has long been the subject of litigation between Cubaexport and Bacardi.[1] In this latest round, Bacardi attempts to challenge the decision of the USPTO Director to accept Cubaexport's 2005 renewal of its trademark registration.

As the District Court correctly concluded, the USPTO properly accepted the renewal because Cubaexport timely submitted an application with an authorization to charge the appropriate fee in accordance with the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the relevant USPTO regulations. The U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") later issued a specific license validating all transactions necessary to the renewal, specifically including the 2005 fee payment. Under OFAC's regulations, a license for a past transaction validates the transaction to the same extent as if the U.S. embargo of Cuba had not been in effect at the time. 31 C.F.R. § 515.203(c).

The District Court also correctly concluded that, even if the fee payment had been untimely, the USPTO acted within its statutory authority in allowing

---

[1] In this brief, "**Cubaexport**" refers to Intervenor/Defendant-Appellee Empresa Cubana Exportadora de Alimentos y Productos Varios, "**USPTO**" refers to Defendant-Appellee the United States Patent and Trademark Office (including, where applicable, its Director), and "**Bacardi**" refers to Plaintiffs-Appellants Bacardi & Company Limited and Bacardi U.S.A., Inc.

Cubaexport to cure any deficiency. By the express terms of the Lanham Act, a registrant is entitled to correct deficiencies in a filed application after the fact.

Accordingly, the District Court's judgment upholding the USPTO's decision should be affirmed.

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction under 28 U.S.C. § 1291. Cubaexport respectfully maintains that the District Court lacked original subject-matter jurisdiction for the reasons set forth in the District Court's 2022 opinion, but recognizes that this Court reversed that jurisdictional decision in a prior appeal to which Cubaexport was not a party. *Bacardi & Co. v. USPTO*, No. 1:21-CV-1441, 2022 WL 2184940, at *4 (E.D. Va. Apr. 6, 2022) (O'Grady, J.), *rev'd and remanded*, 104 F.4th 527 (4th Cir. 2024).

## STATEMENT OF THE ISSUES

The issues are stated in the USPTO's brief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to Bacardi's brief.

## STATEMENT OF THE CASE

### A.     Cubaexport's 1976 Havana Club Trademark Registration

Cubaexport is a corporate entity established by the Cuban government in 1965. Beginning in the 1970s, Cubaexport exported rum from Cuba under the HAVANA CLUB trademark. However, Cubaexport was unable to export its rum to the United States because of the U.S. embargo of Cuba implemented by OFAC's Cuban Assets Control Regulations ("**CACR**"), 31 C.F.R. § 515.101 *et seq.*

On January 27, 1976, Cubaexport obtained a registration from the USPTO for its HAVANA CLUB & Design trademark for Cuban rum. *See* JA529. Although the CACR prevent most U.S. transactions with Cuban entities like Cubaexport, the trademark registration and payment of the associated fee were allowed under a general license in the CACR, which authorizes Cuban companies to register their trademarks in the United States. 31 C.F.R. § 515.527(a)(1). In tandem with a similar general license that allows U.S. entities to register their trademarks in Cuba (even though they also are not permitted to use their marks in Cuba at this time due to the embargo), *id.* § 515.528, this general license promotes reciprocal protection of intellectual property rights between the two countries.

### B.     Bacardi's Prior Efforts to Challenge Cubaexport's Registration

For nearly two decades, Cubaexport's registration at the USPTO went unchallenged. But then, in 1993, after the international beverage distributor Pernod

3

Ricard S.A. entered into an agreement to distribute Havana Club rum around the world, Bacardi—a competitor of Pernod Ricard S.A.—began a decades-long campaign to challenge the HAVANA CLUB & Design trademark. In an apparent effort to disrupt the deal, Bacardi attempted to register a "Havana Club" trademark of its own. The USPTO refused registration on multiple grounds, including because of a conflict with Cubaexport's existing registration. JA12-13, JA19-20, JA33-35. Bacardi then filed a petition with the Trademark Trial and Appeal Board ("**TTAB**") seeking cancellation of Cubaexport's registration. *See Bacardi & Co. v. USPTO*, 104 F.4th 527, 529 (4th Cir. 2024) (summarizing litigation history).

