No. 25-1355

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BACARDI & COMPANY LIMITED; BACARDI USA, INC.,

*Plaintiffs-Appellants*,

v.

UNITED STATES PATENT & TRADEMARK OFFICE; COKE MORGAN STEWART,
IN HER OFFICIAL CAPACITY AS THE ACTING DIRECTOR OF THE UNITED
STATES PATENT & TRADEMARK OFFICE,

*Defendants-Appellees*,

and

EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS,

*Intervenor/Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Virginia

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## BACARDI & COMPANY LIMITED AND BACARDI USA, INC.

Michael C. Lynch
Damon W. Suden
Edwin Adlam Herod
KELLEY DRYE & WARREN, LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800

David M. Zionts
Alexander J. Cave
Yevgeniy Pilipovskiy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiffs-Appellants*
*Bacardi & Company Limited and Bacardi USA, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... ii

INTRODUCTION ................................................................... 1

ARGUMENT ......................................................................... 3

I. The Director's Retroactive Validation Rationale Fails. ................. 3

    A. The Director Acted Unlawfully in Concluding that
        There Was No Payment Deficiency. ...................................... 3

        1. There was no payment for OFAC to retroactively
            validate. ............................................................ 4

        2. OFAC did not issue a retroactive license. .................... 9

        3. Cubaexport's alternative arguments fail...................... 11

    B. The Director's Rationale Was Arbitrary and
        Capricious.................................................................... 14

II. The Director's Extended-Time-To-Cure Rationale Fails.............. 19

    A. The Director Lacked Authority to Extend the Six-
        Month Period for Curing Deficiencies. ................................ 19

        1. PTO regulations prescribe a six-month deadline........ 20

        2. Any discretion the Director has to extend
            deadlines does not apply here.................................... 25

        3. Cubaexport's alternative argument fails..................... 29

    B. The Director's Unexplained Extension of Cubaexport's
        Time to Cure Was Arbitrary and Capricious. ...................... 30

CONCLUSION .................................................................... 33

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMIT ....................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962)........................................................ 15, 32

*Carr v. United States,*
560 U.S. 438 (2010)............................................................ 10

*Cboe Futures Exch., LLC v. SEC,*
77 F.4th 971 (D.C. Cir. 2023)............................................. 19

*Checkers Drive-In Rests., Inc. v. Comm'r of Pats. &*
*Trademarks,*
51 F.3d 1078 (D.C. Cir. 1995) ....................................... 17, 21

*In re Cleary Packaging, LLC,*
36 F.4th 509 (4th Cir. 2022) .............................................. 26

*Fort Stewart Sch. v. Fed. Lab. Rels. Auth.,*
495 U.S. 641 (1990)............................................................ 25

*In re Holland Am. Wafer Co.,*
737 F.2d 1015 (Fed. Cir. 1984) ............................................ 3

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)........................................................ 14, 27

*Michigan v. EPA,*
576 U.S. 743 (2015)................................................. 14, 17, 27

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State*
*Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)................................... 13, 14, 16, 31, 32

*Ohio Valley Env't Coal. v. Aracoma Coal Co.,*
556 F.3d 177 (4th Cir. 2009)............................................... 27

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ................................................................ 8

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................................... 12, 13

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
145 S.Ct. 1497 (2025) ..................................................... 14, 30

*Solenex LLC v. Bernhardt*,
962 F.3d 520 (D.C. Cir. 2020) .............................................. 17

*U.S. Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993) ............................................................. 10

*U.S. Telecom Ass'n v. FCC*,
400 F.3d 29 (D.C. Cir. 2005) ............................................... 25

*United States v. Castleman*,
572 U.S. 157 (2014) ............................................................... 7

**Statutes**

15 U.S.C. § 1059 ........................................................... 3, 8, 29

35 U.S.C. § 3 ......................................................................... 26

Omnibus Consolidated and Emergency Supplemental
Appropriations Act, Pub. L. No. 105-277, 112 Stat. 2681,
(1998) ..................................................................................... 12

**Regulations**

31 C.F.R. § 515.201 ............................................................... 12

31 C.F.R. § 515.203 ..................................................... 4, 7, 12

31 C.F.R. § 515.502 ......................................................... 10, 11

37 C.F.R. § 2.63 ................................................................... 24

37 C.F.R. § 2.146 ........................................................ *passim*

37 C.F.R. § 2.183 ............................................................................. 4

37 C.F.R. § 2.184 ....................................................................... *passim*

37 C.F.R. § 2.185 ....................................................................... 21, 23

37 C.F.R. § 2.186 ....................................................................... 26, 29

37 C.F.R. § 2.208 ............................................................................ 12

64 Fed. Reg. 48,900 (Sept. 8, 1999) .......................................... 23

## Other Authorities

*Sufficient*, Black's Law Dictionary (12th ed. 2024) ................................. 12

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
    Trademark Manual of Examining Procedure § 1606.13(a) ......... 22, 33

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
    Trademark Manual of Examining Procedure § 1707................... 24, 29

U.S. Patent & Trademark Office, U.S. Dep't of Commerce,
    Trademark Manual of Examining Procedure § 1712.02(a) ................. 9

## INTRODUCTION

By December 2005, Congress had made it impossible for Cubaexport to pay the statutory fee for renewing the HAVANA CLUB trademark registration without an OFAC license, which Cubaexport lacked. Had Cubaexport been candid with the PTO about that fact, its registration would have expired long ago, and this case would not exist. Instead, Cubaexport tried to pay anyway by falsely claiming authorization from its counsel's obviously inapplicable license, triggering a tortuous agency process leading to the decision under review.

