**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1355**

---

BACARDI & COMPANY LIMITED; BACARDI USA, INC.,

Plaintiffs – Appellants,

v.

JOHN A. SQUIRES, in his official capacity as the Director of the United States Patent & Trademark Office; UNITED STATES PATENT & TRADEMARK OFFICE,

Defendant – Appellee,

and

EMPRESA CUBANA EXPORTADORA DE ALIMENTOS Y PRODUCTOS VARIOS,

Intervenor/Defendant – Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:21-cv-01441-LMB-IDD)

---

Argued:  December 9, 2025                    Decided:  June 16, 2026

---

Before NIEMEYER, RICHARDSON, and RUSHING, Circuit Judges.

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judges Niemeyer and Rushing joined.

---

**ARGUED:** David Meir Zionts, COVINGTON & BURLING LLP, Washington, D.C., for Appellants.  Weili Justin Shaw, UNITED STATES DEPARTMENT OF JUSTICE,

Washington, D.C.; Carl Jonas Micarelli, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellees.  **ON BRIEF:**  Michael C. Lynch, Damon W. Suden, Edwin Adlam Herod, KELLEY DRYE & WARREN, LLP, New York, New York; Alexander J. Cave, Yevgeniy Pilipovskiy, COVINGTON & BURLING LLP, Washington, D.C., for Appellants.  Brett A. Shumate, Assistant Attorney General, Daniel Tenny, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees John Arthur Squires and United States Patent & Trademark Office.  David H. Bernstein, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellee Empresa Cubana Exportadora de Alimentos y Productos Varios.

RICHARDSON, Circuit Judge:

This spirited trademark dispute lands before our Court yet again. In 2005, Cubaexport applied to renew a trademark registration with the United States Patent and Trademark Office (PTO). But Cubaexport's payment of renewal fees was legally void without a specific license issued by the Treasury's Office of Foreign Assets Control (OFAC). For over a decade, OFAC refused to issue that license. Then, in 2016, it issued a license retroactively authorizing Cubaexport's 2005 payment. Based on the issuance of that license, the PTO approved Cubaexport's renewal filing. Bacardi argues that the PTO exceeded its statutory authority and acted arbitrarily and capriciously by granting renewal ten years after the renewal deadline. We disagree. OFAC's 2016 license validated Cubaexport's 2005 payment, removing the sole legal obstacle to renewal. So we affirm.

## I.      BACKGROUND

We have detailed the underlying facts elsewhere. *See Bacardi & Co. Ltd. v. U.S. Pat. & Trademark Off.* (*Bacardi II*), 104 F.4th 527, 529–30 (4th Cir. 2024). We distill the relevant facts here.

Bacardi has sought registration of the HAVANA CLUB trademark for decades. But Empresa Cubana Exportadora de Alimentos y Productos Varios—a Cuban state-owned business known as "Cubaexport"—has long stood in its way.[1] Cubaexport registered the

---

[1] The trademark was previously registered by José Arechabala, S.A. *See Bacardi II*, 104 F.4th at 529. During the Cuban Revolution, the Cuban government seized and expropriated Arechabala's assets without compensation. After Arechabala's registration expired, Cubaexport registered HAVANA CLUB for itself. In the 1990s, Arechabala sold its remaining interest in the mark to Bacardi. Bacardi sought to register the mark and cancel Cubaexport's registration, which spawned a still-pending lawsuit. *See Bacardi & Co. Ltd.*

trademark in the United States in 1976 and renewed its registration in 1986 and 1996. *See* 15 U.S.C. § 1058(a) ("Each registration shall remain in force for 10 years . . . .").

Cubaexport never sold rum in the United States under the HAVANA CLUB mark during this period, because OFAC regulations prohibit Cuban entities from engaging in most transactions in the United States. *See generally* Cuban Assets Control Regulations, 31 C.F.R. pt. 515. Originally, OFAC nevertheless allowed certain transactions related to the registration and renewal of trademarks with the PTO. *See* 31 C.F.R. §§ 515.201, 515.527 (1995). That authorization included payment of the statutorily required renewal fee. *See* 15 U.S.C. §§ 1058(b), 1059(a); 31 C.F.R. § 515.527(e) (1995). But in 1998, Congress prohibited those transactions too. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 211(a), 112 Stat. 2681, 2681-88 (1998). Under the new regime, to renew its trademark registration before it expired in July 2006, Cubaexport needed to obtain a "specific license" from OFAC exempting it from this prohibition. 31 C.F.R. § 501.801(b).