In 1996, the HAVANA CLUB & Design trademark registration came up for renewal. The registration was successfully renewed and the applicable fee paid under the general license in the CACR.

Then, in 1998, following lobbying by Bacardi, Congress passed a statute, which the parties have called "**Section 211**," as part of an appropriations bill. Pub. L. No. 105-277, § 211, 112 Stat. 2681, 2681-88 (1998). Section 211 modified the general license in the CACR to exclude trademarks that are "the same as or substantially similar to a mark . . . that was used in connection with a business or assets that were confiscated." *Id.* § 211(a)(1); *see also* 31 C.F.R. § 515.527(a)(2) (implementing this change). U.S. courts have held that Section 211 applies to Cubaexport's HAVANA CLUB & Design trademark because the same name

(although with a different design) was used long ago by a Cuban company that was nationalized in 1960. *E.g.*, *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 803 (D.C. Cir. 2011). As so construed, Section 211 required Cubaexport to obtain a specific license from OFAC to pay fees to the USPTO to renew the HAVANA CLUB & Design trademark. *See id.* at 802.[2]

In 2004, the TTAB rejected Bacardi's 1994 petition to cancel Cubaexport's registration. *Galleon S.A. v. Havana Club Holding, S.A.*, No. 92024108, 2004 WL 199225 (T.T.A.B. Jan. 29, 2004). Bacardi then filed a cancellation action under the Lanham Act in the U.S. District Court for the District of Columbia. *Bacardi & Co. v. Empresa Cubana Exportadora de Alimentos y Productos Varios*, No. 1:04-cv-00519-EGS (D.D.C. filed Mar. 29, 2004). That action remains pending over 21 years later. It is currently stayed pending the outcome of this appeal.

## C.    Cubaexport's 2005 Renewal Application

Cubaexport's trademark registration was due for its second renewal in 2006. *See* JA529. On or about December 14, 2005, Cubaexport—through its then-attorneys, Ropes & Gray LLP—submitted a renewal application to the USPTO.

---

[2]    In December 2024, Congress amended Section 211. Pub. L. No. 118-137, 138 Stat. 1649 (2024). The amendment is not retroactive and has no effect on the issues in this appeal.

JA57-60.[3] The application included an authorization for the USPTO to charge all fees to Ropes & Gray's deposit account at the USPTO. JA57.

Because Congress had adopted Section 211 in 1998 (*see supra* p. 4), it was no longer clear that Cubaexport could rely on the general license in 31 C.F.R. § 515.527 to pay the renewal fee. Accordingly, the renewal application cited an existing specific license, which OFAC had issued to Ropes & Gray authorizing representation of Cubaexport, as the authorization for payment of the fee. JA57. OFAC was copied on the renewal application. JA60. On December 21, 2005, the USPTO withdrew the fee payment from Ropes & Gray's account. JA291, JA540, JA542.

On April 6, 2006, OFAC informed Cubaexport and the USPTO that the existing license did not authorize the payment but invited Cubaexport to apply for a new specific license authorizing such payment. JA199-200. The next day, Cubaexport did so. JA196-198.

---

[3]   Cubaexport's filing was a combined renewal application under Lanham Act section 9, 15 U.S.C. § 1059, and declaration of excusable non-use under section 8, *id.* § 1058. The USPTO has held that the U.S. embargo of Cuba is a valid excuse for non-use. *PEI Licensing LLC v. Havana Club Holding S.A.*, No. 92065427, 2020 WL 3551682 (T.T.A.B. June 30, 2020) (citing authorities). For all purposes relevant to this appeal, effectively identical rules and principles apply to both the section 9 renewal application and the section 8 declaration. Because Bacardi's brief focuses on the renewal application, so does this brief. Accordingly, references in this brief to Cubaexport's "**renewal application**" should be understood to include the section 8 declaration as well.