The Director did not have to reward Cubaexport's gambit. When she received Cubaexport's petition in 2006, she could have—and should have—summarily denied it. There were, after all, no grounds for granting it: the OFAC license on which she eventually relied did not exist, and would not until 2016. But the Director chose to wait for more than nine years. And then—just two days after OFAC finally issued a license—she renewed Cubaexport's registration with barely any explanation.

That decision was unlawful. The Director and Cubaexport have identified no viable justification for transforming the unlawful payment

1

attempt that the PTO refused and refunded in 2006 into a complete payment that OFAC could retroactively validate in 2016. They ignore that an OFAC license is not retroactive unless it clearly states as much, which this one did not. They misread the PTO regulation imposing a uniform deadline for curing deficiencies, making a hash of the renewal process along the way. And they offer no basis for the unfettered discretion to extend deadlines they say the Director enjoys.

As flawed as the Director's decision was as a matter of law, her paltry explanation makes this a textbook case of arbitrary and capricious action. Even assuming the Director's course of action was legally available to her (it was not), she still faced a *choice* about how to use the discretionary review authority she invoked; certainly nothing *required* her to act as she did. So the APA required her to reasonably explain *why*, considering all relevant factors and evidence, she chose to grant a renewal nearly nine years after the deadline to cure deficiencies, allowing Cubaexport to achieve through chicanery what it could not have through candor. And it likewise demanded that she reasonably explain *why* she chose to grant Cubaexport a nearly-nine-year extension to meet its statutory obligations, when she could have denied an extension or

2

granted an extension of a month, a year, five years, or even eight years—none of which would have been enough to save the registration.

Whether because she had no explanation for these choices, did not want to state the real explanation, or simply thought no explanation was needed, the Director did not explain them. She and Cubaexport hardly dispute as much, and this failure alone requires vacatur.

Because the Director's decision to renew Cubaexport's registration was unlawful, arbitrary, and capricious, this Court should reverse.

## ARGUMENT

### I. The Director's Retroactive Validation Rationale Fails.

#### A. The Director Acted Unlawfully in Concluding that There Was No Payment Deficiency.

The Director does not dispute that Cubaexport's attempt to pay the statutorily required renewal fee in December 2005 was unauthorized by OFAC at that time. Nor does she dispute that the PTO refunded that unlawful payment attempt. Put differently, she concedes that Cubaexport's renewal application was deficient when submitted, and that the deficiency was not cured by the time the July 2006 statutory deadline for payment came and went. *See* 15 U.S.C. §1059(a); JA314; *cf. In re Holland Am. Wafer Co.*, 737 F.2d 1015, 1018 (Fed. Cir. 1984) ("A

3

complete application must be submitted within a specific statutory time period."); 37 C.F.R. §2.183(b) ("A complete renewal application must include … [t]he fee required.").

Yet on the Director's telling, OFAC—by issuing a license in 2016—transformed Cubaexport's unlawful and unsuccessful 2005 payment attempt into a complete, lawful, and timely payment, disappearing the deficiency. Director Br. 15-22. She claims that in arguing otherwise, Bacardi seeks to "bind[] the agency to the examiner's actions at an intermediate step in the administrative process." *Id.* at 12.

That misunderstands the problem. Of course the Director makes final decisions for the PTO. But the Director, no more than the appellate courts to which she analogizes herself, *see id.* at 16-17, may not make final decisions contradicted by facts and contrary to law. Here, the facts and law constrained the Director to uphold the examiner's decision.

> 1. *There was no payment for OFAC to retroactively validate.*

Begin with the nature of OFAC's retroactive licensing power. *See* 31 C.F.R. §515.203(c). OFAC may retroactively validate transactions that as a factual matter occurred, but were prohibited at the time by the Cuban Assets Control Regulations, 31 C.F.R. Part 515 ("CACR"). The

4

power to give a completed transaction after-the-fact legal validation cannot make something that never happened retroactively spring into existence. *See* Bacardi Br. 35-38. So the Director's argument cannot work unless, before OFAC issued the 2016 license, Cubaexport's 2005 payment attempt somehow yielded a completed (albeit legally ineffective) transaction. The Director, in other words, needs to show that in 2016 there was a prior payment for OFAC to retroactively validate, even though Cubaexport's payment attempt was refunded in 2006, *see* JA314, JA542, and even though Cubaexport in 2016 had to submit a *new* fee payment plus a deficiency surcharge, JA289, JA539, JA542—neither of which would have been necessary had a 2005 payment existed.