In December 2005, Cubaexport submitted its renewal filing without the required license. The PTO received the renewal funds, but OFAC later notified the PTO that Cubaexport lacked specific authorization for the payment. So Cubaexport quickly applied for a license.

---

*v. Empresa Cubana Exportadora de Alimentos y Productos Varios*, No. 1:04-cv-00519 (D.D.C. filed Mar. 29, 2004) (case docket).

4

With the renewal deadline closing in, a PTO examiner[2] notified Cubaexport that its application was deficient because the "required fee" had "not been paid," citing the OFAC notification.  J.A. 289.  The examiner indicated the December 2005 fee would "be refunded since it was not properly authorized" and warned that if Cubaexport failed to obtain a specific license, its registration would expire.  J.A. 291 n.1.

OFAC denied Cubaexport a specific license.  So, in August 2006, the PTO examiner refused to renew Cubaexport's registration and refunded the renewal fee.  Cubaexport responded on two fronts:  It sued OFAC in federal court and petitioned the PTO Director for review of the decision to deny renewal.  The Director suspended "matters with respect to [the PTO] petition" while the OFAC litigation played out.  J.A. 466.

Six years later, Cubaexport lost the OFAC suit.  *See Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of the Treasury*, 638 F.3d 794 (D.C. Cir. 2011), *cert. denied*, 566 U.S. 986 (2012).  But Cubaexport pressed on.  First, when it reported the suit's outcome to the PTO, Cubaexport presented additional arguments against cancellation of its mark—which further delayed the PTO Director's review.  Second, in November 2015, Cubaexport again applied for a specific license from OFAC to renew its trademark registration, ahead of what would be its 2016 expiration date.

This time, OFAC granted the license.  Specifically, OFAC authorized Cubaexport "to engage in all transactions necessary to renew and maintain the HAVANA CLUB trademark registration . . . including those related to Cubaexport's submission filed with

---

[2] A PTO examiner, or "trademark examining attorney," is a federal employee who examines trademark applications for compliance with applicable laws.

5

the USPTO on or about December 14, 2005, and the payment referenced therein." J.A. 518. Cubaexport updated the PTO, and in January 2016, the Director[3] granted Cubaexport's petition for review of the examiner's 2006 refusal to renew. The Director noted that Cubaexport had "timely submitted" its renewal filing and payment, but the examiner had been "constrained to refuse the filing" because Cubaexport lacked OFAC authorization for the fee payment. J.A. 526. Because Cubaexport had since obtained a license specifically authorizing the December 2005 payment, the Director found "the fee payment . . . effective as of December 14, 2005," and the renewal filing to be "complete and acceptable as of that date."[4] *Id.*

But the PTO's action did not end the matter. Instead, Bacardi entered the fray, suing the PTO and its Director under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). *Bacardi & Co. Ltd. v. U.S. Pat. & Trademark Off.* (*Bacardi I*), No. 1:21-cv-1441, 2022 WL 2184940 (E.D. Va. Apr. 6, 2022). In Bacardi's view, the Director lacked statutory authority to renew an already-expired registration and did not reasonably explain

---

[3] The Commissioner for Trademarks acted on the Director's behalf in granting Cubaexport's petition. For simplicity, we refer to the Director as the decisionmaker.

[4] The Director concluded that, in the alternative, nonpayment of the renewal fee is a deficiency that is curable "within the time period prescribed after notification of the deficiency." J.A. 526 (citing 15 U.S.C. §§ 1058(c), 1059(a)). The Director reasoned that Cubaexport timely petitioned the Director and was entitled to cure the deficiency while its petition was pending. Because Cubaexport provided the OFAC license as a "timely supplement to its petition" and authorized the PTO to "charge any uncollected fees," the Director deemed the application complete. J.A. 526.

the decision to grant the petition.[5]  *See Bacardi II*, 104 F.4th at 530.  The district court

dismissed the case, holding that the Lanham Act precluded judicial review under the APA.

We reversed and remanded.  *Id.* at 530–34.

On remand, Cubaexport intervened as a defendant.  *See Bacardi & Co. Ltd. v. U.S.

Pat. & Trademark Off.* (*Bacardi III*), No. 1:21-cv-1441, 2025 WL 711959, at *1 (E.D. Va.

Mar. 3, 2025).  The parties then filed cross-motions for summary judgment, and the district

court granted Defendants' motions.  *Id.* at *6.  The district court reasoned that the OFAC

license validated the payment as of December 2005, so the payment was timely.  *Id.* at *4.