### D.     Proceedings Before the USPTO Post-Registration Examiner

On July 20, 2006, the USPTO post-registration examiner assigned to the case issued an initial office action declining Cubaexport's renewal based on OFAC's advice that the existing specific license did not authorize the USPTO to accept payment of the required fee. JA289-291. That office action asked Cubaexport to inform the USPTO within six months whether OFAC granted or denied Cubaexport's request for a specific license to pay the fee. JA289.

On July 28, 2006, OFAC denied Cubaexport's specific license application. JA303. The stated ground was that OFAC had "received guidance from [the Department of] State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark." JA303.

Cubaexport submitted a timely response to the July 2006 office action on August 1, 2006. JA293-300. The response informed the USPTO that OFAC had declined to grant the specific license and argued that the USPTO should nonetheless accept the renewal. JA293.

The USPTO post-registration examiner responded by issuing a new office action, dated August 3, 2006, which maintained the refusal of Cubaexport's renewal application, again based on the absence of an OFAC license. JA314. The fee that USPTO had charged to Cubaexport was refunded that same day. *See* JA540, JA542.

7

The August 2006 office action informed Cubaexport of its right to "file a petition to the Director requesting review of this decision." JA314.

### E.      Proceedings Before the USPTO Director

Consistent with the USPTO examiner's notice, Cubaexport filed a timely petition on October 4, 2006, asking the USPTO Director to set aside the examiner's decision and to accept the fee payment and renewal. JA315-465. That petition was initially suspended pending an unsuccessful challenge by Cubaexport to OFAC's 2006 license denial, JA466, and then was the subject of further correspondence and meetings in 2012. JA490-513. As of the end of 2015, the Director had not yet issued a decision on the petition.

In light of the different climate for U.S.-Cuba relations that existed in 2015,[4] Cubaexport applied to OFAC on November 10, 2015 for a new license authorizing all transactions necessary for the past 2006 renewal—specifically including the payment that the USPTO had refused to accept in December 2005—as well as the then-upcoming 2016 renewal. *See* JA522.

OFAC granted the requested specific license on January 11, 2016. JA522-523. The OFAC license authorized all transactions necessary to renew the trademark registration "including" those "related to Cubaexport's submission filed with the

---

[4]   *See, e.g.*, Obama White House, *Charting a New Course on Cuba*, https://obamawhitehouse.archives.gov/issues/foreign-policy/cuba [https://perma.cc/2E7N-8F8Z] (2016).

USPTO on or about December 14, 2005, *and the payment referenced therein*." JA523, § 1 (emphasis added).

Upon receiving OFAC's specific license, Cubaexport supplemented its pending petition to the USPTO Director with a letter informing the Director of the specific license. JA520-521. Because Ropes & Gray's deposit account was no longer active, Cubaexport's new counsel at Debevoise & Plimpton LLP authorized the USPTO to charge any remaining fee to that firm's account. JA519.

On January 13, 2016, the USPTO Director—acting through the Commissioner for Trademarks—granted Cubaexport's petition and accepted the Application and associated payment based on the OFAC license, as further described in the USPTO's brief. JA524-527; USPTO Br. 8.

### F.    Proceedings in the District Court

Despite the pendency of its existing action in the District of Columbia (*see supra* p. 5), Bacardi commenced this action in 2021, challenging the USPTO's 2016 decision to accept Cubaexport's 2005 renewal application. JA8-29. As described in the USPTO's brief, the District Court upheld the USPTO Director's decision in all respects, and Bacardi appealed. *See* USPTO Br. 9-11.

### SUMMARY OF THE ARGUMENT

The USPTO's acceptance of the 2006 renewal of Cubaexport's trademark complied with law because Cubaexport fulfilled all of the requirements for renewal.