The Director's first stab at that problem conflates fact and law. "As a factual matter," she claims, a payment happened when the PTO initially withdrew funds from Ropes & Gray's account. Director Br. 20. But of course, the PTO soon refunded that money. JA314, JA542. And the "practical consequence[]"—much as the Director wishes it away (at 20-21)—was to undo any acceptance of Cubaexport's payment attempt "as a factual matter." That is, after all, how refunds work. So the Director could not "restore[] the effectiveness of the initial transfer" that

had already been unwound. *Id.* at 20. And certainly OFAC—which lacks authority to dictate particular consequences under the Lanham Act and its regulations—could not "require[]" her to do so. *Id.* The "initial transfer" simply did not exist. *Id.*

Consider a hypothetical. Suppose that in December 2005, the Director—overlooking the CACR—ordered a shipment of Cubaexport's ersatz Havana Club rum (setting aside all the practical barriers to such a transaction). Then suppose the Director changed her mind, received a refund, and shipped it back. If OFAC then issued a retroactive license covering rum sales to the Director, it would not mean that a completed rum sale happened in 2005. The Director would still have her money, Cubaexport would still have its rum, and neither would change hands without a *new* transaction. Now suppose that the parties instead unwound the attempted purchase because Cubaexport realized the CACR prohibited it without a license. That would not change the fact that the purchase attempt was unwound; again, the money and rum would not change hands absent a new transaction. Retroactively removing the CACR as a *legal* barrier to a purchase, in other words, would not resurrect as a *factual* matter an already-reversed-in-fact

6

transaction. Only a retroactive license validating the purchase *before* it was unwound could yield a transaction that exists "as a factual matter"—*i.e.*, one capable of being legally validated retroactively.

This case is no different. Had OFAC issued a retroactive license *before* there was a refund (and during the period for curing deficiencies, *see infra* Part II.A), the result would have been a complete payment effective as of December 2005: the license would have rendered the otherwise "null and void" transaction legally "enforceable." 31 C.F.R. §515.203(a), (c). But that did not happen. Years *before* the 2016 license, the PTO refunded the fee that Cubaexport brazenly attempted to pay based on a manifestly inapplicable license. Come January 2016, there did not exist any December 2005 payment capable of being rendered lawful.

That leaves the Director's fallback position: that a "payment" is completed when funds are tendered. *See* Director Br. 17-19. But that argument runs headlong into the presumption that "Congress … does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in judgment). In the context of a statute requiring "payment" of a fee for a government benefit, it

makes no sense to treat tendering funds alone as "payment." That would allow a registrant to obtain the benefit while keeping its money—for example, if a bank refused to process a sanctioned entity's payment attempt. The statutory text does not compel that result, which is "contrary to common sense." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see* Bacardi Br. 29-30.

The Director has no response. She maintains instead (at 19) that requiring the payor to conclusively part with funds would "create bizarre results" or "eviscerate [her] review authority," such as by foreclosing "payment" when examiners fail to timely accept or erroneously reject funds timely tendered. *Id.* But that reasoning conflates *whether* a complete payment exists with *when* it is effective. Even if ultimate acceptance of funds is necessary for the former, the measure of the latter might be when funds were tendered. That coheres with the Act's text, which requires that a renewal "application … be *made*"—not *accepted*— before the statutory deadline. 15 U.S.C. §1059(a) (emphasis added). It also coheres with the PTO's practice of reinstating, without deficiency surcharge, registrations cancelled or expired due to PTO error. U.S.

Patent & Trademark Office, U.S. Dep't of Commerce, Trademark Manual of Examining Procedure §1712.02(a) ("TMEP").

The Director thus lacks a solution to the basic problem with the retroactive validation rationale: there was no completed payment to retroactively validate. And this conclusion makes sense. As nobody disputes: had Cubaexport acknowledged it lacked a license, and not tried to pass off the Ropes & Gray license as somehow authorizing payment, there would be no 2005 payment to retroactively validate. *See* Bacardi Br. 37-38. Nor does anyone doubt that there would be no payment if the PTO had immediately recognized Cubaexport's ploy and rejected its payment attempt at the outset. It makes no sense to say that everything is different simply because the PTO initially relied on Cubaexport's false representation and withdrew the funds, only to reverse course upon learning that Cubaexport had flouted the CACR. As Cubaexport has admitted, the PTO "refused to *accept* the fee." JA323. A payment not accepted is not a payment at all.

### 2. *OFAC did not issue a retroactive license.*

The Director's rationale independently fails because the 2016 license lacks retroactive effect. *See* Bacardi Br. 38-40. Neither the

9

Director nor Cubaexport confronts the regulation stating that licenses do not "authorize or validate any transaction effected" in the past unless they "*specifically* so provide[]." 31 C.F.R. §515.502(a) (emphasis added); *see* Bacardi Br. 38-39. That regulation "impos[es] what is, in effect, a clear-statement rule." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993) (law requiring "specific[]" reference is clear-statement requirement). And the 2016 license contains no clear statement of retroactive effect.

On the contrary, it authorizes Cubaexport only to "*engage* in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration … , including those *related* to Cubaexport's submission filed with the USPTO on or about December 14, 2005, and the payment referenced therein." JA523 (emphasis added). The Director brushes aside (at 22) the present-tense verb "engage." But "undeviating use of the present tense" is a "striking indic[ator]" of "prospective orientation." *Carr v. United States*, 560 U.S. 438, 449 (2010) (cleaned up). An authorization to "engage" in specified transactions is naturally read as *prospectively* authorizing future transactions.