In the alternative, it held that Cubaexport corrected any fee deficiency by making a valid

payment while its petition was pending.  *Id.* at *5.  Bacardi timely appealed, and we now

reach the merits.

## II.    DISCUSSION

We review the district court's grant of summary judgment *de novo* and, accordingly,

review the PTO's actions directly.  *Pharm. Coal. for Patient Access v. United States*, 126

F.4th 947, 953 (4th Cir. 2025).

### A.    The PTO Director Acted Within Statutory Authority

Whether the PTO exceeded its statutory authority is a question of law we review *de

novo*.  *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 679–80 (4th Cir. 2020).

We conclude that the PTO acted within its authority.

---

[5] As we noted in *Bacardi II*, "[v]arious Directors have led the PTO since the events underlying this suit."  104 F.4th at 530 n.2.  The current Director, John A. Squires, is the named defendant on appeal.

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, provides federal statutory protection for trademarks and creates a nationwide trademark registry. *U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 552 (2020). Registration confers significant benefits: It is "prima facie evidence" of the mark's validity and provides constructive notice nationwide of the registrant's claim of ownership. *Iancu v. Brunetti*, 588 U.S. 388, 391 (2019) (quoting 15 U.S.C. § 1115(a)).

To prevent marks no longer in use from cluttering the register and blocking others from using them, a registration expires ten years after issuance unless the registrant renews it within the statutory period. 15 U.S.C. § 1058(a). Sections 8 and 9 lay out the renewal requirements. Section 8 requires the registrant to file an affidavit confirming the mark's continued use in commerce (or providing an excuse for nonuse) and to pay a fee. § 1058(b). Section 9 allows a registration to be renewed for ten-year periods "upon payment of the prescribed fee and the filing of a written application."[6] 15 U.S.C. § 1059(a). The Act authorizes the Director to set the requirements for a complete affidavit and application. *See id.* But it requires the registrant to pay the fee in the year before the registration expires, or within a six-month grace period thereafter if accompanied by a grace-period surcharge. §§ 1058(a), 1059(a).

In December 2005, Cubaexport wired money to the PTO. Although the funds transferred, the PTO later determined that Cubaexport lacked the required license and

---

[6] The statute authorizes the Director to prescribe the fee amount. 15 U.S.C. §§ 1058(b)(1)(D), 1059(a). The fee schedule is set by regulation. *See* 37 C.F.R. § 2.6(a)(5), (12). In practice, applicants may submit a combined Section 8 affidavit and Section 9 renewal application with the required fees.

refunded the payment. *See* 31 C.F.R. § 515.203(a). Without payment, Cubaexport could not satisfy a statutory requirement for renewal. *Cf. Bacardi & Co. Ltd. v. Empresa Cubana Exportadora de Alimentos y Productos Varios*, No. 1:04-cv-00519, 2023 WL 2384145, at *3 (D.D.C. Mar. 6, 2023) (describing how OFAC's retroactive license revocation invalidated intervening transfers). That was true in 2006, when the PTO examiner found the filing could not be accepted.

But we do not review the PTO examiner's 2006 decision, because it was not the agency's final action in this matter. Because Cubaexport timely petitioned the Director for review, the Director's 2016 decision is the PTO's final action—and the only action we review today. 5 U.S.C. § 704; 37 C.F.R. § 2.186(c). In 2016, the Director determined that Cubaexport's payment was valid *as of 2005*.

What changed between 2006 and 2016? Cubaexport secured an OFAC license. Under the Cuban Assets Control Regulations, that license authorized the December 2005 payment. Section 515.502 of the regulations governs when a license may authorize an earlier transaction: No license "shall be deemed to authorize or validate any transaction effected prior to the issuance thereof" unless the license "specifically so provides." 31 C.F.R. § 515.502(a); *see also* 31 C.F.R. § 515.203(c) (addressing licenses issued "before, during or after a transfer"). The phrase "specifically so provides" refers to the operative authorization in the preceding clause—the authorization or validation of an already-

9

effected transaction. 31 C.F.R. § 515.502(a). In other words, that antecedent phrase identifies what the license must specifically provide.[7]

Cubaexport's license did just that. It authorized Cubaexport "to engage in all transactions necessary to renew and maintain" its trademark registration, "including those related to Cubaexport's submission filed with the USPTO on or about December 14, 2005, and the payment referenced therein." J.A. 518. The license specifically identifies and authorizes *past* transactions, including the December 2005 payment. That is enough under § 515.502(a).[8]