On December 14, 2005, which was before the January 27, 2006 deadline, Cubaexport submitted a renewal application combined with a declaration of excusable non-use. Cubaexport also paid the required $500 fee by providing authorization to charge its counsel's deposit account; that account contained sufficient funds to cover the fee. Under the USPTO's regulations and procedures, that authorization constitutes valid payment. Therefore, there was no fee deficiency.

In fact, the USPTO drew payment from Cubaexport's counsel's account on December 21, 2005. Thus, the payment was not only submitted, but it also was *completed* before the deadline for submission of the renewal application. Although the USPTO examiner subsequently rejected the renewal based on advice from OFAC that the payment required a specific license from OFAC under the CACR, Cubaexport filed a timely petition to challenge that decision, and eventually the payment was authorized by OFAC through a specific license. Because OFAC's regulations make clear that the specific license had the effect of retroactively validating the December 14, 2005, payment as of the date when it was made, the Director correctly held that there was no fee deficiency as of December 14, 2005, and accepted the renewal of Cubaexport's registration as of that date.

But even if Bacardi were somehow correct that there was a fee deficiency, Cubaexport would still be entitled to its renewal because Cubaexport had a statutory right to cure any fee deficiency. Under the Lanham Act, an applicant may correct a

10

deficiency in a renewal application or declaration of use or excusable non-use upon payment of a deficiency fee. The USPTO collected the previously returned payment with a deficiency fee, as authorized by the OFAC specific license, when it granted Cubaexport's petition in January 2016.

Because the USPTO Director's 2016 decision to accept the December 2005 renewal was mandated by law, Bacardi's assertion that the decision was "arbitrary and capricious" is without merit. In any event, the USPTO's decision was eminently rational. Had the USPTO simply been following its own governing law and regulations, it would have accepted the renewal in 2005, when it was first filed. The USPTO post-registration examiner rejected the renewal in 2006 only because OFAC, based on foreign policy advice from the State Department, decided not to license the associated fee payment at that time. Cubaexport timely petitioned the USPTO Director for review. The Director then accepted the renewal in 2016 because OFAC, again based on foreign policy advice from the State Department, revisited its earlier decision and decided to license the payment retroactively. This removed the sole basis for refusing the renewal. The Director therefore properly granted Cubaexport's petition and accepted the renewal.

## STANDARD OF REVIEW

The standard of review is stated in the USPTO's brief.

**ARGUMENT**

## I.  Cubaexport Submitted Timely Payment as Prescribed by Law.

Under section 9 of the Lanham Act, the filing of a renewal application requires payment of a fee prescribed by the USPTO Director. 15 U.S.C. § 1059(a); *see also id*. § 1058(b)(1)(D) (analogous requirement for section 8 declaration). As of December 2005, the regulations adopted by the Director had set the applicable fee at $500. *See* JA289.

The USPTO's regulations also specify the forms of payment that are accepted. As relevant here, the regulations allow attorneys to establish deposit accounts at the USPTO for "paying any fees due." 37 C.F.R. § 2.208(a). No particular formalities are needed to charge the account; rather, "[a] general authorization to charge all fees, or only certain fees to a deposit account containing sufficient funds may be filed in an individual application, either for the entire pendency of the application or with respect to a particular document filed." *Id.* § 2.208(b). This counts as effective payment if there are funds in the account sufficient to cover the required fee, including at the time the USPTO attempts to draw the payment. *See id*. The USPTO explains in its procedural manual for examiners: "If the deposit account authorization was included with the renewal application as filed, and the deposit account had sufficient funds to cover the fee(s) in question, *there is no fee deficiency*." USPTO, *Trademark Manual of Examining Procedure* ("**TMEP**")

12

§ 1606.05(c) (emphasis added); *see also* TMEP § 1604.06(c) (same for section 8 declaration fees).