That the license authorizes transactions "related to" Cubaexport's December 2005 submission and the "payment referenced" therein does not suggest otherwise. *Contra* Director Br. 22. That language, read together with "engage," suggests prospective authorization of *new* transactions necessary to complete the 2005 renewal *submission* (if the Lanham Act and PTO regulations allow). In other words, it clarifies that the authorization encompasses another try at completing the payment "referenced" in Cubaexport's 2005 submission, JA523, which the PTO had years earlier "refused to accept." JA323 (emphasis removed). If OFAC meant to retroactively validate a supposed December 2005 payment, there were far clearer ways to "specifically so provide[]." 31 C.F.R. §515.502(a); *see* Bacardi Br. 39.[1]

### 3.  *Cubaexport's alternative arguments fail.*

Cubaexport largely retreats from the 2016 license in favor of an even more extreme argument. It claims that under a PTO regulation, it satisfied the "payment" requirement *in December 2005* by authorizing withdrawal from a deposit account containing "sufficient" funds. In

---

[1] Indeed, when OFAC revoked a different license Cubaexport had obtained under false pretenses, it clearly specified that its action was "retroactive to the date of issuance." JA97.

Cubaexport's view, *even without* the 2016 license, the Director *had* to overrule the deficiency finding. Cubaexport Br. 12-14, 20. Of course, the Director's decision cannot be upheld on this basis because she did not rely on it. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). And for good reason.

The regulation states that "[a]n authorization to charge a fee to a deposit account will *not* be considered payment of the fee … *unless* sufficient funds are present in the account to cover the fee." 37 C.F.R. §2.208(b) (emphasis added). That cannot trump Section 211, a *statute* that barred Cubaexport from paying the fee absent a license. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, §211(a), 112 Stat. 2681, 2681-88 (1998). Nor can it override the CACR, which legally nullifies transactions violating its prohibitions. 31 C.F.R. §§515.201(a)-(c), 515.203(a)-(b). And in all events, in light of Section 211 and the CACR, the funds in Ropes & Gray's deposit account were not available—and thus not "sufficient"—to pay the renewal fee. *See Sufficient*, Black's Law Dictionary (12th ed. 2024) ("[a]s much as is needed *for a given purpose*"; "*[l]egally* adequate; equal to a proposed legal end" (emphases added)).

Undaunted, Cubaexport reaches (at 14) for the equally audacious argument that the *refund* was "null and void" because *the PTO* lacked an OFAC license. But the Director did not rely on this theory either, so her decision cannot be upheld on that basis. *See Chenery*, 318 U.S. at 95. In fact, Cubaexport never even raised this theory with the PTO or OFAC— even though it contended that the PTO needed a license for the *different* action of updating the register to reflect the expiration of Cubaexport's registration. *See* JA491-94, JA502. (OFAC rejected that contention without mentioning the PTO's refusal to accept Cubaexport's payment, of which it was well aware. *See* JA510-11; *see also* JA491, JA506-07.) Cubaexport cannot ask this Court to "supply a reasoned basis for the agency's action" that not only "the agency itself has not given," but which Cubaexport did not give either. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

***

Because the OFAC license did not and could not eliminate the deficiency that undeniably existed as of the end of the 2006 statutory renewal period, the Director acted unlawfully in deeming a 2016 payment

13

effective in December 2005 and treating Cubaexport's application as non-deficient.

## B.    The Director's Rationale Was Arbitrary and Capricious.

The Director's reliance on the retroactive validation rationale was also arbitrary and capricious, an independent basis for vacatur.

Assuming the retroactive validation rationale was not unlawful, the Director faced a novel situation and a choice about how to exercise the discretionary "supervisory authority" she invoked, which applies only in "appropriate circumstances." *See* JA526 (citing 37 C.F.R. §2.146(a)(3)); *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("appropriate" confers discretion); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (same).  The Director was certainly not *required* to renew Cubaexport's registration.  To pass muster under the APA, her choice therefore needed to be "reasonable and reasonably explained," and the Director does not contend otherwise.  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S.Ct. 1497, 1511 (2025); *State Farm*, 463 U.S. at 43.

But the decision failed to clear that bar.  Perhaps the best evidence is the Director's own brief, for almost nothing in it appears in the two sentences of the Director's decision adopting the retroactive validation

rationale. The decision did not mention any error by the examiner warranting correction. *But see* Director Br. 14-17. Nor did it suggest that the PTO's refund may be ignored because it was the "examiner's action[] at an intermediate step." *But see id.* at 12. Indeed, because the decision contained essentially no explanation, essentially everything the Director now says is "appellate counsel's *post hoc* rationalization[]." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

What little the Director's decision did say left critical matters unaddressed. Most blatantly, it did not explain why the existence of the license made it "appropriate," 37 C.F.R. §2.146(a)(3), for the Director to exercise discretionary "supervisory authority" to reward Cubaexport's machinations. *See* Bacardi Br. 60. Again, nobody disputes that there would have been no payment to retroactively validate if Cubaexport had not tried to pass off a license allowing its *lawyers* to "*receive* payment for" unrelated legal services, JA199 (emphasis added), as authorization for Cubaexport to pay the renewal fee. The retroactive validation rationale is only even remotely plausible because of Cubaexport's underhanded tactic, which caused the PTO to erroneously withdraw funds it soon returned.