So § 515.502(a) tells us that the 2016 OFAC license reaches the December 2005 transaction. And § 515.203(c) tells us the license's legal effect: A license authorizing a prior transfer "shall validate such transfer or render it enforceable to the same extent as it would be valid or enforceable but for" the embargo against Cuba. 31 C.F.R. § 515.203(c). But for the embargo, the 2005 payment would have been timely and effective, satisfying the statutory renewal requirement. Indeed, the funds changed hands. It was only later that

---

[7] Bacardi argues that § 515.502(a) demands a clear statement that the license applies retroactively. True enough. Section 515.502(a) *is* a clear-statement rule of sorts—a license won't be read to reach backward by silence or implication. But the regulation requires specificity, not talismanic phrasing. A license that identifies a past transaction and authorizes it clearly applies retroactively.

[8] Bacardi's focus on the word "engage" in the license is misplaced. "To engage" is an infinitive; it carries no tense of its own and draws its temporal content from context. Here, the license authorized transactions "including those related to" a submission already "filed" in December 2005 and "the payment referenced therein." J.A. 518. That language points to past conduct, not merely future acts. Section 515.502(a) requires no more.

the PTO examiner directed that the payment be refunded.[9]  When the Director considered the petition's merits in 2016, the license had validated the December 2005 payment, making it just as valid as it would have been in a world with no embargo.  So the Director correctly found that Cubaexport had paid the fee within the renewal period.

---

[9] Bacardi urges us to hold that a payee's subsequent handling of funds determines a payment's validity.  Relying on dictionary definitions, Bacardi claims that "payment" requires not only tender, but also the payee's acceptance.  *See Payment*, Black's Law Dictionary (12th ed. 2024); *Payment*, Black's Law Dictionary (3d ed. 1933).  But a payee-focused definition is far from universal.  *See Payment*, Webster's Third New Int'l Dictionary (3d ed. 2002); *Payment*, Webster's New Int'l Dictionary (2d ed. 1942).  And when dictionaries define a term differently, the statutory text resolves the dispute.  *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 226–29 (1994).

Here, Bacardi's understanding runs counter to the statutory text.  Indeed, the statute conditions renewal upon "payment" of the prescribed fee and "filing" of a renewal application.  These are both acts the *registrant* must perform within the statutory window, not the agency.  15 U.S.C. § 1059(a); *cf.* U.S. Patent & Trademark Office, *Trademark Manual of Examining Procedure* § 405.06 (2002) (identifying only bounced checks, refused EFTs, and chargebacks—actions initiated by a third-party financial institution—as grounds to treat a fee as unpaid).  Bacardi's rule would make the registrant responsible for something only the agency can do:  accepting the funds.  *Cf. Ford Motor Co. v. United States*, 768 F.3d 580, 587 n.1 (6th Cir. 2014) (finding it "inappropriate to permit [an agency], as the putative payee, to determine whether a specific remittance constitutes a payment").  A later refund—whether correct or incorrect—does not erase the registrant's timely tender, or its legal effect, if the tender is ultimately validated.

The OFAC license gave the prior payment new legal status.  The Director was no longer required to refuse renewal—and acted within statutory limits by granting it.[10]  So Bacardi's statutory-authority challenge fails.[11]

## B.    The Director Reasonably Explained The Decision

Agencies must act reasonably and explain themselves reasonably.  *Ohio v. EPA*, 603 U.S. 279, 292 (2024).  The agency must offer a "rational connection between the facts found and the choice made."  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  But if the PTO's explanation is merely "of less than ideal clarity," we will uphold its decision "if the agency's path may reasonably be discerned."  *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  This kind of review is "very deferential."  *Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, 98 F.4th 483, 498 (4th Cir. 2024) (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)).

The Director's explanation was brief but adequate.  The Director identified the examiner's reason for refusing renewal:  Cubaexport lacked OFAC authorization for the fee payment.  *See* J.A. 526 (noting the examiner was "constrained to refuse the filing because petitioner lacked an OFAC license authorizing the fee payment").  The Director

---

[10] Timely submission of the combined filing and statutory fees is necessary but not sufficient for renewal.  The filing may be deficient in other ways, some of which may be corrected.  Although the Director cannot waive these threshold requirements, satisfying them does not compel renewal.  The Director may still refuse renewal on other grounds.