As the Director found in granting Cubaexport's petition, JA526, and as the District Court held in upholding the Director's decision, JA566-567, Cubaexport fulfilled the fee payment requirement as of December 14, 2005. In the application filed on that date, Cubaexport authorized the USPTO to "use Ropes & Gray deposit account number 06-1075 (Order Number 001214-0001) for the filing fee in this matter." JA57. Bacardi does not dispute that the Ropes & Gray account contained sufficient funds, both on the day the renewal application was submitted and when the USPTO actually drew the payment on December 21, 2005. *See* JA291 n.1, JA540, JA542. Accordingly, under the USPTO's regulations, payment was validly made as of December 14, 2005. *See* 37 C.F.R. § 2.208. Therefore, "there is no fee deficiency," TMEP § 1606.05(c), and USPTO properly accepted the renewal.

Bacardi's effort to analogize the situation to a bounced check or declined credit card (Appellants' Br. 29) is far off the mark. Cubaexport's payment was not declined because of insufficient funds. In fact, *it was not declined at all*. The USPTO successfully withdrew the funds on December 21, 2005. JA291 n.1, JA540, JA542. Thus, Bacardi's statement that the transaction was not "*timely completed in 2005*," Appellants' Br. 39, is contrary to the record.

13

The fact that the USPTO later decided to return the funds and mark the transaction as "reversed," JA542, does not change the fact that (1) Ropes & Gray authorized its account to be charged on December 14, 2005, and (2) the account contained sufficient funds when the USPTO went to withdraw the fees. Under the USPTO's regulations, that constitutes sufficient payment as of December 14, 2005, regardless of what the USPTO then rightly or wrongly chose to do with the funds. 37 C.F.R. § 2.208(a); *see also* TMEP §§ 405.03, 1604.06(c), 1606.05(c).

In any event, the USPTO's attempt to refund the payment was legally invalid under the CACR. An entity receiving an unauthorized payment from a Cuban national is required to hold the payment in a blocked account, not refund it, unless otherwise licensed by OFAC. *See* 31 C.F.R. §§ 515.201(b), 515.205(a), (h), 515.319. *See generally* OFAC, FAQ No. 9, https://ofac.treasury.gov/faqs/9 (updated Aug. 21, 2024). Unlike Cubaexport's 2005 payment, which OFAC retroactively licensed in 2016, JA517-518, the record contains no evidence that OFAC ever licensed the USPTO's refund. Accordingly, the refund is "null and void" and has no legal effect. 31 C.F.R. § 515.203(a) (voiding unlicensed transfers, with exceptions not applicable here).

Bacardi also has no basis to argue that the December 14, 2005 payment was untimely because the OFAC license was only issued later. *See* Appellants' Br. 34-

14

40. OFAC has ample authority to license transactions after the fact. The CACR specifically provide:

> [A]n appropriate license or other authorization issued by or pursuant to the direction or authorization of the Secretary of the Treasury *before, during or after* a transfer shall validate such transfer or render it enforceable *to the same extent as it would be valid or enforceable but for the provisions of* [the CACR and the underlying law].

31 C.F.R. § 515.203(c) (emphasis added).

OFAC granted precisely such a license in 2016, authorizing the payment that Cubaexport had already made in 2005:

> Subject to the conditions and limitations stated herein, [Cubaexport] is hereby authorized to engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration No. 1,031,651 at the United States Patent and Trademark Office (USPTO), *including those related to Cubaexport's submission filed with the USPTO on or about December 14, 2005, and the payment referenced therein*, as described in the Application.

JA518 (emphasis added).

Thus, by the plain terms of the regulations, Cubaexport's payment was not void but rather was validated as of the date when it was made, *i.e.*, December 14, 2005. The USPTO was therefore required to treat the December 2005 payment as if the embargo of Cuba did not exist at that time—*i.e.*, as valid or enforceable "to the same extent as it would be valid or enforceable but for the provisions of" the CACR. 31 C.F.R. § 515.203(c). Bacardi's contention that the payment never happened

because OFAC had not licensed it *at the time* would write this provision out of the CACR. Accepting Bacardi's novel argument also would have far-reaching and unpredictable consequences, as it would impermissibly constrain OFAC's licensing authority under both the CACR and numerous other OFAC sanctions programs.