It is hardly obvious that it is "appropriate," 37 C.F.R. §2.146(a)(3), to grant Cubaexport a *benefit* from this maneuver. At a minimum, how to respond to this behavior raised questions of policy and equity that were "an important aspect of the problem," which the Director needed to consider and explain. *State Farm*, 463 U.S. at 43. But if a reasonable explanation existed for rewarding Cubaexport, she did not provide it. Her cursory invocation of the retroactive validation rationale (to the extent that rationale is discernible at all from her decision, *but see* Bacardi Br. 56-58), said nothing about why exercising that discretion to benefit Cubaexport was "appropriate" under these unusual circumstances. Neither, for that matter, does her brief.

Nor did the decision explain why it was "appropriate" to grant Cubaexport's petition—filed on October 4, 2006, JA315—based on a license that did not exist until January 11, *2016*, JA522-23. *See* Bacardi Br. 60-61; JA526. The Director allowed the petition to sit for 3,388 days (including 1,339 days *after* Cubaexport's legal challenge to OFAC's denial of a specific license failed, JA491-92, at which point there was no conceivable reason to continue waiting). If she had decided the petition in its first *3,385* days, she of course would have denied it, because OFAC

16

had not authorized Cubaexport to pay the renewal fee. Yet conveniently for Cubaexport, she chose to wait until just two days after OFAC finally issued the 2016 license—and just one day after Cubaexport alerted her to that fact. JA520-23. In other words, the delay *enabled* the Director's ultimate decision, and so is part and parcel with it.

That extraordinary delay, moreover, had "identified consequences or harms." *Solenex LLC v. Bernhardt*, 962 F.3d 520, 527 (D.C. Cir. 2020). Even a slightly shorter delay would have resulted in Cubaexport's registration expiring, and Bacardi's competing application proceeding. The Director needed to "reasonably take[] into account" and address these "harmful consequences emanating from that [extraordinary] delay," *see id.* at 528, especially given the congressional policy against "deadwood" on the register, *see Checkers Drive-In Rests., Inc. v. Comm'r of Pats. & Trademarks*, 51 F.3d 1078, 1085 (D.C. Cir. 1995). But she did not do so, and it is hard to imagine how she could have done so reasonably.

The Director's explanation fell short of the "reasoned decisionmaking" the APA requires, *Michigan*, 576 U.S. at 750 (cleaned up), for still other reasons, as Bacardi has detailed (at 56-61). Bacardi

17

will not belabor them except to note that the Director hardly responds, even to one of the most serious problems: the failure to address *any* of the substantial evidence in the administrative record that there was no "payment" to retroactively validate. *See* Bacardi Br. 59. The Director's only response (at 23) to this point—and to nearly all of Bacardi's arbitrary-and-capricious arguments—is that this evidence was not presented to her and was not so significant that she needed to address it *sua sponte*. But Cubaexport had no incentive to raise arguments that would undermine its own petition, and the Director denied Bacardi's request to be heard in the renewal proceeding. JA287. Having decided to close her ears to any considerations Bacardi might surface, it was all the more incumbent on the Director herself to identify, consider, and address all relevant evidence, considerations, and arguments.

Moreover, the evidence that no payment existed was significant. The Director cannot deny that the refund happened and undid, as a factual matter, what came before. As of 2024—well *after* the Director acted—PTO records identified the 2005 fee transaction as having been "REVERSED." JA542. The PTO's normal practice is to treat incomplete or reversed payment attempts (for example, those "charged back" by a

financial institution) as ineffective, and the Director did not explain why she deviated from that policy here. *See* Bacardi Br. 30-31, 60. Nor does she deny that the funds that eventually covered the fee in 2016 (plus a surcharge due only in the event of deficiencies) came from a *different* deposit account than the one Cubaexport used in 2005—or that PTO records show those funds as received in 2016. JA289, JA539, JA542. Given all these facts, the possibility that no 2005 payment existed to retroactively validate was not "insignificant," and the Director needed to address it, along with the other important considerations Bacardi has identified.

The Director's explanation of the retroactive validation rationale thus "leaves too many key questions unanswered to satisfy the APA" and should be set aside. *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 978 (D.C. Cir. 2023).

## II.    The Director's Extended-Time-To-Cure Rationale Fails.

### A.    The Director Lacked Authority to Extend the Six-Month Period for Curing Deficiencies.

As Bacardi has explained (at 42-47), both PTO regulations and (as the Director concedes, at 25) the July 2006 Office Action set a six-month deadline for Cubaexport to cure the payment deficiency. *See* 37 C.F.R.

§2.184(b)(1); JA289. The Director does not dispute that Cubaexport did not and legally could not cure in that period, or that Cubaexport only purported to cure in 2016. Yet the Director says that the otherwise untimely cure became timely because she enjoys unfettered discretion to extend the deadline. Director Br. 24-26. That is incorrect.

### 1. *PTO regulations prescribe a six-month deadline.*

The Director's key premise is that neither the Act nor PTO regulations "sets a uniform deadline for" curing deficiencies. Director Br. 24. The Director takes this position because she lacks discretion to override a deadline set by statute or regulation (absent, in the latter case, a superseding regulation).

But as Bacardi explained (at 42-46), the PTO *has* by regulation given registrants six months after notification of a deficiency to file a "response" curing the deficiency or explaining why none exists, or else the registration "expire[s]." 37 C.F.R. §2.184(b)(1). The Director's attempts to erase that deadline fail.