[11] Because the validated 2005 payment satisfied the statutory fee requirement, we do not consider the alternative argument that Cubaexport cured a payment deficiency while its petition was pending.

12

then identified the changed fact:  Cubaexport had obtained an OFAC license specifically authorizing the December 2005 filing and fee payment.  *See id.* ("Petitioner has provided an OFAC license that specifically authorizes petitioner's December 14, 2005 combined § 8/9 filing and fee payment.").  So the Director drew the straightforward legal conclusion: "[T]he fee payment is effective as of December 14, 2005, and the combined § 8/9 filing is considered complete and acceptable as of that date." *Id.*[12]

Even so, Bacardi contends the Director acted arbitrarily and capriciously by failing to explain the delay in deciding the petition for review.  We disagree.  Much of the delay required no explanation:  The petition was stayed during the OFAC litigation.  And after the stay lifted, the Director considered Cubaexport's renewed arguments against cancellation, leaving at most a fraction of the total delay unaccounted for.  Regardless of the reasons for the delay, Bacardi did not timely challenge the decision's timing or the lack of explanation for the delay.[13]  So this argument is forfeited.  *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

---

[12] The Director did not explicitly cite the regulatory provision that permits an OFAC license to "authorize or validate any transaction effected prior to the issuance thereof" if it "specifically so provides."  31 C.F.R. § 515.502(a).  But the Director's reliance on that rationale is readily discernible from the Director's language, which tracked the regulatory text, explaining that Cubaexport's license "*specifically* authorizes" its December 2005 fee payment, rendering it "effective as of December 14, 2005."  J.A. 526 (emphasis added).

[13] Before the Director granted the petition for review, Bacardi *might* have challenged the delay itself.  *See, e.g.*, *Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021); *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).  And after the petition for review was granted, Bacardi *might* have challenged the agency's action based on prejudicial delay.  *See Solenex LLC v. Bernhardt*, 962 F.3d 520, 527–28 (D.C. Cir. 2020) ("[A] party challenging agency action must identify something more than mere delay—it must identify harmful consequences emanating from that delay that were not reasonably

Bacardi takes several more shots at the Director's decision.[14] None land. To the extent these objections dress Bacardi's statutory arguments in arbitrary-and-capricious clothing, we reject them for the same reasons we concluded the Director acted within statutory authority. And an agency need only address the "important aspect[s] of the problem" before it, not every item in the administrative record. *State Farm*, 463 U.S. at 43. The administrative record makes clear that only the missing OFAC license prevented Cubaexport's timely submission from satisfying the Lanham Act's fee requirement. It was not arbitrary or capricious to conclude that removing this sole barrier satisfied the statute.

*      *      *

---

taken into account by the agency."). Bacardi did neither. Nor has Bacardi pointed to anything that demanded the Director explain its procedural timeline prior to reaching a final action. *Cf. State Farm*, 463 U.S. at 43 (requiring an agency to "articulate a satisfactory explanation for its action").

[14] For example, Bacardi challenges the PTO's collection of the renewal fee *and* a late surcharge. The deficiency surcharge, however, is consistent with the PTO's alternative determination that Cubaexport timely cured a payment deficiency. Any overcharge is between Cubaexport and the PTO; it is not a basis for invalidating the renewal.

Bacardi also faults the Director for not reconciling the decision with how the PTO treated the fee payment in the meantime. But the PTO's interim handling of the payment is irrelevant to the payment's legal status after OFAC issued the license authorizing the December 2005 payment. *Cf. Vandenbark v. Owens-Ill. Glass Co.*, 311 U.S. 538, 542–43 (1941) (noting that changes in law may "cause the reversal of judgments which were correct when entered"); *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78 (1943) ("[T]he Commission was required to act under the law as it existed when its order . . . was entered. . . . Otherwise the administrative body would issue orders contrary to the existing legislation."); *Thorpe v. Hous. Auth.*, 393 U.S. 268, 281–82 (1969) (extending the general rule that "an appellate court must apply the law in effect at the time it renders its decision" to changes "made by an administrative agency acting pursuant to legislative authorization"). The changed legal status of the 2005 payment is not evidence contrary to the Director's decision. So the Director had no obligation to address it. *See State Farm*, 463 U.S. at 43.

14

The OFAC license cleared the fog, removing the legal obstacle that had prevented the 2005 transfer from counting as payment.  What looked incomplete in 2006 was, by 2016, timely and effective.  The Director recognized as much, and so did the district court.  The judgment is

*AFFIRMED.*