In sum, Cubaexport validly paid the required fee as of December 14, 2005, so there was no payment deficiency that needed to be corrected. The USPTO therefore correctly accepted the renewal application and the associated fee as of that date.

## II.    Even If There Had Been a Payment Deficiency, Cubaexport Had the Right to Correct the Deficiency Once It Received an OFAC License.

### A.    The Right to Correct Deficiencies Is Guaranteed by Statute, and Cubaexport Complied with All Relevant Deadlines.

Even if there had been a payment deficiency, it was cured at the time the Director granted Cubaexport's Petition in 2016 and collected payment for a second time. Under the Lanham Act, Cubaexport had a statutory right to correct any deficiency "within the time prescribed after notification of the deficiency." 15 U.S.C. §§ 1058(c), 1059(a). The legislative history of this provision, which was adopted in 1998, makes clear that it was intended to overturn the pre-1998 practice of denying renewals or cancelling trademarks for failure to cure a deficiency in a renewal application or section 8 declaration before a trademark expired. *See* 144 Cong. Rec. S6578, 1998 WL 319872 (June 15, 1998) (explaining that a deficiency can be cured even after the statutory grace period expires); *see also id.* at S6579 (explaining

intention to harmonize sections 8 and 9). Moreover, the statute as amended "does not . . . place any limits on the type of deficiency or omission that can be cured after expiration of the statutory filing period." *Id.* at S6578.

Bacardi makes the mistake of assuming that the "time prescribed" to cure a deficiency is the six-month response time set forth in the USPTO examiner's July 2006 office action. In fact, the six-month period is simply a deadline to reply to that non-final office action itself, not a final deadline to cure any deficiency. JA289 ("A complete response must be received within 6 months from the mailing date of this Office action. The owner must respond by notifying the USPTO whether the specific license application filed on April 7, 2006 has been granted or denied."). The Director confirmed this understanding in the decision granting the Petition: "The Office action provided a response time of six months to notify the USPTO whether that request for a specific license was granted or denied." JA525.

Bacardi argues that "the district court never explained what it could mean, in context, to 'respond' to an Office Action if not to cure the deficiency (*or convince the examiner why there is none*)." Appellants' Br. 46 (emphasis added). But Bacardi's parenthetical concession demonstrates why Bacardi's argument fails. In fact, Cubaexport's response *did* explain to the examiner why there was no deficiency. JA294. Specifically, on August 1, 2006, Cubaexport timely responded to the July 2006 office action by filing a detailed response, JA293-300, which explained (among

17

other things) that "Cubaexport's renewal application was timely filed together with the fee prescribed by the PTO regulations that implement the Lanham Act's renewal provisions." JA294. While the examiner may not have found Cubaexport's August 1, 2006 response convincing, the examiner's decision was subject to review by the Director. Cubaexport's response explained in detail why Cubaexport believed there was no deficiency. It was therefore adequate even under Bacardi's own made-up standard.

The examiner's August 2006 office action maintained the examiner's refusal to accept the renewal and notified Cubaexport of its right to petition the Director to overturn the examiner's decision within another six months. JA314. Cubaexport fully complied with that new six-month deadline by filing a timely petition to the Director on October 4, 2006, explaining why the USPTO should accept its renewal and fee payment. JA315-465. Under the USPTO's regulations, a timely petition to the Director suspends the expiration or cancellation of a registration. *See* 37 C.F.R. § 2.186(b) ("The petition must be filed within six months of the date of issuance of the Office action maintaining the refusal [to accept a renewal application], or the renewal application will be abandoned and the registration will expire."); *see id.* § 2.165(b) (similar for section 8 declaration).