The Director first observes that §2.184, unlike its neighbor, §2.185, does not use the word "deficiencies." Director Br. 27.[2] But as Bacardi explained (at 42-43), the "response" that §2.184(b)(1) requires within six months *is* the vehicle PTO regulations provide for curing renewal application deficiencies. The Director appears to acknowledge that reality. She recounts that "the examiner's July 2006 Office action informed Cubaexport that it had six months to *correct the deficiency*." Director Br. 25 (emphasis added) (citing JA289). True, and the Office action did so without using the word "deficiency"—what it said was "RESPONSE TIME DEADLINE." JA289.

The Director's argument must therefore be that a deficiency cure is a "response," but is somehow exempt from "the six-month deadline for filing a response" set by §2.184(b)(1). Director Br. at 28. But that is

---

[2] To the extent the Director suggests (at 24) that §2.185 creates an open-ended period for curing deficiencies, she is mistaken. That provision governs deficiency *surcharges*. In relevant part, it says only that a surcharge must be paid if a deficiency is cured after a registration expires, but not if it is cured before. *See* 37 C.F.R. §2.185(a)(2). Construing it to give registrants *unlimited* time to cure would create serious tension with the statutory requirement that there be a finite "time prescribed" for curing deficiencies, and the congressional policy disfavoring "deadwood." *See* Bacardi Br. 41, 48-49; *Checkers*, 51 F.3d at 1085.

21

atextual (and nonsensical). Section 2.184(b)(1) draws no distinction between a response curing a deficiency and, say, one arguing no deficiency exists. It says just that the deadline for filing a "response"—of any sort—is six months after the Office action refusing renewal. The Director has no power to draw distinctions that §2.184(b)(1) does not.

Though the plain text suffices, the interpretive aids Bacardi's opening brief cited confirm this reading, notwithstanding the Director's efforts to dismiss them.

*First*, as Bacardi explained (at 43-44), the TMEP reflects the PTO's established policy of requiring deficiencies to be cured within six months, and specifically cites §2.184(b)(1) in support of that policy. TMEP §1606.13(a). The Director counters (at 27) that it instead directs examiners merely to borrow the "response" deadline from §2.184(b)(1) and repurpose it as the deadline for curing deficiencies. But because deficiency cures are (undisputedly) "responses," the more natural reading is that the TMEP clarifies and confirms what §2.184(b)(1) already establishes.[3]

---

[3] Bacardi has never contended, as the Director claims (at 26-27), that the TMEP binds the Director—only that it is persuasive evidence of the meaning of §2.184(b)(1). Bacardi Br. 45.

*Second*, the preamble to the rule in which §2.184(b)(1) was promulgated refers to a "six-month deficiency period" in discussing sections 2.184 and 2.185 together. *See* Bacardi Br. 44-45 (citing 64 Fed. Reg. 48,900, 48,915 (Sept. 8, 1999)). The Director responds (at 29) that it is "unclear" what her own agency's explanation meant to refer to, but it is only unclear if one disregards the only plausible candidate: §2.184(b)(1). Contrary to the Director's suggestion (at 29), the reference *cannot* be to the "six-month grace period" referenced in §2.185(a)(2). That provision itself makes clear that the "six-month grace period" is not a "deficiency period," as it contemplates correction of deficiencies (with a surcharge) "after" the grace period expires.

The Director next resorts (at 28) to protesting that the six-month deadline set by §2.184(b)(1) cannot apply if she is to "exercise effective review authority." She worries in particular that if the deadline does apply, registrants would lack any opportunity to correct deficiencies the Director identifies but examiners missed. *Id.* That premise is questionable. When an examiner identifies a deficiency, the registrant is entitled to a six-month period to try to cure it. *See* 37 C.F.R. §2.184(b)(1). So it stands to reason that if the examiner fails to identify a deficiency

23

and so incorrectly denies the registrant an opportunity to cure, the Director may exercise her "supervisory authority," *id.* §2.146(a)(3), and correct that error by affording the registrant the six-month period it should have received. Indeed, the Director herself understands her supervisory authority to allow her to correct an examiner's "clear error or … abuse of discretion." TMEP §1707. Bacardi does not argue otherwise.

But even if the Director's premise was right, the solution would be for the PTO to promulgate a new regulation, not to ask this Court to ignore §2.184(b)(1). PTO regulations already provide an example of such a regulation, giving an applicant for an *initial* registration 30 days (or more, in specified circumstances) after the Director *denies* a petition "to comply with" any "requirement that is the subject of" the petition. 37 C.F.R. §2.63(c)(1)-(3). And notably, this provision affords the Director no discretion to extend that deadline. It defies logic that the Director has *no* discretion to extend deadlines for curing deficiencies in initial applications, but *absolute* discretion to do so for renewal applications. If anything, timeliness is more critical in the latter context (given congressional policy disfavoring "deadwood") than the former (where the

24

cost of delay falls principally on the applicant, who risks losing priority for their trademark).

Finally, the Director suggests (at 30-31) that the "presumption of regularity" somehow justifies unfettered discretion to extend deficiency deadlines. That presumption, though, is about how agencies exercise power they have; it does not justify exercising power they lack. Regardless, to the extent the Director thinks it "farfetched and inconsistent with the presumption" that "the Director will allow unused trademark registrations to accumulate by not acting on petitions," *id.* at 32, that is precisely what she did here—for more than nine years.