After reviewing Cubaexport's response in light of Cubaexport's petition and its supplements, the Director concluded that there was no payment deficiency in

2005 or, if there was, Cubaexport was entitled to cure the deficiency by making the payment in 2016. JA526. Since the Director has plenary power to review the examiner's decisions, the Director's final decision—and not the non-final decision of a lower-level agency employee—is what counts. *See* 37 C.F.R. §§ 2.146, 2.186 (providing for exercise of supervisory authority by Director); *see also* 37 C.F.R. §§ 2.165(c), 2.186(d) (action by Director on petition is prerequisite to judicial review).

Treating an interim deadline to respond to an examiner's nonfinal refusal as a final deadline to cure deficiencies would upend decades of consistent practice before the USPTO. *See* USPTO Br. 24-26 (citing precedent). It would defeat the right to appeal an examiner's decision to the Director and ultimately to the courts. *See* 37 C.F.R § 2.186(c) ("A decision by the Director is necessary before filing an appeal or commencing a civil action in any court."); *id.* § 2.165(c) (same under section 8). And it would improperly treat the examiner's initial office action as the last word, when only the Director's decision on a petition constitutes final agency action. *See id.*; *see also* TMEP § 1606.14(b) ("The decision on a petition under 37 C.F.R. § 2.146 is the final action of the USPTO" on a refusal of a renewal application).

## B.    The USPTO's Acceptance of Cubaexport's Renewal Application Was Neither Arbitrary Nor Capricious.

Having failed to show that the acceptance of the renewal was prohibited by law, Bacardi next tries to show that acceptance of the renewal was "[a]rbitrary and

[c]apricious." Appellants' Br. 55. Bacardi's argument has four fundamental flaws: (1) the decision to accept the renewal cannot have been arbitrary and capricious because it was required by law; (2) in any event, contrary to what Bacardi contends, the Director's decision was adequately explained, but Bacardi ignores the relevant explanation; (3) the Director's decision was fully consistent with longstanding USPTO precedent; and (4) the Director acted rationally in relying on OFAC's licensing decision, which in turn rested on an unreviewable foreign policy determination by the Department of State.

**First**, because the USPTO's acceptance of Cubaexport's renewal application was required by statute and USPTO and OFAC regulations, it was in no way arbitrary or capricious. Where an outcome is dictated by law, the agency must follow the law, and an aggrieved party cannot claim that the agency's decision to do so was somehow arbitrary and capricious. *See, e.g.*, *Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, 98 F.4th 483, 498 (4th Cir. 2024) (where "practical inconsistency" in agency's decision was attributable to statute passed by Congress, it cannot be a basis for attacking the agency's decision).

**Second**, the Director's decision was more than adequately explained. Bacardi argues that the Director failed to give a reasoned explanation for the determination that "[t]hus, the fee payment is effective as of December 14, 2005." JA526; *see* Appellants' Br. 56-61. In fact, the Director's conclusion follows directly—and as a

matter of law—from the statement in his decision that immediately preceded that quote, namely: "Petitioner has provided an OFAC license that specifically authorizes petitioner's December 14, 2005 combined § 8/9 filing and fee payment." JA526. The connection between the two statements is indicated by the Director's use of the word "[t]hus" to introduce the statement that "the fee payment is effective as of December 14, 2005," indicating that that sentence follows from the sentence that precedes it. JA526.

Bacardi does not seriously dispute that OFAC has the authority to license a payment "before, during or after" the payment takes place. 31 C.F.R. § 515.203(c); *see supra* p. 14. The Director's decision makes clear that the only reason the USPTO examiner did not accept the renewal in 2005 or 2006 was that OFAC had advised the USPTO that an OFAC license was required. JA526; *see also* JA416 (examiner deems fee unpaid only because of absence of OFAC license), JA432 (similar). Once OFAC removed that obstacle, USPTO was required to accept the renewal as of the date it was received. Thus, what Bacardi calls "the examiner's well-founded conclusion that the renewal application fee had *not* been paid," Appellants' Br. 59, was irrelevant as a matter of law because it was superseded by subsequent events.