> ### 2. *Any discretion the Director has to extend deadlines does not apply here.*

Because §2.184(b)(1) prescribes a uniform six-month deadline for curing deficiencies, the Director may extend that deadline only if another regulation authorizes her to do so. *See Fort Stewart Sch. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990) ("an agency must abide by its own regulations"); *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34-35 (D.C. Cir. 2005) (substantive change to notice-and-comment regulation requires notice and comment). Indeed, even if §2.184(b)(1) did not apply, the Director would still need authorization in a regulation to extend the six-

25

month deadline she concedes (at 25) the July 2006 Office Action set.[4]  The lone regulation the Director identifies is the one authorizing her, on a petition for review, to exercise "supervisory authority" to overrule examiners "in appropriate circumstances."  37 C.F.R. §2.146(a)(3); *see* Director Br. 24-26, 32-33.[5]  But however far that power extends, it does not authorize the extension granted here.  *See* Bacardi Br. 51-54.

Indeed, the Director's "supervisory authority" may not authorize extending deficiency cure deadlines at all, especially given that §2.184(b)(1) specifies a deadline.  *Cf. In re Cleary Packaging, LLC*, 36 F.4th 509, 515 (4th Cir. 2022) ("the more specific provision should govern over the more general").  The Director identifies (at 25-26) four times in the last decade she has extended deficiency cure deadlines on this basis,

---

[4] The Director has delegated responsibility for adjudicating renewal applications to examiners, while reserving power to review their decisions through the (optional) petition process.  *See* 37 C.F.R. §2.186(b).  That review power is cabined by regulation to specific circumstances.  *See id.* §2.146(a)(1)-(5), (b).  An unlimited power, untethered to PTO regulations, to override one type of examiner action—setting deficiency cure deadlines—would contradict that scheme.

[5] The Director also points to her general authority to act for the PTO.  *See* Director Br. 30 (citing 35 U.S.C. §3).  But that does not suffice because any extension power must be tethered to the Director's review power.  *See supra* n.4.

but that proves little. *Cf. Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 215 (4th Cir. 2009) (considering "[d]ecades worth of administrative practice" as "longstanding"). And even a truly longstanding practice would not necessarily reflect legality, which is for courts to decide. *See Loper Bright*, 603 U.S. at 412.

But the Court need not reach that question to hold that the Director lacked power to extend Cubaexport's deadline. The Director may exercise "supervisory authority" only in "appropriate circumstances." §2.146(a)(3). And although "appropriate" confers discretion, it does not confer *unlimited* discretion. *See, e.g.*, *Michigan*, 576 U.S. at 752; *Loper Bright*, 603 U.S. at 395.

The novelty of the extension granted here alone suggests it was not "appropriate." Unsurprisingly, neither the Director nor Cubaexport has identified another extension granted where the deficiency existed because another legal framework (here, Section 211 and the CACR) *prohibited* the registrant from curing within the originally prescribed period. *See supra* Part I.A. And by any standard, it is not an "appropriate" use of the PTO Director's review authority to nullify such

27

a framework by extending the deficiency deadline (here, for nearly nine years) until the framework changes.

Confirming the point, the best examples the Director can muster involve nothing remotely similar.  In each of the four she cites (at 25-26), she allowed a registrant to cure a minor technical mistake (a non-compliant specimen or insufficient proof of ownership) by filing additional evidence *with the petition*.  And in each, she acted on the petition within six months.  Here, by contrast, the deficiency was not a mistake (technical or otherwise), it was not cured with the petition, and the Director did not act within six months of the petition.  The deficiency was instead a legal consequence of the Cuban embargo, and so could not be cured unless OFAC issued a license within the six-month cure period, which it did not.  And it was only purportedly cured here after the Director sat on Cubaexport's petition for more than nine years, until OFAC changed its mind and issued Cubaexport a license.

Indeed, the extension was not "appropriate" by even the PTO's own understanding.  The Director has long understood her "supervisory" authority to allow her to correct an examiner's "clear error or … abuse of discretion," or to excuse minor defects where a petitioner "has

28

substantially complied with the requirements of the statute or rules." TMEP §1707. But there was no error here. *See supra* Part I.A. And the Director never explains how Cubaexport could have "substantially complied" when it *could not* legally comply. *See* Bacardi Br. 53-54.

### 3. Cubaexport's alternative argument fails.

Again Cubaexport leaps beyond the Director but falls flat. This time, Cubaexport refuses to admit even that the July 2006 Office Action prescribed a six-month deficiency deadline. *See* Cubaexport Br. 17. It thus thinks there is *never* a "time prescribed" for curing deficiencies, 15 U.S.C. §1059(a), unless *the Director* personally prescribes one. Nonsense. As the Director acknowledges (at 25), the July 2006 Office Action prescribed a six-month deficiency deadline. And it had to: the Lanham Act presupposes that registrants will be given a "time prescribed" for curing deficiencies "after notification of the deficiency," 15 U.S.C. §1059(a), a point at which the Director is not yet involved (per a delegation of authority reflected in PTO regulations, *see* 37 C.F.R. §2.186).

\*\*\*

Whatever the Director's authority to extend deadlines in more

pedestrian circumstances, she does not enjoy the limitless discretion required to grant Cubaexport the nearly-nine-year extension it needed to lawfully cure its deficiency.