**Third**, the USPTO's decision was amply supported by longstanding USPTO precedent. As the District Court explained, the USPTO regularly allows applicants to cure deficiencies in renewal applications long after the renewal deadline has

passed. JA568-570. Applying that consistent practice in Cubaexport's case was not an abuse of discretion. Contrary to Bacardi's assertion, there is no requirement that the Director utter the magic words "substantial compliance." Appellants' Br. 65-66. In fact, substantial compliance (even if relevant) is not required at all. *See* USPTO Br. 34. All that is necessary is that the applicant submitted *some* renewal application, even a deficient one, within the statutory period. *See* 15 U.S.C. § 1059(a).

In any event, there is no dispute that Cubaexport's renewal application complied not only substantially but fully with all of the Lanham Act's requirements. The only alleged deficiency is that a separate regulatory regime—the CACR—required a specific license for the accompanying payment to be effective. Allowing the USPTO to deny a renewal based on application deficiencies that were later cured would run directly contrary to Congress's intent in enacting the 1998 Lanham Act amendments. *See supra* p. 16. The Director's decision to follow the statutory mandate and established USPTO precedent was, at a minimum, well within the Director's discretion.

**Finally**, in seeking to paint the USPTO's acceptance of the renewal application as arbitrary and capricious, Bacardi ignores crucial context: the reason for the USPTO's decision was a change in OFAC's position on whether to license the December 2005 fee payment, which in turn was based on a change in foreign policy as determined by the Department of State. *See* JA303, JA522-523; *see also*

31 C.F.R. § 501.801(b)(5) ("The denial of a specific license does not preclude the reconsideration of an application or the filing of a further application."). Here, the USPTO clearly acted rationally in giving effect to the decision of OFAC—in consultation with the State Department—to retroactively license the 2005 payment.

Had the USPTO simply been following its own governing statute and regulations, it would have accepted the renewal application and accompanying fee payment in 2005, when it was first submitted. The USPTO examiner's reasons for refusing renewal in August 2006 were not based on anything in the Lanham Act or the USPTO regulations. Instead, the only reason stated was that OFAC decided not to license the associated fee payment at that time. JA314. OFAC, in turn, based its decision on guidance from the State Department that granting a license would be inconsistent with U.S. foreign policy as it existed at that time. JA303.

Like the examiner's August 2006 refusal, the Director's acceptance of the registration in 2016 also was based on action by OFAC—this time, a decision to license the relevant transactions. JA526. The USPTO is not a foreign-policy-making body. It had a rational basis to accept the decision of OFAC, in consultation with the State Department, on a core matter of U.S. foreign policy, and on that basis renew the registration in accordance with law and the USPTO's own procedures. Nothing further is required. *See Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 291 (4th Cir. 2004) (agency action must be upheld unless decision lacked rational basis).

Bacardi does not and cannot contend that it can seek judicial review of the U.S. Government's changes in foreign policy toward Cuba. Instead, Bacardi seeks to challenge U.S. foreign-policy decisions through the back door by claiming that there was something "arbitrary and capricious" about the USPTO acting to give those decisions effect. Clearly, there was not. The District Court correctly granted summary judgment dismissing Bacardi's Complaint.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

Date: August 8, 2025

Respectfully submitted,

*/s/ David H. Bernstein*
David H. Bernstein
Carl Micarelli*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Intervenor/Defendant-Appellee*
*Empresa Cubana Exportadora de Alimentos y*
*Productos Varios*

* Not admitted to the Fourth Circuit Bar

24

## STATEMENT CONCERNING ORAL ARGUMENT

Because this case involves a straightforward application of statutes and regulations, and because the District Court's decision was plainly correct, Cubaexport does not believe that oral argument is necessary.

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 5,408 words.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2502 in Times New Roman 14-point regular.

*/s/ David H. Bernstein*
David H. Bernstein