## B. The Director's Unexplained Extension of Cubaexport's Time to Cure Was Arbitrary and Capricious.

Assuming the Director had discretion to extend Cubaexport's deadline, her choice needed to be "reasonable and reasonably explained." *Seven Cnty.*, 145 S.Ct. at 1511. It was not, providing an independent basis to vacate her decision.

The Director tacitly admits (at 33) that her decision was one of "less than ideal clarity." That is quite the understatement. The decision did not even acknowledge an extension was granted; the Director concedes (at 25) it only "effectively extend[ed]" the deadline. And the decision contained *no* explanation, reasonable or otherwise, for *why* the Director chose not to "adhere to the original deadline." *Id.* Nor did it grapple with other alternatives—*e.g.*, a one-month, one-year, five-year, or eight-year extension, none of which would have been enough to save Cubaexport's registration. *See supra* pp. 16-17. It thus failed the most basic requirement of "reasoned decisionmaking": that the agency "cogently

explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48, 52.

The Director does not try to argue otherwise. She instead recasts Bacardi's argument as limited to the fact that she did not "expressly extend[] the deficiency-correction deadline," and responds only to that. Director Br. 33. The Director certainly should have acknowledged she was extending the deficiency-correction deadline. Doing so was a necessary first step to explaining "*why* [Cubaexport's] actions sufficed to … cure the deficiency within the time prescribed." Bacardi Br. 62. But Bacardi also expressly raised the Director's failure to "explain *the reason for* th[e] extension." *Id.* (emphasis added). Neither the Director nor Cubaexport ever responds to that argument. And the Director's justification for failing to expressly acknowledge the extension is obviously insufficient. The Director says (at 33) that doing so "would have been … academic … because Cubaexport had already paid." Whether Cubaexport's new payment cured the deficiency and so justified renewal, though, turned on whether the Director was "adher[ing] to the original deadline" or extending it, and for how long. Director Br. 31. The choice was not "academic."

31

Perhaps the Director gave no reasonable explanation because none is possible. Even now, the Director offers only that renewing Cubaexport's registration "was ... consistent with American foreign policy." *Id.* at 34-35; *see also* Cubaexport Br. 22-24. That explanation (which cannot be found in the decision itself) is at best a justification for renewal once an extension had been granted, not for granting the extension itself—which *frustrated*, for nearly a decade, U.S. foreign policy decisions in effect throughout that period. Or perhaps the Director, for whatever reason, did not want to explain why she was granting such an unprecedented extension. Whichever it was, the Director needed to "disclose the basis" of her decision, *Burlington Truck Lines*, 371 U.S. at 168, and "explain why [she] ... exercised [her] discretion in a given manner," *State Farm*, 463 U.S. at 48. Undisputedly, she did not.

The Director's responses to Bacardi's other arbitrary-and-capricious arguments fare no better. In contending that she did not depart from agency policy without acknowledging the change, *see* Bacardi Br. 63-64, the Director rehashes the same faulty arguments discussed in Part II.A above, dismissing §2.184(b)(1) and the TMEP and claiming that four decisions granting extensions in radically different circumstances

32

are evidence of a "routine[]" PTO practice. Director Br. 33-34. Her efforts to minimize the TMEP's relevance ring especially hollow: the Director's argument here is that the TMEP does not apply to her, but her decision cited seven separate TMEP provisions in support of her action. JA526.[6] And in responding to Bacardi's argument that the decision cannot be upheld on a "substantial compliance" rationale, Bacardi Br. 65-66, the Director all but concedes that the decision did not rely on that rationale, Director Br. 34.

Because the Director's decision to allow Cubaexport more than nine years to cure its deficiency was neither reasonably explained nor reasonable, it was arbitrary and capricious and should be set aside.

## CONCLUSION

The Court should reverse the judgment of the district court.

---

[6] She also notes (at 34) that §1606.13(a)—the TMEP provision reflecting the PTO's established policy of giving registrants six months to cure deficiencies—was not among these provisions. So what? The Director's failure to cite §1606.13(a) underscores the point: that although the Director thought enough of the TMEP to cite it (repeatedly) in explaining her decision, she ignored the provision most relevant to the question of length of time for curing deficiencies, and failed to explain her departure from the policy that §1606.13(a) reflects.

Date: August 29, 2025

/s/ David M. Zionts

| | |
|---|---|
| Michael C. Lynch | David M. Zionts |
| Damon W. Suden | Alexander J. Cave |
| Edwin Adlam Herod | Yevgeniy Pilipovskiy |
| KELLEY DRYE & WARREN, LLP | COVINGTON & BURLING LLP |
| 3 World Trade Center | One CityCenter |
| 175 Greenwich Street | 850 Tenth Street, NW |
| New York, NY 10007 | Washington, DC 20001 |
| (212) 808-7800 | (202) 662-6000 |

*Attorneys for Plaintiffs-Appellants Bacardi & Company Limited and Bacardi USA, Inc.*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 25-1355         **Caption:** Bacardi & Co. Ltd., et al. v. USPTO, et al.

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓]  this brief or other document contains _____6,471_____ [*state number of*] words

[ ]  this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓]  this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word version 2408____ [*identify word processing program*] in
Century Schoolbook, size 14____ [*identify font, size, and type style*];

**or**

[ ]  this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) David M. Zionts_____

Party Name_Bacardi & Co. Ltd. and Bacardi USA, Inc.___   Date:_8/29/2025_____